UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x:
MICHAEL BERGAMASCHI; and     :
FREDERICK ROBERSON; on behalf of   :
themselves and all others similarly situated,  :
                :   **CLASS ACTION COMPLAINT**
      Plaintiffs,     :
                :
     v.        :   ____-CV-_____
                :
ANDREW M. CUOMO, Governor of New :
York State, in his official capacity; and TINA :
M. STANFORD, Chairperson of the New York :
State Board of Parole, in her official capacity; :
                :
      Defendants.    :
------------------------------------------------------------ x

## PRELIMINARY STATEMENT

1.   This class-action, civil-rights case challenges New York State's jailing of thousands of people accused of violating their parole conditions without giving them any opportunity to be considered for release during the months it takes to adjudicate their parole violation charges. This unconstitutional mandatory jailing takes on particular urgency as COVID-19 spreads uncontrollably in New York City's jails, posing a grave threat to those in detention. With state officials having suspended much of the normal process of adjudicating parole violations, more than a thousand people merely alleged to have violated parole are trapped in New York City jails with no clear avenue of escape from COVID-19.

2.   For people accused of violating parole, re-incarceration begins long before their cases are heard. The state's Board of Parole mandates jail for everyone accused of violating parole until a final revocation hearing where the Board determines if the violations occurred. Because the Board does not evaluate anyone for release, the Board indiscriminately detains everyone,

forcing them all to languish in jail.  Even when parole hearings were regularly taking place, people accused of violating their parole conditions would often sit in jail for months at a time, in some cases for an average of over 150 days, because the Board allows no opportunity for those waiting for their final hearings to be released.

3.     The injustice of the mandatory jailing of people accused of parole violations is compounded by the near collapse of the parole revocation system following the onset of the coronavirus pandemic.  The Board is obligated to provide people a preliminary probable cause hearing and a final revocation hearing to contest the accusations against them.  But the overwhelming majority of hearings have been suspended, with scant information available about when they will be reinstated, leaving people confined in limbo in New York City jails—currently the most dangerous place in the world for contracting COVID-19.  Because almost a quarter of parole warrants are dismissed at preliminary hearings, people who would likely be released if the preliminary hearings took place remain confined indefinitely in jail.

4.     New York re-incarcerates more people on parole for mere rule violations, called technical violations, than every other state in the country except one.  On any given day in March 2020, an average of 738 people in New York City were detained in jail simply because they were accused of a technical parole violation like a missed curfew or failing to report changing jobs.

5.     Almost half of the people on parole in this state live in New York City.  Among the New York City population, Black and Latinx people are disproportionately detained on alleged parole violations.  As of February 2020, Black and Latinx individuals on parole comprised 91% of those detained for technical violations and 97% of those detained for a parole violation from a misdemeanor arrest in New York City's jails.

6.      The Board needlessly detains people, primarily people of color, who pose no risk if released pending their final hearing.  Many languish in jail for months only to be found not guilty of their accused parole violations.  Others languish in jail only to be released even if they are found guilty.  Thirty-eight percent of people on parole detained due to a technical violation and 40% of people on parole whose alleged violations were based on a new arrest were ultimately released back to the community at the final revocation hearing.

7.      People who go to jail lose the precious freedom they had only recently earned. Months in jail can derail the lives people have built after they come out of prison.  Incarceration can cause people to lose their jobs, their homes, and even the custody of their children.  People who are incarcerated face the humiliations, stresses, and traumas of being locked up in jail. Families depending on the income of the person who is incarcerated are left scrambling to pay their bills.

8.      Now, the harms they face include the risk of contracting the COVID-19 virus. According to data released by the New York City Board of Correction as of April 3, 2020 – the day this case was filed – 239 people incarcerated on Rikers Island have COVID-19.  More than 2,000 people are housed in quarantine units for people potentially exposed but who do not have symptoms, amounting to nearly 50% of the total jail population.  In addition, 273 Department of Correction and Correctional Health Service staff members have tested positive.  These numbers are growing rapidly every day.

9.      At current rates of infection, the virus's "attack rate" in New York jails – that is, the rate at which the population is being infected – is 64 times higher than the average in the United States of America and seven times higher than New York City.

10.     The Defendants have violated and continue to violate the plaintiffs' rights under the Fourteenth Amendment of the United States Constitution and the due process clause of New York State Constitution.  Plaintiffs seek declaratory and injunctive relief to end the defendants' mandatory detention of people accused of parole violations pending their final hearing, a scheme that needlessly confines over a thousand people in New York City jails at great risk to their health and safety.

## PARTIES

### The Named Plaintiffs

11.     Michael Bergamaschi is a forty-year-old white resident of New York City who is jailed at Rikers Island on a parole warrant.  He is accused of technical parole violations.  He has been in jail at Rikers Island since March 11, 2020.

12.     Frederick Roberson is a fifty-eight-year-old Black resident of New York City who is jailed at Rikers Island on a parole warrant.  He is accused of technical parole violations.  He has been in jail at Rikers Island since March 12, 2020.

### The Defendants

13.     Defendant Andrew M. Cuomo is Governor of New York State.  Under Article 2-B of the N.Y. Executive Law, Governor Cuomo has authority to declare a state disaster emergency by executive order and, subject to the state and federal Constitutions, temporarily suspend laws during the emergency if compliance with the laws would impede action necessary to cope with the disaster or if suspension of the laws is necessary to cope with the disaster.  Governor Cuomo is a State actor who acts under color of law within the meaning of 42 U.S.C. § 1983, and he is sued in his official capacity.

14.     Defendant Tina M. Stanford is the Chairperson of the New York State Board of Parole, which is part of the New York State Department of Corrections and Community Supervision (DOCCS).   While part of DOCCS, the Board has independent decision-making authority, and it is responsible for setting the conditions of parole, determining when parole violations occur, and determining the appropriate response to violations of parole, under New York Executive Law §§ 259-i(3)(f), -(3)(x), 259-c(2), and -c(6).   The Board also has independent rulemaking authority to issue rules governing its work, including the parole revocation process and the retaking and detention of individuals accused of violating parole, under New York Executive Law §§ 259-c(11) and 259-i.   As Chairperson, Ms. Stanford is responsible for issuing the Board's rules that govern its work and for the administrative functions and daily operations of the Board and its staff.   Chairperson Stanford is a State actor who acts under color of law within the meaning of 42 U.S.C. § 1983, and she is sued in her official capacity.

## FACTS

*Parole: A Chance to be Free, with Conditions*

15.     The federal government and states throughout the country have laws that allow for people to be released early from prison.   In New York, people may be released on "parole" from an indeterminate sentence (for example, a two- to five-year sentence), based on the Board's discretionary decision to release a person early.   When using that discretion, the Board may release people onto parole only if "release is not incompatible with the welfare of society."   People may also be released from prison on "conditional release" from an indeterminate sentence for earned good time credit, or from a determinate sentence (for example, a two-year sentence) for a required

period of post-release supervision.  Unlike parole, conditional release is automatic and does not require the Board's discretionary decision to release.

16.     Conditional release and parole are both commonly referred to as "parole," including throughout this Complaint, given that under both, people are released under conditions of release set by the Board, supervised by parole officers, and face the Board's parole revocation process for any alleged violations.  According to DOCCS, as of March 1, 2020, it supervised 33,981 people under parole.

17.     As the United States Supreme Court has recognized, the purpose of parole is "to help people reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed."  Parole gives people the opportunity to be free from prison, return home to their families and communities, and to work or pursue education.  Unlike the average individual who has unconditional liberty, people on parole have conditional liberty dependent on their observance of special parole restrictions.

18.     New York's Board of Parole requires that people on parole follow a set of universal parole conditions.  These conditions include reporting to their parole officer, staying away from other people with criminal convictions, not using or having drugs without appropriate medical authorization, and immediately telling their parole officers about changes in home address, employment, or program status.  The Board also requires that people follow special parole conditions that are specific to each individual, like abiding by a curfew, obtaining and maintaining employment, supporting dependent children, and participating in counseling or treatment programs.

19.     A parole officer who has "reasonable cause" to believe the person they are supervising has "lapsed into criminal ways or company" or violated a condition of parole "in an

important respect" must report this up the chain of command, typically to the supervising parole officer. If the supervising parole officer agrees that reasonable cause exists, the officer may then issue a parole warrant that authorizes the arrest and "temporary detention" of a person accused of new criminal behavior, "absconding" from supervision, or technical (rule) violations. Technical parole violations are based on violations of the parole rules, like breaking curfew, as opposed to new criminal arrests. A parole officer may execute the parole warrant by arresting the person on parole and detaining the person in a jail in the county where the arrest took place or by issuing a warrant if the person on parole has stopped reporting and their whereabouts are unknown.

20.     Before their parole can be revoked, people on parole are entitled to challenge the truth of any allegation that they violated conditions of their parole. To protect the Constitutional rights and valuable freedom of people on parole, the U.S. Supreme Court has required a preliminary probable cause hearing and a final revocation hearing.

*Jailed in Limbo: Parole Hearings Are Suspended*

21.     Individuals in jail in New York on a parole warrant are entitled to a preliminary probable cause hearing and a final revocation hearing. At the preliminary hearing, a preliminary hearing officer, an employee of DOCCS, determines whether there is probable cause to believe that a person has violated a condition of release in an important respect. Those already convicted of the misdemeanor that causes the parole violation are not entitled to a preliminary hearing because the misdemeanor conviction establishes probable cause. Individuals on parole can choose to waive their preliminary hearing and go directly to the final revocation hearing. For those who choose to have a preliminary hearing, the hearing must take place within 15 days from their arrest and detention on the parole warrant, under the Executive Law.

22.     Parole cases only advance to any sort of hearing when the Parole Bureau, or field office, sends cases to the Parole Violations Unit ("PVU") to be prosecuted. There are often long delays in this process.

23.     Under the Executive Law, the final revocation hearing must be scheduled within 90 days from a finding of probable cause at the preliminary hearing or the waiver of the preliminary hearing.  At the final revocation hearing, an administrative law judge (ALJ), a DOCCS employee, determines whether the preponderance of the evidence demonstrates that the individual accused of violating parole has in fact "violated one or more of the conditions of release in an important respect."  If the ALJ finds the person not guilty of the violation charges, the ALJ must dismiss the charges, cancel the delinquency, and "restore" or release the person to parole supervision.  If, on the other hand, the ALJ finds the person guilty, the ALJ must revoke the person's release on parole and, based on the Board's guidelines, order re-incarceration, placement in a program as an alternative to re-incarceration, or release back to supervision.

24.     Before the final hearing, the preliminary probable cause hearing is the only opportunity for people on parole to have someone who was not involved in the decision to arrest them examine the facts of their alleged parole violation.  In New York City, almost a quarter of all parole warrants are dismissed at the preliminary hearing, resulting in a person's release from jail, after a hearing officer examines the facts of the alleged violations.  Without a preliminary hearing, these individuals would have remained in jail despite the serious flaws in the allegations against them.

25.     On March 7, 2020, Governor Cuomo issued an executive order declaring a state disaster emergency in response to documented cases of the spread of COVID-19 in New York. Further, due to the spread of COVID-19, on March 20, 2020 Governor Cuomo issued an executive

order suspending "any specific time limit for" any process or proceeding prescribed by any law until April 19, 2020.

26.     In the wake of the Governor's suspension of all time limits, hearings in the parole revocation process have been all but suspended.  While some hearings previously scheduled are now being placed back on a hearing calendar for telephonic hearings, at the time this Complaint was filed, DOCCS had not yet tested the telephonic hearing system.  It is not clear if or when that system will be functional to carry out hearings.  Moreover, only cases previously calendared for hearings have been slated for new hearings; the class members and their lawyers have been provided no information about whether and when the vast majority of hearings – preliminary and final – will take place.  As a result, the vast majority of people detained on a parole warrant in New York City jails are incarcerated for the foreseeable future without any way to contest the factual allegations against them or seek their release.

27.     In criminal court proceedings, courts in New York City have video conferencing available to conduct arraignments to ensure that people are not jailed in limbo without seeing a judge.  As of today, DOCCS still has not set up the capability to conduct video parole revocation hearings.  Nearly three weeks ago, on March 16, Legal Aid Society lawyers representing people accused of parole violations demanded that DOCCS set up a video conferencing system to allow hearings to continue while also protecting those incarcerated, Legal Aid lawyers, and DOCCS staff from becoming infected with COVID-19.

28.     In some cases, prosecutors in the PVU have worked with lawyers for alleged parole violators to offer "revoke and restore" plea bargains, in an effort to release more people in light of the COVID-19 crisis.  However, these offers have been made available in only a limited number of cases and are not available for the large number of people currently incarcerated at Rikers on a

parole warrant who have not either waived or not yet had a preliminary hearing, and thus whose information is not yet in the custody or control of the PVU.

29.     In an April 1, 2020 news conference, Governor Cuomo informed the public that, according to the state's projection, New York would reach the apex of the COVID-19 pandemic at the end of April.  Based on this projection, suspension of parole revocation hearings likely will be extended for weeks past April 19.

***The Board Indiscriminately Jails People Pending the Final Parole Revocation Hearing***

30.     New York's Executive Law requires that the Board issue regulations that specify the "reasonable and appropriate action" necessary for the Board to make a final determination on an alleged parole violation.  This "reasonable and appropriate action" is set forth in two Board regulations.  Under 9 N.Y.C.R.R. § 8005.7(5), if a preliminary hearing is held and probable cause is found, the preliminary hearing officer "shall direct that the alleged violator be held for further action pursuant to section 8004.3."  Under section 8004.3, when probable cause is established at the preliminary hearing, the person waives the hearing, or the person is convicted of a misdemeanor crime, a supervising officer may issue "a declaration of delinquency and, where the releasee is in custody, or . . . has absconded, order . . . a final revocation hearing."

31.     Combined, these mandatory detention regulations permit a final revocation hearing only if the person accused of violating parole is in custody or has absconded.  Under the Board's mandatory detention regulations, every person scheduled for a final revocation hearing must be detained pending their hearing without any evaluation of whether detention is necessary. Regardless of the alleged parole violation, the individual's likelihood of returning for the final hearing, or whether the individual poses no public safety risk, the Board treats everyone awaiting a final revocation hearing the same: locking them up in jail until their final hearing.

32.     There are only two ways under the Board's regulations that an individual can be released before the final revocation hearing: first, if an ALJ or three members of the Board decide to end revocation proceedings after the preliminary hearing by canceling the declaration of delinquency and vacating the warrant, and second, if the same people vacate the warrant and agree to cancel the declaration of delinquency contingent on a person successfully completing a treatment program.

### The Board's Mandatory Detention Regulations Needlessly Harm New Yorkers

33.     New York's parole system is oriented towards re-incarceration. Forty-one percent of new admissions to New York State prisons in 2017 were for parole violations. In 2018, 85% of people returned to prison for parole violations were returned for technical violations. New York sends more people back to prison for technical parole violations than every other state in the country except one. The Board typically imposes re-incarceration for parole violations, with three-quarters of violations resulting in a return to prison. The problem is acute in New York City. As of March 1, 2020, there were 33,981 individuals under parole supervision in New York State, 46% of whom lived in New York City.

34.     Because New York's Board of Parole mandates detention pending a final hearing for people accused of violating parole, the revolving door back to incarceration begins before any determination of wrongdoing is made. As of April 30, 2019, approximately 40% of individuals detained in New York City for parole violations were there for technical violations, and around 30% were charged with violations due to new arrests for misdemeanors and non-violent felonies. According to the Independent Commission on NYC Criminal Justice and Incarceration Reform 2019 report, approximately 900 people were held in City jails each day on parole violation warrants because they have been charged with new crimes. Though some people have been released from

11

New York City jails in light of COVID, as of April 3, 2020, 439 people remain on Rikers Island for technical parole violations.

35.     The rates of reincarceration for technical parole violations fall especially hard on Black and Latinx communities.  Of those detained for technical violations in New York City's jails on April 3, 2020, Black and Latinx individuals totaled 90% of the population.  In a 2018 op-ed advocating for reforms to New York's parole system, the District Attorneys for Manhattan and Brooklyn wrote that "[w]e need to treat parole like a focused resource targeted at helping people turn their lives around, not a recidivism trap."  In a follow-up 2020 op-ed, the District Attorneys for Manhattan, Brooklyn, and the Bronx decried the significant racial disparities in a parole process that "functions as a revolving door back to incarceration."

36.     In January 2020, New York implemented a new bail reform law that eliminated pretrial detention as an option for the vast majority of misdemeanor offenses.  But because of the Board's mandatory detention regulations, people are jailed for parole violations for misdemeanors for which they would otherwise be released pre-trial.  In fact, two-thirds of all people held in New York City jails for an alleged misdemeanor charge are on parole.  Of those on parole detained with new misdemeanor charges as of February 2020, 99% were people of color.

37.     The number of people incarcerated on parole violations is increasing, and the increase is largely due to technical violations.  For example, Columbia University Justice Lab reported that the New York City jail population dropped by 23% between 2014 and 2018, with decreases for nearly every subgroup, but the one exception is for people jailed for technical parole violations.  That number grew by 20% during this period.  Between January 2018 and March 2020, the jail population decreased by 40%, while the number of people held on technical parole violations grew by 9%.

38.     The Governor announced more than a week ago the intention to release of up to 600 people held on technical parole violations because of the COVID-19 pandemic, but to date only a little over 100 people have been released.  The release process is a black box: there is no transparency around the process or criteria, and no one has had an opportunity to be heard about their release.  439 people remain incarcerated in New York City jails solely for technical parole violations.  Over a thousand people remain in New York City jails for alleged parole violations. Despite the Governor's recent emergency release, the prior trends will resume unabated after the pandemic.

39.     Under the Board's regulations, people accused of violating parole can languish in jail for 15 days before anyone is required to establish probable cause at the preliminary hearing, then for an additional 90 days before the final revocation hearing.  Yet as recently as March 20, 2020, 19% of people being held on a technical parole violation in New York City jails had been in custody for more than 90 days, 38 of whom had been in custody for six months or more.  For those on parole charged with misdemeanors in New York City, the average time in jail pending the final hearing, prior to their suspension, has been 100 days (compared with 12 days for pretrial detainees in the criminal system); for those charged with felonies, the average time has been 169 days (compared with 36 days in the criminal system), according to the Mayor's Office of Criminal Justice's (MOCJ's) 2018 Report.  Under New York's January 1, 2020 bail law, individuals who are arrested for misdemeanors and non-violent felonies generally should be released pending trial, but if they are on parole at the time of the arrest, they are detained for a hundred or more days as they await their final hearing.

40.     By not considering people for release pending their final hearing, the Board needlessly detains people who pose no risk if released.  The Board needlessly detains people even

after it has offered them a plea deal, like a drug treatment program, that does not involve incarceration.  The Board detains large numbers of people who are ultimately released after their final revocation hearing, resulting in a needless waste of months of their lives behind bars and the destruction of people's newly rebuilt lives.  According to MOCJ's report, after languishing in jail for an average of fifty-seven days even prior to the COVID-19 emergency, 38% of people accused of technical violations are released at their final revocation hearing because they were found not guilty or because the Board determined that a return to prison was not the appropriate response.  For those detained based on new arrests, 40% were later released from jail because they were found not to have committed a parole violation.

41.     People who go to jail lose the precious freedom they had only recently earned.  Their agency is taken from them: where they can move, what they can read, or even what they can eat at any moment.  They are even monitored as they sleep and use the bathroom.  The jailing of people who are waiting for their final hearing, especially for months at a time, has a destructive impact on people on parole and their families.  Even a few weeks in jail can cause people to lose their jobs, their homes, and even custody of their children.  Individuals living in homeless shelters immediately lose their spot in the shelter to someone else in need of temporary housing.  Families that depend on incarcerated breadwinners for child or elder care are put in precarious financial positions.   And the toll of parents being separated from their children can lead to their children suffering lasting psychological consequences.

42.     The COVID-19 pandemic significantly increases the harms that individuals on parole may suffer in jail while awaiting their final hearing.  Incarcerated individuals are confined in congregate spaces and are forced to interact often with correction staff or others to get food and other essential services, making it impossible to engage in the social distancing recommended by

health officials.  Now that COVID-19 has entered the New York City jails, it is starting to spread like wildfire.  The Rikers rate of infection is seven times as high as the infection rate in New York City, which remains the global epicenter of the virus.  At current rates of infection, the virus's "attack rate" in New York jails – that is, the rate at which the population is being infected – is 64 times higher than the average in the United States of America and seven times higher than any other place on the planet at any point in this pandemic's existence.  The rate of COVID-19 infection on Rikers Island per 1000 people has increased exponentially since March 18, 2020.  Rikers Island's rate of COVID-19 infection on April 3, 2020 was 284 times higher than it was on March 18, 2020: a 28,400% increase in infection rate.  The virus has the potential to infect most of the incarcerated population, including those simply accused of violating conditions of parole.  Those aged 50 and above, those with underlying medical issues, and those who are pregnant face a higher risk of severe illness or death if they contract the COVID-19 virus.  As of April 3, 2020, 21% of people being held on technical parole violations (92 people) were 50 years of age or older.

43.     For those with underlying medical conditions, the conditions in New York City jails are particularly dangerous.   One man with severe asthma, high blood pressure, immunocompromised HIV-positive status, and a severe heart condition described his situation as "facing death every day."  He is unable to access his required heart medication reliably; even his asthma inhaler must be brought to him by a CO at times convenient to the staff, defeating the purpose of having an inhaler, which he needs at all times in case of an asthma attack.  Despite having multiple underlying conditions, he has not been given a protective face mask though the staff has told everyone to wear masks, and he has had to make his own.

44.     At present, at least 239 incarcerated people on Rikers Island are confirmed to be carrying the virus; 273 staff members have tested positive. The number of infected people already

exceeds the capacity to isolate patients in Rikers' Communicable Disease Unit.  Based on concerns over the impact that COVID-19 will have on the New York City incarcerated population, the New York City Board of Correction, the watchdog organization monitoring the city's jails, called for the release of people detained for parole violations, among other groups.

### A Better Way: Evaluating People for Release Pending the Final Revocation Hearing

45.    In 2018, Governor Andrew M. Cuomo remarked that "New York jails and prisons should not be filled with people who may have violated the conditions of their parole, but present no danger to our communities."  But the Board's mandatory detention regulations remains unchanged, and, as a result, New York's jails continue to be filled with people accused of violating parole who pose no risk to the community.

46.    Other jurisdictions have adopted systems that are less likely to deprive people accused of violating parole of their liberty arbitrarily or for long periods of time prior to a hearing on the merits.  The federal government and twenty states evaluate people for release pending their final revocation hearings.

47.    In the federal system, for example, a magistrate judge may release people on supervised release at their initial appearance, before the preliminary hearing.  States like New Jersey, Connecticut, Pennsylvania, Maryland, California, Vermont, Maine, Massachusetts, Alaska, Wisconsin, Florida, Georgia, Virginia, Washington, Wyoming, and North Dakota all allow their respective parole boards or designated officials to hold hearings to evaluate individuals for release pending the final hearing based on factors like flight risk.  In nearly all these states, this evaluation takes place during the preliminary hearing if probable cause is established.  States like Iowa, Louisiana, South Carolina, and West Virginia allow their courts or parole boards to evaluate individuals for release on bail or bond pending the final hearing.

## INDIVIDUAL PLAINTIFF ALLEGATIONS

### Plaintiff Michael Bergamaschi

48.     Early in the morning of March 11, 2020, Michael Bergamaschi was startled awake by officers who came to arrest him at his wife's home.  Mr. Bergamaschi was home with his wife and nine-year-old son.  As officers arrested him, his wife tried to comfort his son who was crying hysterically.

49.     Mr. Bergamaschi is a 40-year-old man with a wife and one child, his son.  Mr. Bergamaschi has a history of drug abuse, and he is now dedicated to avoiding relapse.  He is on parole because he was convicted of burglary in the third degree.  He served two years in prison for that conviction.  He was released from prison in late February to serve approximately one year on parole.

50.     Mr. Bergamaschi is in jail at Rikers Island because his parole officer charged him with five technical parole violations: failing to make an office report with his parole officer; failing to notify his parole officer that he changed his address from the shelter he was assigned to; failure to be at the shelter during his curfew hours; failure to go to an intake appointment for a drug treatment program; and failure to comply with a parole condition that he stay away from his wife and his son unless his parole officer gives him permission to see them.

51.     When he was released from prison, his parole officer assigned him to live in a transitional homeless shelter in Brooklyn.  The shelter he was assigned to had rooms that housed up to 25 people per room, with beds about 5 feet apart from each other.  He slept next to people smoking crack cocaine, marijuana, K2, and other drugs at night.  One night, he saw his neighbor sleeping with a needle in his arm.  Seeing so much drug use is difficult for someone fighting his own addiction.  His parole officer told him needed to just "be strong."

52.     Neither Mr. Bergamaschi nor his wife understands why the Board required that as a condition of his parole he can't see his wife and son without his parole officer's permission.  In 2013, his wife obtained an order of protection against him at a time when he was spiraling deep into his drug addiction problems.  His son has never had an order of protection against him.  After Mr. Bergamaschi was imprisoned for burglary, his wife and his son would regularly come to visit him.  Towards the end of his prison sentence, the Board even noted his close family ties when they released him on parole.

53.     At Rikers, Mr. Bergamaschi is in a housing unit that is under quarantine.  No one in the housing unit is allowed to leave.  Correction officers wearing surgical masks pulled out some people living in the unit with him, and he is not sure why.  A few days ago, everyone in his unit was woken up at around 3:30 in the morning and told to wear surgical masks.

54.     Because he is subject to the Board's mandatory detention, Mr. Bergamaschi does not have the opportunity for a hearing to explain why he should be released while he waits for his final parole revocation hearing.

55.     In fact, Mr. Bergamaschi has not even had his preliminary probable cause hearing. It was scheduled to take place on March 24 then it was postponed to April 1, but it never happened. No one has explained to him why the hearing didn't happen or if it will be rescheduled.  He has no idea if he will ever have a hearing on his alleged parole violations.  Mr. Bergamaschi desperately wants to get out of jail and return back to his family.  His son has been shaken up ever since he saw his father arrested.  His wife is heartbroken.  All the hope that she had of her family reuniting and moving past their problems went away when her husband was taken from her and sent to jail.  She can't sleep at night because of recurring nightmares that he has died in jail from COVID-19.

**Plaintiff Frederick Roberson**

56.     Asleep at home, Frederick Roberson was woken up early on March 12, 2020 by officers at his door.  His wife, a special education teacher, had already gone to work that morning.  He was arrested, taken from his home, and brought to jail at Rikers Island, where he remains to this day.

57.     Mr. Roberson is 58-years-old and lives with his wife, three of his five children, and his granddaughter.  He was involved in a car accident a few years ago that severely injured his spine.  He now suffers from spinal stenosis, a narrowing of the disks in his spine that causes pressure on his spinal nerves.  Since the accident, he has been unable to work because he is disabled.  At home, he helps his family with the day-to-day chores.  His ten-year-old granddaughter and fifteen-year-old son rely on him for help with their homework.  He has not seen his granddaughter or his children since he was arrested for allegedly violating parole.

58.     Mr. Roberson is in jail at Rikers Island because his parole officer charged him with technical violations of parole: missing a curfew, failing to report to his parole officer, not completing his drug treatment program, failing to notify his parole officer of a change in his treatment program status, and alleged drug use.  He had been attending his drug treatment program until he was rushed to Elmhurst Hospital in an ambulance because of an inflammation of his pancreas, a symptom of his chronic pancreatitis.  Though he's been labeled as an "absconder," he was arrested at his family home, the same address at which he's assigned to live and that his parole officer has on file.

59.     Mr. Roberson is on parole because he was convicted of burglary in the third degree for stealing plates and cups from someone's china cabinet.  He served more than five years in prison for that conviction, until April of last year.  Mr. Roberson has struggled to fight a drug

addiction.  His path to recovery has been riddled with relapse and crimes directly related to his drug abuse disorder, including the burglary conviction.

60.     Based on his age and his underlying medical issues, Mr. Roberson is in the "highest risk group" for suffering serious complications from COVID-19, according to Dr. Rachel Bedard. Dr. Bedard is a Rikers Island geriatrician who has written a letter on Mr. Roberson's behalf requesting that courts reconsider the necessity of his detention during the COVID-19 emergency. Despite Dr. Bedard's letter, Mr. Roberson has remained in jail for over three weeks now.

61.     Because he is subject to the Board's mandatory detention, Mr. Roberson does not have the opportunity for a hearing to explain why he should be released while he waits for his final parole revocation hearing.  He waived his preliminary hearing, and he has no idea when he will have the final hearing.

62.     At Rikers, Mr. Roberson walks around with a towel covering his face to protect him from COVID-19.  He uses socks that his wife sent him to cover the phone receivers he holds when he talks to his family.  This week, the unit he is staying in was placed under quarantine, meaning he is not allowed to leave the unit except for one hour of recreation.  He can't go to the law library or to religious services.  All programming has stopped, so he can't continue with substances abuse counseling.

63.     Since he was jailed at Rikers, his legs have become swollen.  Because of the unhealthy food in the jail, his blood sugar has risen.  Doctors at the jail prescribed him medication to address his worsening diabetes.  Doctors also prescribed him medication for hypertension.

64.     Though his medical condition is worsening, the hardest part about being in jail for Mr. Roberson is that he is unable to be with his family and he has no idea when he can get out of jail to see them.  Due to the COVID-19 pandemic, family visits are prohibited at all New York

City jails.  He is just as worried about his family's health as he is about his own.  His wife is 61-years-old and has high blood pressure.  His daughter has a history of bronchitis, his son and his granddaughter both have chronic asthma, and they all use a machine two to three times a day to help them breath.  He is scared he may never see them again.

## CLASS ACTION ALLEGATIONS

65.     The named plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all people on parole in New York City who are or will be detained pending their final hearing on a parole warrant pursuant to 9 N.Y.C.R.R. § 8005.7(5) and § 8004.3.  All four requirements of Rule 23(a) are satisfied:

a.      *Numerosity*: Joinder of all class members is impracticable because of the size of the class.  On any given day in 2019, an average of 768 people in New York City were detained in jail because they were accused of a technical parole violation.  Hundreds more were detained in New York City because they were accused of violating parole due to a new criminal arrest.  As of today, over a thousand individuals are detained in New York City jails because they were accused of violating parole.

b.      *Commonality*: There are questions of law and fact common to all members of the class, including, but not limited to: whether the defendants' mandatory detention of individuals accused of violating parole pending their final revocation hearing results in a violation of the class members' due process rights.

c.      *Typicality*: The claims of the named plaintiffs are typical of those of the class.  The named plaintiffs, like all class members, have been subjected to the defendants' mandatory detention regulations, actions or inaction, have been injured by this, and require similar relief.

d.      *Adequacy of Representation*: The named plaintiffs and class counsel will fairly and adequately represent the interests of the class.  The named plaintiffs have suffered injury and are committed to obtaining declaratory and injunctive relief that will benefit the entire class by ending mandatory detention pending the final parole revocation hearing.  Their interests are not antagonistic to those of other class members.  Class counsel have many years of combined experience in complex civil litigation, civil rights, and class action litigation.

66.      Class-wide declaratory and injunctive relief are appropriate under Rule 23(b)(2) because the Defendant has acted or refused to act on grounds applicable to the class as a whole.

## JURISDICTION AND VENUE

67.      This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

68.      This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201 and 2202.  This Court may also grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.  This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

69.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).  A substantial part of the events described in this complaint occurred in the Southern District of New York.

## CLAIMS FOR RELIEF

### First Cause of Action

70.      The named plaintiffs, on behalf of themselves and all others similarly situated, incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

71.     Defendants' mandatory detention regulations, actions, or inactions have violated and continue to violate the named plaintiffs and putative class members' due process rights under the Fourteenth Amendment of the United States Constitution.

## Second Cause of Action

72.     The named plaintiffs, on behalf of themselves and all others similarly situated, incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

73.     Defendants' mandatory detention regulations, actions, or inactions have violated and continue to violate the named plaintiffs and putative class members' due process rights under the New York State Constitution, Article I, Section 6.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that the Court:

a.  Assume jurisdiction over this matter;

b.  Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

c.  Declare that Defendants' mandatory detention regulations, acts, or omissions violated the named plaintiffs and class members' due process rights under the Fourteenth Amendment of the United States Constitution and Article I, Section 6 of the New York State Constitution;

d.  Permanently enjoin the defendants from enforcing its mandatory detention regulations in violation of the federal and state Constitutions, and

   a.  order the defendants to conduct hearings evaluating each person's suitability for release pending their final revocation hearings where each person on parole has the opportunity to be heard and present evidence.

e.   Award the plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

f.   Grant any other relief the Court deems just and proper.

Dated: April 3, 2020
     New York, New York

                                          Respectfully submitted,

                                          *s/ Philip Desgranges*
                                          Philip Desgranges
                                          Grace Y. Li*
                                          Molly Biklen
                                          Christopher T. Dunn
                                          NEW YORK CIVIL LIBERTIES
                                              UNION FOUNDATION
                                          125 Broad Street, 19th Floor
                                          New York, New York 10004
                                          (212) 607-3300
                                          pdesgranges@nyclu.org
                                          gli@nyclu.org
                                          mbiklen@nyclu.org
                                          cdunn@nyclu.org

                                          Corey Stoughton
                                          The Legal Aid Society
                                          199 Water Street
                                          New York, NY 10038
                                          212-577-3367
                                          cstoughton@legal-aid.org

                                          *Attorneys for Plaintiffs*

*Application for admission to the New York bar pending