UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
MICHAEL BERGAMASCHI, *et al.*, on behalf of
themselves and all others similarly situated,

     Plaintiffs,

   - against -

ANDREW M. CUOMO, Governor of New York
State, in his official capacity, *et al.*,

     Defendants.
------------------------------------------------------------

        1:20-cv-2817 (CM)

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY  10005

*Attorney for Defendants*

Andrew Amer
 Special Litigation Counsel
Amanda Yoon
 Assistant Attorney General
  *of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ..................................................................................................5

    A.   The Parole Revocation Procedures ...............................................................5

    B.   The Status of Parole Violator Hearings in the Wake of the Pandemic ........................7

    C.   The Status of Technical Violator Reviews Pursuant to the Governor's Directive............9

    D.   State Habeas Filings in the Wake of the Pandemic..............................................10

    E.   Plaintiffs' Complaint ..................................................................................12

STANDARD OF REVIEW ................................................................................................13

ARGUMENT ................................................................................................................14

    I.    PLAINTIFFS FAIL TO DEMONSTRATE A CLEAR OR
           SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS .............................14

    II.   PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM
           BECAUSE THEY CAN SEEK RELEASE THROUGH A STATE
           HABEAS PETITION........................................................................................22

    III.  THE BALANCE OF EQUITIES TIPS DECIDEDLY IN FAVOR OF
           THE PUBLIC'S INTEREST IN HAVING THE PAROLE BOARD
           AND LEGISLATURE DETERMINE WHETHER PAROLEES
           SHOULD BE DETAINED PENDING THEIR REVOCATION
           HEARINGS....................................................................................................23

CONCLUSION...............................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Adelphia Supply USA,* No. 15 CV 5826, 2015 WL 10906060 (E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Labs. v. H&H Wholesale Servs., Inc.,* 670 Fed. Appx. 6 (2d Cir. 2016) ............................................................................ 13

*Argo v. United States,* 505 F.2d 1374 (2d Cir. 1974).................................................. 2, 5, 17

*Calhoun v. New York State Div. of Parole Officers,* 999 F.2d 647 (2d Cir. 1993) .............................. 16, 18

*Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir. 1985) .................................................... 23

*David v. Rodriguez,* No. 88 Civ. 2115, 1989 WL 105804 (S.D.N.Y. Sept. 5, 1989) ............................ 17

*eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006) ...................................................... 23

*Faheem-El v. Klincar,* 841 F.2d 712 (7th Cir. 1988) ..................................................... 18, 19

*Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112 (2d Cir. 2005) ............................................. 22

*Galante v. Warden, Metropolitan Correction Center,* 573 F.2d 707 (2d Cir. 1977).................... 2, 17, 18, 19

*Gidatex, S.r.L. v. Campeniello Imports, Ltd.,* 13 F. Supp. 2d 417 (S.D.N.Y. 1998) ............................... 23

*Lora v. Shanahan,* 804 F.3d 601 (2d Cir. 2015), *judgment vacated on other grounds,* 2018 WL 1143819 (U.S. Mar. 5, 2018) ............................................................ 20

*Matthews v. Eldridge,* 424 U.S. 319 (1976) .................................................................... 18

*Mempa v. Rhay,* 389 U.S. 128 (1967) .......................................................................... 15

*Mental Hygiene Legal Serv. v. Spitzer,* No. 07 cv 2935 (GEL), 2007 WL 4115936 (S.D.N.Y. Nov. 16, 2007) .................................................................... 20

*Morrissey v. Brewer,* 408 U.S. 471  (1972). ..................................................................... *passim*

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.,* 684 F.3d 286 (2d Cir. 2012) ................................. 14

*New York ex rel. Schneiderman v. Actavis PLC,* 787 F.3d 638 (2d Cir. 2015) ........................................ 14

*North American Soccer League, LLC v. United States Soccer Federation, Inc.,* 883 F.3d 32 (2d Cir. 2018) ...................................................................... 14

*Patton v. Dole,* 806 F.2d 24 (2d Cir. 1986) ................................................................... 13

*Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89 (1984).................................... 21

*People ex rel. Calloway v. Skinner*, 33 N.Y.2d 23 (1973) ........................................................... 21

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ...................................................................... 23

*Schall v. Martin*, 467 U.S. 253 (1984) ................................................................................. 21

*Singas Famous Pizza Brands Corp. v. New York Advertising LLC*, 468 F. App'x 43 (2d
    Cir. 2012) ........................................................................................................ 22

*Suce v. Taylor*, 572 F.Supp.2d 325 (S.D.N.Y. 2008) ...................................................... 16, 17

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995) ....................... 14

*Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964 (2d Cir. 1995) ................................. 23

*United States v. Sanchez*, 225 F.3d 172 (2d Cir. 2000) ........................................................ 16

*Weinberger v. Romer-Barcelo*, 456 U.S. 305 (1982) .......................................................... 22

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ......................................................... 23

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .................................. 23

## Statutes

8 U.S.C. § 1226(c) ................................................................................................... 20

Ark. Code Ann. § 16-93-705 .................................................................................... 7

Mo. Rev. Stat, § 217.720 ........................................................................................... 7

N.Y. CPLR Article 70 ......................................................................................... 10, 24

New York Exec. Law § 259-i(3) ............................................................................. 5, 6

## Treatises

Cohen, *Law of Probation & Parole* § 1:1 (2d ed.) ................................................... 7

## Regulations

9 N.Y.C.R.R. § 8003.2 ............................................................................................ 15

9 N.Y.C.R.R. § 8004 ................................................................................................ 5

9 N.Y.C.R.R. § 8005 ............................................................................................. 5, 6

Defendants Andrew M. Cuomo, Governor of New York State, and Tina M. Stanford, Chairperson of the New York State Board of Parole ("Parole Board"), sued here in their official capacities (collectively "Defendants"), respectfully submit this memorandum of law, along with the Declaration of Rhonda Tomlinson, dated April 10, 2020 ("Tomlinson Decl."), the Declaration of Anthony J. Annucci, dated April 10, 2020 ("Annucci Decl."), and the Declaration of Andrew Amer, dated April 10, 2020 ("Amer Decl"), and all attached exhibits, in opposition to the Motion for a Preliminary Injunction filed by Plaintiffs Michael Bergamaschi and Frederick Roberson (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

For decades, New York's parole revocation procedures have afforded parolees all the due process to which they are entitled under the Supreme Court's landmark decision in *Morrissey v. Brewer*, 408 U.S. 471 (1972). The Parole Board provides parolees with notice of any parole violations and two reasonably prompt hearings – a preliminary hearing to determine probable cause within 15 days of arrest and a final revocation hearing on the merits within 90 days. Along with a majority of states, New York detains parole violators pending their final revocation hearing if the parole warrant is not dismissed at the preliminary hearing stage.

Plaintiffs now claim these long-standing procedures are constitutionally infirm. They seek a wholesale revision of New York's parole revocation statute and regulations by judicial fiat to include a new bail assessment review by a neutral decision-maker on the suitability of releasing each parolee pending the final revocation hearing based on factors such as flight risk and danger to the community. While Plaintiffs insist they are not asking for a right to bail (*see* Plaintiffs' Memorandum of Law ("Plaintiffs' MOL"), ECF No. 19, at n.12), that is precisely what they seek based on the procedures they ask the Court to impose by way of a mandatory injunction. They want "an immediate evaluation"

on "their suitability for release" based on an assessment of their "likelihood of returning for the final hearing" and whether they "pose[] a public safety risk." *Id.* at 20, 24-25. Plaintiffs seek to mandate a bail review process as part of New York's parole revocation procedures.

Plaintiffs bring this action to challenge New York's laws and regulations mandating detention for parole violators pending their final revocation hearings. Plaintiffs assert that they are filing this case at this particular moment in time, more than 40 years after New York adopted its mandatory detention and dual hearing procedures in the wake of *Morrissey*, because of the exigencies created by the COVID-19 pandemic. But the pandemic does not alter the fact that there is no merit to the substantive arguments Plaintiffs raise in support of their due process challenge to mandatory detention. Their argument focuses on the traditional factors that are relevant to a procedural due process analysis – a balancing of their liberty interests against the government's interests in detaining parole violators. The conditions of their confinement are not relevant to that analysis.

Plaintiffs fail to satisfy the heightened standard for obtaining the extraordinary relief of a mandatory injunction. First, they have no clear or substantial likelihood of success on the merits because the Supreme Court has already declared what process is due to parolees in revocation proceedings and it does not include a release suitability review. In striking the appropriate balance between a parolee's liberty interests and the government's interests in detaining parole violators, the Supreme Court concluded that a probable cause determination "would be sufficient to warrant the parolee's *continued detention and return to the state correctional institution pending the final decision*." *Morrissey*, 408 U.S. at 487 (emphasis added). That closes the door on Plaintiffs' due process claim.

If the Court needs more to reject Plaintiffs' claim (which it should not), shortly after *Morrissey*, the Second Circuit held that a parole violator has no constitutional right to bail absent the most unusual circumstances. *Galante v. Warden, Metropolitan Correction Center*, 573 F.2d 707, 708 (2d Cir. 1977) (citing *Argo v. United States*, 505 F.2d 1374, 1377-78 (2d Cir. 1974)). Here, Plaintiffs' argue in direct

conflict with *Galante* that a bail-like release suitability review is required in *all circumstances*.  Plaintiffs'
MOL at 18-19 (urging an immediate release suitability review for everyone "accused of violating
parole").  And despite the prevalence of mandatory detention for parole violators among the states –
Plaintiffs identify only a minority of 20 states that do not have mandatory detention (*see* Complaint
("Compl"), ECF No. 1, ¶¶ 46-47) – Plaintiffs fail to cite a single decision holding that a parolee has a
due process right to a release suitability review pending a final revocation hearing.  That speaks
volumes.

Second, Plaintiffs will not suffer irreparable harm if there is no preliminary injunction pending
resolution of the case.  While there is no doubt that the COVID-19 pandemic may give rise to
exigencies and heightened health risks for certain parolees detained at Rikers Island and elsewhere,
such individuals are not without recourse to avoid harm during the pendency of this case in the
absence of a preliminary injunction.  They may seek release through a state habeas petition filed
pursuant to Article 70 of the New York Civil Practice Law and Rules ("CPLR").   Since New York
declared a state of emergency as a result of the pandemic, hundreds of inmates at Rikers Island and
other correctional facilities in New York, including Plaintiff Roberson and other parole violators
detained pending their final revocation hearings, have filed state habeas petitions, many of which have
been granted.[1]

Moreover, the temporary suspension of in-person preliminary and final revocation hearings at
Rikers Island due to the pandemic has now been addressed and successfully resolved.   The
Department of Corrections and Community Supervision ("DOCCS") has worked diligently with New
York City over the past few weeks to make the necessary infrastructure upgrades at Rikers Island to
provide audio conferencing capabilities that allow the Parole Board to conduct preliminary and final

---

[1]  The hearing on Plaintiff Roberson's habeas petition has been concluded and remains under
   consideration.

revocation hearings among all participants – parolees, witnesses, preliminary hearing officers, administrative law judges, and attorneys – by telephone. The audio conferencing system is now operational and the Parole Board is in the process of rescheduling hearings that were previously adjourned. Plaintiff Bergamaschi's preliminary hearing was rescheduled to this morning, April 10, 2020, and his warrant was lifted so he is being released.

Finally as to irreparable harm, at the direction of the Governor in response to the pandemic, the Parole Board has evaluated over 1400 parole violators statewide for immediate release pending final revocation hearings based on specific criteria designed to ensure the safety of the parolees and the public at large. Those evaluations are complete and more than half of the parolees have been released as a result of this pandemic-related discretionary review process.

Third, the balance of equities tips decidedly in favor of Defendants. The public interest is better served by having the Parole Board continue its decades-long implementation of legislative policy mandating detention of alleged parole violators pending final revocation hearings. Any consideration of relaxing the mandatory detention laws and regulations should be left to the New York Legislature and the Parole Board based on their consideration of the pros and cons of releasing alleged parole violators back into the community. Indeed, the Legislature is currently considering a bill to amend the parole revocation statute to provide for a hearing in a local criminal court within 24 hours of an arrest on a parole warrant to assess whether the parolee should be released on his own recognizance pending his final revocation hearing – essentially the same type of release suitability review Plaintiffs ask this Court to impose by way of mandatory injunction. In contrast, Plaintiffs fail to demonstrate how the public benefits by having this Court impose by judicial fiat a new review process involving an unidentified "neutral decision-maker," with its attendant costs paid from the public fisc.

For these reasons, Plaintiffs' application for a mandatory injunction should be denied in its entirety. New York's long-standing parole revocation procedures comply in all respects with the due

process requirements laid down in *Morrissey*. Plaintiffs have no constitutional entitlement to a release suitability review pending their final revocation hearings.

## STATEMENT OF FACTS

### A.  The Parole Revocation Procedures

Parole is an alternative method by which a prisoner may complete the sentence. Admission to parole status does not terminate a prisoner's sentence. *See Morrissey*, 408 U.S. at 477. "[T]he essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id.* These conditions restrict a parolee's activities substantially beyond the ordinary restrictions imposed by law on an individual citizen. *Id.* The parole officer plays an integral role in guiding the parolee into constructive development with the ability to enforce the conditions with the leverage to revoke the parole and return the parolee to prison. *Id.* Not every violation of parole conditions automatically leads to revocation. In New York, under DOCCS Directive 9050 titled "Community Supervision Revocation Process," several steps such as a case conference with a bureau chief and investigation of the possible violation must first be undertaken before the issuance of a parole warrant is considered for a technical violation, and such a warrant is then issued only by a Senior Parole Officer or higher, if the violations are believed to be "in an important respect." *See* Executive Law § 259-i(3)(a)(i); 9 N.Y.C.R.R. § 8004.2; Annucci Decl. at ¶ 9, Exh. 1.

New York Executive Law § 259-i(3) and 9 N.Y.C.R.R. §§ 8004 and 8005 set forth the procedures involved in parole revocation hearings. First, within three days of detention pursuant to the parole warrant, the parolee must be given notice of the charges and of his rights. N.Y. Exec. Law § 259–i(3)(c)(iii); 9 N.Y.C.R.R. § 8005.7. Within 15 days of the execution of the parole warrant, a preliminary hearing must be held before a hearing officer who has not had "any prior supervisory involvement over the alleged violator." N.Y. Exec. Law § 259-i(3)(c)(i). At the preliminary hearing,

a parole officer must establish probable cause that a violation of a parole condition in an important respect occurred. N.Y. Exec. Law § 259-i(3)(c)(i) & (iv). The parolee has the right to appear and to present witnesses and evidence on his own behalf, as well as the right to confront and cross-examine adverse witnesses. N.Y. Exec. Law §§ 259-i(3)(c)(iii) & (iv); 9 N.Y.C.R.R. § 8005.3(c). **After the preliminary hearing, the** hearing officer must issue a written decision stating the reasons for the determination and citing to the evidence upon which the determination was based. N.Y. Exec. Law §§ 259-i(3)(c)(iii). If a finding of probable cause is made at the preliminary hearing or the parolee waives his right to a preliminary hearing, a final revocation hearing must be scheduled within 90 days. N.Y. Exec. Law §§ 259-i(3)(f)(i). At the final revocation hearing, the parolee is entitled to a number of due process protections, including: (i) the right to compel witnesses to appear at the hearing and provide testimony; (ii) the right to subpoena and submit documentary evidence; (iii) the right of confrontation and cross examination; (iv) the right to submit mitigating evidence for the purpose of being restored to supervision; and (v) the right to representation of counsel. N.Y. Exec. Law § 259-i(3)(f)(iv) and (v). In the event the alleged violator is indigent and cannot afford counsel, an attorney will be assigned to afford representation. N.Y. Exec. Law § 259-i(3)(f)(v). If the hearing officer does not find that a violation of release in an important respect was committed, the charges are dismissed and the parolee is released back to the parole. N.Y. Exec. Law §§ 259-i(3)(f)(ix); 9 N.Y.C.C.R. § 8005.20(a)*; see generally*, Tomlinson Decl. at ¶¶ 2-3.

Since 1978, under N.Y. Exec. Law § 259-i(3), if the parole officer has probable cause to believe that the parolee has violated a condition of his parole, a warrant may be issued for his temporary detention, in accordance with the rules of the Parole Board. The statute expressly provides that the detention of any such person may be "further" regulated by rules and regulations of the Parole Board. N.Y. Exec. Law § 259-i(3)(a)(i). The Parole Board's regulations mandate the detention of the alleged violators once there is probable cause to find that the alleged violator has violated one or more of the

conditions of parole *in an important respect*.  9 N.Y.C.R.R. § 8005.7(a)(5) ("If the preliminary hearing officer finds that there is probable cause to believe that the alleged violator has violated one or more of the conditions of parole *in an important respect*, he *shall* direct that the alleged violator be held for further action pursuant to section 8004.3 of this Title.") (emphasis added).

New York's mandatory detention policy is not unique or unusual.  In a majority of states, alleged parole violators who are taken into custody by the police or corrections officers on a parole warrant are detained pending their final revocation proceedings.  Cohen, *Law of Probation & Parole* § 1:1 (2d ed.) (available on Westlaw at LAWPROBPAR § 18:5); *see e.g.,* Mo. Rev. Stat, § 217.720 (West 2018); Ark. Code Ann. § 16-93-705 (West 2020); *see also* Compl. ¶ 47 (listing only 20 states that do not have mandatory detention for parole violators pending the final revocation hearing).

### B.  The Status of Parole Violator Hearings in the Wake of the Pandemic

Hearings for parole violators in New York City are normally held in-person at the Donald Cranston Judicial Center on Rikers Island (the "Judicial Center").  Tomlinson Decl. at ¶ 4.  That facility is owned by the City of New York and operated by the New York City Department of Corrections ("NYC DOC").  *Id.*  On March 10, 2020, in response to the recommendations from the Center for Disease Control and the World Health Organization regarding the risk of exposure to COVID-19, the Criminal Justice Bureau at NYC DOC implemented a number of restrictions regarding operation of the Judicial Center, which included ending all court hearings by 4:30pm, closing the Judicial Center promptly at 5pm, and eliminating all overtime for NYC DOC staff.  *Id* at ¶ 5.  Between March 11 and March 15, 2020, personnel from NYC DOC, the Bureau of Adjudication for the Parole Board ("Adjudication Bureau"), and The Legal Aid Society ("Legal Aid") discussed alternatives to in-person hearings for alleged parole violators, including the possibility of using Skype to conduct video conference hearings at the Judicial Center in the event the COVID-19 pandemic prevented in-person conferences.  *Id.* at ¶ 6.  Then on March 15, 2020, Legal Aid insisted that DOCCS and NYC DOC

suspend the next day's hearing calendar until the parties involved could discuss how to protect the rights of their clients to be present during parole violation hearings in light of "the tremendous health risk posed by the unabated spread of Coronavirus in NYC."  *Id.* at ¶ 7.

On March 16, 2020, Legal Aid notified personnel from DOCCS and NYC DOC via email that Legal Aid attorneys would not be attending final revocation hearings.  *Id.* at ¶ 8.  During the week of March 16, 2020, live preliminary hearings continued to take place with County 18-b attorneys at Rikers Island and arraignments took place at Rikers Island via video conference.  *Id.* at ¶ 9.  During that same week, DOCCS, NYC DOC and Legal Aid continued to explore technological options to utilize for hearings and ultimately chose WebEx, an audio-based conferencing system, which was acceptable to Legal Aid.  *Id.* at ¶¶ 11-12.

On or about March 23, 2020, all preliminary hearings stopped because the hearing rooms were too small to allow for social distancing, but arraignments continued to take place with 18-b counsel via video conference.  *Id.* at ¶ 13.  Between March 24, 2020 and April 9, 2020, written and oral plea agreements took place with Legal Aid and 18-b attorneys.  *Id.* at ¶ 15.  During this same time period, the infrastructure upgrades required in the Judicial Center and various other buildings at Rikers Island in order to use the WebEx system were handled by NYC DOC and overseen by Brian Charkowick, Executive Director of Infrastructure & Operations at NYC DOC.  *Id.* at ¶¶ 16.

On April 7, 2020, NYC DOC tested the WebEx system and it performed successfully.  *Id.* at ¶ 18.  As a result, the next day DOCCS staff began the process of rescheduling the backlog of preliminary and final revocation hearings using the WebEx system.  *Id.*  Preliminary hearings resumed for parolees housed at Rikers Island the morning of April 9, 2020 using the operational WebEx system.  *Id.* at ¶ 19.  On April 10, 2020, scheduling resumed for final revocation hearings to commence at Rikers Island on April 13, 2020.  *Id.* at ¶ 20.  All hearings at Rikers Island are proceeding, as they must, in accordance with the restrictions put in place by NYC DOC on March 10, 2020, which require all

hearings to conclude by 4:30pm and the Judicial Center to close promptly at 5pm, and preclude any NYC DOC staff from working overtime.  *Id.* at ¶ 19.   In addition to implementing the WebEx system to resume hearings by audio conference in response to pandemic, the Parole Board has agree to Legal Aid's request to depart from the Parole Board's usual practice and accept oral plea agreements that are confirmed in a signed approved form and sent to the Parole Board.  *Id.* at ¶ 23.

Plaintiff Bergamaschi's preliminary hearing originally scheduled for March 24, 2020 was rescheduled for the morning of April 10, 2020 and has now been completed.  *Id.* at ¶ 22.  The Preliminary Hearing Officer has ordered that his warrant be lifted, so he will be released.  *Id.*  Plaintiff Roberson waived his preliminary hearing (Compl. ¶ 61), and his final revocation hearing is scheduled for April 14, 2020 (Tomlinson Decl. at ¶ 21), well within the 90-day period required under New York's parole revocation procedures.

### C.  The Status of Technical Violator Reviews Pursuant to the Governor's Directive

In response to a directive from the Governor in the wake of the COVID-19 pandemic, DOCCS staff, in coordination with Parole Board staff, undertook a review of parolees detained statewide on a technical parole violation or absconding charge to ascertain their eligibility to have their parole violation warrants lifted.  Annucci Decl. at ¶ 4.  Taking into account the need to ensure the safety of its employees, parolees under its supervision, and the public at large, DOCCS staff, in coordination with Parole Board staff, developed eligibility criteria for a qualifying alleged parole violator to obtain a discretionary review to potentially have the violation warrant lifted.  Under the final criteria, the parolee: (i) must have a risk score of 3 or 4 using the Correctional Offender Management Profiling for Alternative Sanctions ("COMPAS")  clinical assessment tool; (ii) must not have been convicted of a sex offense; (iii) must not suffer from a significant mental illness, meaning the parolee has not been assigned an Office of Mental Health 1-S designation; (iv) must not have a history of domestic violence; (v) must not have engaged in misconduct  involving either weapons or

violent conduct as the basis for the violation; and (vi) must have an existing residence or have received placement in an approved housing facility. *Id.* at ¶ 5.

DOCCS staff, in conjunction with Parole Board staff, recently completed this discretionary release review process for all qualifying parole violators in custody on a parole warrant throughout the State. *Id.* at ¶ 6. Out of a total of 1534 qualifying cases (including approximately 600 parolees detained at Rikers Island or elsewhere in New York City), the Parole Board determined a total of 760 parolees met the eligibility requirements for discretionary release and had their warrants lifted. *Id.* Overall, approximately half of all parolees held on a technical violation or absconding charge had their warrants lifted and have been re-released to the community in conformity with the Governor's direction to DOCCS and the Parole Board as part of the State's comprehensive response to the COVID-19 pandemic. *Id.*

With respect to the Plaintiffs, DOCCS staff, in coordination with Parole Board staff, determined that neither was eligible for discretionary release under the criteria because Plaintiff Roberson has the required COMPAS score and Plaintiff Bergamaschi has a history of domestic violence and a related alleged parole violation. *Id.* at ¶ 7. Going forward, DOCCS staff, in coordination with Parole Board staff, will continue to review all new qualifying alleged parole violators in custody for discretionary release under these criteria until the exigent circumstances created by the pandemic no longer exist. *Id.* at ¶ 8.

### D. State Habeas Filings in the Wake of the Pandemic

In the wake of the COVID-19 pandemic, there has been a significant increase in the number of petitions being filed for a writ of habeas corpus in state court pursuant to Article 70 of the New York Civil Practice Law and Rules ("CPLR") by inmates housed at Rikers Island and New York State Correctional Facilities. Amer Decl. at ¶ 2. Within the last few weeks, over 60 separate state habeas petitions – many involving multiple petitioners - have been filed on behalf of scores of parolees

10

detained in Rikers Island on a parole warrant.  As a result of these habeas petitions, many slleged parole violators have been released from custody pending their final revocation hearings.  *Id.* at ¶ 3. In one of those state habeas petitions, Plaintiff Roberson, along with 99 other parole violators detained at Rikers Island, seeks release.  *Id.* at ¶ 4.  The hearing on that habeas petition began on April 8, 2020, in New York Supreme Court, County of Bronx, and has concluded.  *Id.*  To date, the court has issued orders granting relief to 40 petitioners, with the remaining petitioners' requests under consideration. *Id.*, Exh. A.  With respect to Plaintiff Roberson, the judge requested his medical records in order to rule on his request.  *Id.* at ¶ 4.

In another petition filed on behalf of 18 inmates at Rikers Island, including two alleged parole violators, the New York Supreme Court, County of Bronx, granted release to three of the petitioners based on a detailed, individualized assessment of each petitioner's criminal history, the nature of the pending charges, and the particular health risks posed to the petitioner by COVID-19.  *Id.* at ¶ 5, Exh. B at 7-8 (granting release of petitioner Anderson), 21-22 (granting release of petitioner Santos), 22-23 (granting release of petitioner Steed).  In reaching these determinations, the court first found that NYC DOC had undertaken "substantial efforts . . . to contain the spread of COVID-19 at Rikers Island."  *Id.*, Exh. B at 4.  After reviewing affidavits submitted by the NYC DOC Deputy Commissioner of Quality Assurance and Integrity and the NYC DOC Senior Correctional Institutional Administrator for Health Affairs describing the steps taken by NYC  DOC to address the COVID-19 risk at Rikers Island – including separating vulnerable inmates from the general population, isolating inmates testing positive for the virus, providing guidance to inmates on preventing the spread of the virus, monitoring at-risk individuals, evaluating inmates exhibiting flu-like symptoms, and implementing the containment and control guidelines issued by government health authorities such as daily cleaning and sanitizing of the facility and requiring staff to wear masks and gloves – the court rejected petitioners' contention that NYC DOC had exhibited a deliberate

indifference to the COVID-19 risk.  *Id.*, Exh. B at 4-5.  The court also noted that according to the testimony of the NYC DOC officials, roughly 20% of all inmates at Rikers Island were released between March 17 and April 1, 2020, leaving entire buildings on Rikers Island empty and providing "space for segregating individuals and allowing for greater social distancing."  *Id.*, Exh. B at 5.

### E.  Plaintiffs' Complaint

Although New York's parole revocation procedures, including mandatory detention of parolees pending a final revocation hearing, have been in place for decades, Plaintiffs chose to wait until now to bring this action challenging mandatory detention on due process grounds.  Plaintiffs' due process claim is a broad-based, sweeping attack on New York's statutory and regulatory procedures that mandate detaining alleged parole violators pending their final revocation hearings. And while the COVID-19 pandemic has everything to do with the timing of Plaintiffs' constitutional challenge, it is not relevant to the substance of their due process claim.  The due process argument Plaintiffs assert now they could have raised at any time over the past four decades.

Plaintiffs allege that under the Parole Board's regulations governing revocation hearings, upon a finding of probable cause at the preliminary hearing, when the parolee waives the preliminary hearing (as Plaintiff Roberson did, *see* Compl. ¶ 61), or where the parolee is convicted of a misdemeanor, the parolee must be detained pending his final revocation hearing.  *Id.* ¶ 30.  Plaintiffs assert that under these procedures, "every person scheduled for a final revocation hearing must be detained pending their hearing without any evaluation of whether detention is necessary, and more specifically without regard to the alleged parole violation, risk of flight, or public safety risk." *Id.* ¶ 31.  Plaintiffs allege that the mandatory detention of alleged parole violators pending their final revocation hearings "has a destructive impact on people on parole and their families," and that the COVID-19 pandemic "significantly increases the harms that individuals on parole may suffer in jail while awaiting their final hearing." *Id.* ¶¶ 41-42.

Plaintiffs assert there is "a better way" to handle parolee detention pending final revocation hearings, which is to adopt the procedures followed by the federal government and 20 states whereby parole boards "evaluate people for release pending their final revocation hearings." *Id.* ¶ 46. Implicit in this assertion is the acknowledgment that a majority of states have mandatory detention. Plaintiffs bring their claim on behalf of a purported class comprising "all people on parole in New York City who are or will be detained pending final hearing on a parole warrant pursuant to" New York's parole revocation procedures. *Id.* ¶ 65. Plaintiffs invoke this Court's jurisdiction pursuant to 42 U.S.C. § 1983 and assert only two claims under the Due Process Clauses of the federal and state constitutions. *Id.* ¶¶ 67, 70-73. They seek a mandatory injunction compelling the Parole Board to significantly augment the existing parole revocation procedures to include a new hearing to evaluate "each person's suitability for release pending their final revocation hearings where each person on parole has the opportunity to be heard and present evidence." *Id.* at 23. In their motion for a preliminary injunction, Plaintiffs provided further detail on this new release suitability review that is in form and substance a bail hearing. It must be conducted by a "neutral decision-maker," who must (i) consider factors such as whether the parolee is a flight risk or presents a public safety risk and (ii) support any denial of release by a reasoned decision in writing or on the record. Plaintiffs' MOL at 20, 24-25.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986). Because of the extraordinary nature of the relief involved, a plaintiff is required to "carry the burden of persuasion by a clear showing for each factor." *Abbott Labs. v. Adelphia Supply USA*, No. 15 CV 5826, 2015 WL 10906060, at *5 (E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Labs. v. H&H Wholesale Servs., Inc.*, 670 Fed. Appx. 6 (2d Cir. 2016). Generally, a plaintiff seeking a preliminary injunction must show: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships

decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."

*North American Soccer League, LLC v. United States Soccer Federation, Inc.,* 883 F.3d 32, 37 (2d Cir. 2018)

(citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

Where, as here, a plaintiff seeks a mandatory injunction - one that "alter[s] the status quo by

commanding some positive act" - a higher standard applies. *Tom Doherty Assocs., Inc. v. Saban Entm't,*

*Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). Plaintiffs seeking a mandatory injunction must show "a clear or

substantial likelihood of success on the merits." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684

F.3d 286, 294 (2d Cir. 2012); *see also North American Soccer*, 883 F.3d at 37. Plaintiffs acknowledge they

seek a mandatory injunction and must satisfy this heightened standard. *See* Plaintiffs' MOL at 10.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO DEMONSTRATE A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

The gravamen of Plaintiffs' case, and the basis for their requested injunction, is the claim that

the Parole Board's mandatory detention of parolees pending their final revocation hearings violates

due process. To cure this alleged due process violation, Plaintiffs demand a major revision of New

York's parole revocation procedures, requiring a neutral decision-maker to conduct a new and

immediate evaluation of the suitability of each parolee's release pending the final revocation hearing,

with any determination to continue detention supported by a reasoned decision in writing or on the

record. Plaintiffs' MOL at 24-25. Plaintiffs have no clear or substantial likelihood of success on the

merits of their due process claim because both the Supreme Court and the Second Circuit held decades

ago that a state parolee may be detained pending his final revocation hearing consistent with due

process provided the state affords the parolee, as New York does, notice of his parole violations and

preliminary and revocation hearings conducted within a reasonable period of time.

In the landmark decision of *Morrissey v. Brewer*, the Supreme Court held that where a state provides a system of parole, it may not revoke a person's parole without providing minimum due process protections. 408 U.S. at 487-89; *see also Calhoun v. New York State Div'n of Parole Officers*, 999 F.2d 647, 652 (2d Cir. 1993) (citing *Morrissey* due process requirements for revocation hearings). However, parolees in parole revocation proceedings are not entitled to "the full panoply of rights" that are accorded defendants in a criminal prosecution. *Morrissey*, 408 U.S. at 480 (*citing Mempa v. Rhay*, 389 U.S. 128 (1967)).

The Supreme Court began its analysis in *Morrissey* with a review of the purpose and function of parole. "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey*, 408 U.S. at 477. Parole is an established variation on imprisonment intended to help those convicted of crimes reintegrate into society as constructive members of society as soon as they are able, without being confined for the full term of the sentence imposed, while serving to alleviate the costs to society of keeping an individual in prison. *Id.* In order to achieve these objectives, parolees are subject to specified conditions for the duration of their parole terms, conditions that often substantially restrict a parolee's activities, but are essential to the reintegration process. *Id.*; 9 N.Y.C.R.R. § 8003.2 (listing New York's standard parole release conditions).

"The enforcement leverage that supports the parole conditions derives from the authority to return the parolee to prison to serve out the balance of his sentence if he fails to abide by the rules." *Morrissey*, 408 U.S. at 478–79. Parole therefore creates only a conditional liberty interest; revocation of parole deprives the parolee "only of the conditional liberty properly dependent on observance of special parole restrictions." *Id.* at 480. The reasoning that justifies releasing prisoners on parole also

dictates that the revocation of parole need not involve "the full panoply of rights" or procedural safeguards provided to a defendant in a criminal proceeding. *Id.*

> Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts. Given the previous conviction and the proper imposition of conditions, the state has an *overwhelming interest* in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole.

*Id.* at 483 (emphasis added); *United States v. Sanchez*, 225 F.3d 172, 175 (2d Cir. 2000) ("The Supreme Court does not, however, attach to revocation proceedings the full range of procedural safeguards associated with a criminal trial because a probationer already stands convicted of a crime.") (internal citations omitted).

In light of the state's overwhelming interest in revoking parole when parole conditions are violated, the Due Process Clause requires merely that the "state must provide a preliminary probable cause hearing . . . as well as a final revocation hearing, at which a parolee may present evidence and confront witnesses." *Calhoun v. New York State Div. of Parole Officers*, 999 F.2d 647, 652 (2d Cir. 1993) (citing *Morrissey*, 408 U.S. at 487-89). New York's parole revocation procedures, providing as they do for preliminary and final revocation hearings as required by *Morrissey*, "generally satisfy due process." *Calhoun*, 999. F.2d at 652-53; *Suce v. Taylor*, 572 F.Supp.2d 325, 335 (S.D.N.Y. 2008) (citing *Calhoun*).

Plaintiffs seek to engraft onto *Morrissey* additional due process requirements for a state's continued detention of alleged parole violators through the final revocation hearing in the form of a bail-like release suitability review process where a neutral decision-maker would assesses whether a parolee presents a flight risk or danger to the community. Plaintiffs MOL at 18-20 (arguing that "additional process" is due beyond the two hearings required by *Morrissey* of an immediate evaluation on a parole violator's "suitability for release" by a neutral decision-maker, including "likelihood of

returning for the final hearing" and "public safety risk").  The Supreme Court foreclosed this argument in *Morrissey*, expressly stating that a probable cause determination at the preliminary hearing "would be sufficient to warrant the parolee's *continued detention and return to the state correctional institution pending the final decision*."  *Morrissey*, 408 U.S. at 487 (emphasis added); *see also David v. Rodriguez*, No. 88 Civ. 2115, 1989 WL 105804, at *3-4   (S.D.N.Y. Sept. 5, 1989) (dismissing Plaintiff's lawsuit which challenged the constitutionality of the mandatory incarceration provision for parole violators on the ground that "a determination [of probable cause] would be sufficient to warrant parolee's continued detention and return to the state correctional institution pending the final decision." (citing *Morrissey*, 408 U.S. at 487)); *Suce*, 572 F.Supp.2d at 334 (noting that the Supreme Court "has not articulated any additional due process requirements for parole revocation proceedings" beyond notice and the preliminary and final revocation hearings).

Shortly after the Supreme Court decided *Morrissey*, the Second Circuit rejected Plaintiffs' argument that mandatory detention of parolees in all circumstances pending a final revocation hearing violates their constitutional rights: "[A parolee] no longer enjoys the benefit of the presumption of innocence and has no constitutional right to bail.  Bail pending a parole revocation hearing is therefore granted only in 'most unusual circumstances,'" *Galante v. Warden, Metropolitan Correction Center*, 573 F.2d 707, 708 (2d Cir. 1977 (quoting *Argo v. United States*, 505 F.2d 1374, 1377-78 (2d Cir. 1974)), as opposed to *all circumstances* where an alleged parole violator is detained as urged by Plaintiffs, *see* Plaintiffs MOL at 18-19 (urging a bail-like hearing for *everyone* "accused of violating parole").

According to Plaintiffs, "twenty states evaluate people for release pending their final revocation hearings," assessing "factors like flight risk" or "release on bail or bond."  Compl. ¶¶ 46-47.  The negative pregnant of this assertion is that New York is among 30 states – a clear majority – that detain alleged parole violators pending their final revocation hearings *without any evaluation for*

*possible release.*  Despite the prevalence of mandatory detention of parolees pending the final revocation hearing, Plaintiffs fail to cite a single case holding that such detention constitutes a due process violation.  This comes as no surprise given the Supreme Court's pronouncement in *Morrissey* that a determination of probable cause would be sufficient to warrant "continued detention" pending the final revocation hearing.  *Morrissey*, 408 U.S. at 487.

Plaintiffs rely on only one case that discusses the constitutionality of a state's mandatory detention of parolees pending a final revocation hearing – the Seventh Circuit's *en banc* decision in *Faheem-El v. Klincar*, 841 F.2d 712, 725 (7th Cir. 1988) (en banc).  Plaintiffs' reliance on *Faheem-El* is misplaced.  In *Faheem-El*, the plaintiff parolee brought an action pursuant to Section 1983 while he was detained pending his final revocation hearing to obtain a preliminary injunction mandating "an immediate bail hearing" similar to the relief sought here.  841 F.2d at 716.  The district court held that due process required the parole board to provide the plaintiff with a bond hearing and granted the preliminary injunction.  *Id.* at 722.  The Seventh Circuit, sitting *en banc*, disagreed and reversed.  *Id.* The circuit court determined that the Illinois revocation statute, like New York's revocation process as determined by the Second Circuit (*Calhoun,* 999 F.2d at 652), complied "with the minimum procedures outlined in *Morrissey*."  841 F.2d at 723.  And the appellate court further held – also consistent with Second Circuit precedent (*Galante*, 573 F.2d at 708) – that the bail hearing normally required by due process "is outweighed by the state's interest in regulating parole."  841 F.2d at 724.

But the six-judge majority in *Faheem-El* left open the possibility on remand that the district court might find a due process violation after applying the balancing test in *Matthews v. Eldridge*, 424 U.S. 319 (1976), which required assessing evidence of the burdens and costs to the state of implementing the requested bail review process, none of which was part of the record below.  841 F.2d at 726-27.  Plaintiffs' reliance upon the majority's remand for review under *Matthews* offers no

assistance here because this aspect of the decision conflicts with Second Circuit precedent holding that an alleged parole violator generally has no constitutional right to bail.  *Galante*, 573 F.2d at 708.  Not only is this Second Circuit precedent binding on this Court, but it is also clearly the more compelling view for the reason pointed out by the five judges who concurred in the *Faheem-El* majority opinion.  As explained by Judge Easterbrook, *Morrissey* holds that a probable cause determination "would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision." 841 F.2d at 730 (Easterbrook, J., concurring) (quoting *Morrissey*, 408 U.S. at 487).  This holding compels the rule adopted by the Second Circuit and leaves no room for the *Faheem-El* majority's remand for additional analysis by the district court:

> It is unnecessary for us to balance interests under the Due Process Clause, and unwarranted to invite the district judge to take more evidence and strike his own balance.  The Supreme Court has done it already.
>
> *   *   *
>
> Since *Morrissey* decides the issue before us, the court's survey of arguments pro and con is unnecessary, and its invitation to the district court to conduct still a further balancing is unwarranted.  It supposes that our view matters, that judges of the inferior federal courts may decide this case the other way if they disagree with *Morrissey*.  *Wise or not (as we mark wisdom), the Supreme Court's discussion is authoritative.  It precludes consideration of a "release suitability hearing" – bail by any other name, and as sweet to the parolee.*

*Id.* at 730-31 (emphasis added).  Two judges joined in Judge Easterbrook's concurring opinion and two judges wrote separate concurrences agreeing that *Morrissey* forecloses any argument that mandatory detention of alleged parole violators pending the final revocation hearing violates due process.  *Id.* at 731 (Wood, J., concurring) (refusing to "support the remand as it relates to further consideration of a judicially imposed release-suitability hearing" because *Morrissey* answers the issue "in all constitutional respects") and (Ripple, J., concurring) (finding "*Morrissey* is a comprehensive reconciliation of the competing interests of the parolee in continued liberty and the various interests of the government in this context" and, therefore, concluding that "[f]urther adjustment of these

interest is not an option open to us as an intermediate appellate court").

Ignoring the controlling language in *Morrissey* and *Galante*, Plaintiffs strain to find support from cases decided in markedly different contexts.  For example, in *Mental Hygiene Legal Serv. v. Spitzer*, No. 07 cv 2935 (GEL), 2007 WL 4115936 (S.D.N.Y. Nov. 16, 2007), the court upheld a due process challenge to a statute requiring mandatory detention of convicted sex offenders from the time their criminal sentence was *completed* until a final civil commitment merits hearing.  *Id.* at * 15.  The mandatory detention at issue in *Mental Hygiene* is not analogous to the situation here, where a parolee is detained for violating the conditions of his parole *prior to the time his criminal sentence is completed*.  It is precisely because "[t]he essence of parole is release from prison, *before* the completion of sentence, on the condition that the prisoner abide by certain rules *during the balance of the sentence*," that due process rights are circumscribed.  *Morrissey*, 408 U.S. at 477 (emphasis added).  Because the plaintiffs in *Mental Hygiene* had completed their sentences at the time of their mandatory detention, *Morrissey's* rationale for limiting the scope of due process rights simply does not apply.

To the extent mandatory detention in other contexts is even relevant – which is not the case given that *Morrissey* and *Galante* are directly on point – the more apt analogy is the mandatory detention of non-citizens pending removal proceedings pursuant to Section 1226(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c).  In *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015), *judgment vacated on other grounds*, 2018 WL 1143819 (U.S. Mar. 5, 2018), the Second Circuit addressed whether prolonged mandatory detention of non-citizens without a bond hearing violates due process.  The court concluded that due process requires a bond hearing only when a non-citizen is detained *for longer than six months* – far longer than the period of mandatory detention for parole violators under New York's parole revocation procedures.  804 F.3d at 616.  Under the rationale of *Lora*, the mandatory detention of alleged parole violators pending the final revocation hearing held within the reasonable period

afforded under New York's revocation procedures (as required under *Morrissey)* does not present any due process concerns.

Plaintiffs fare no better on their due process claim under the state constitution for two reasons. First, as a jurisdictional matter, the Eleventh Amendment bars this Court from granting injunctive relief based on a state law claim against state officials. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 121 (1984) ("a claim that state official violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment," including "state-law claims brought into federal court under pendent jurisdiction").

Second, as a substantive matter, the New York Court of Appeals has reached the same conclusion under the Due Process Clause of the state constitution as the Second Circuit has reached under the Due Process Clause of the U.S. Constitution: a parolee detained pending a final revocation hearing has no due process right to bail. *People ex rel. Calloway v. Skinner*, 33 N.Y.2d 23, 33 (1973).

Finally, Plaintiffs cite numerous statistics about parolees detained pending their final revocation hearings – the number who are detained for so-called "technical parole violation," the percentage who are Black and Latin individuals, and the number who are released at the final revocation hearing. Compl. ¶¶ 4-6; Plaintiffs' MOL at 7-8, 21. These statistics may be relevant to the Parole Board and legislators when considering whether to modify New York's parole revocation procedures, but they have no relevance to the Court's analysis of Plaintiffs' due process claim. *Schall v. Martin*, 467 U.S. 253 (1984) (finding that early dismissal and post-conviction release statistics did not justify overturning a statute providing for the preventive detention).

## II.   PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM BECAUSE THEY CAN SEEK RELEASE THROUGH A STATE HABEAS PETITION

Irreparable harm requires showing that an "actual and imminent" injury will occur that "cannot be remedied if a court waits until the end of trial to resolve the harm." *Singas Famous Pizza Brands Corp. v. New York Advertising LLC*, 468 F. App'x 43, 45 (2d Cir. 2012); *accord Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005).  In evaluating whether the plaintiff will suffer imminent harm, "the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits . . . ." *Weinstein v. Krumpter*, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015) (quotation omitted).  "At the preliminary injunction stage, the only cognizable harms are those that cannot be remedied at the end of trial if the movant were to prevail." *Freedom Holdings*, 408 F.3d at 115.

Plaintiffs cannot demonstrate irreparable harm because they can seek relief during the pendency of this case in the absence of a preliminary injunction.  *See Weinberger v. Romer-Barcelo*, 456 U.S. 305, 315 (1982) (reversing appellate court's preliminary injunction order after finding that the remedy sought in the injunction could be achieved by other means).  The heightened risk of infection from COVID-19 Plaintiffs allege the class members are facing while detained at Rikers Island awaiting their final revocation hearings would be the only matter that arguably cannot be abated absent release.  However, detained parolees can seek release without the requested injunction by filing a habeas petition in state court under Article 70 of the CPLR.  A state habeas petition would allow for the same remedy Plaintiffs are ultimately seeking through the new release suitability review they ask the Court to engraft onto New York's revocation procedures.  In fact, scores of parole violators detained at Rikers Island have already successfully sought release from detention through state habeas petitions.  Amer Decl. at ¶¶ 3-5.  When an avenue for complete relief is available through the state courts, this Court should decline to award relief. *Cf. Weinberger*, 456 U.S. at 315

Finally, the timing of Plaintiffs' request for the specific preliminary injunctive relief they seek undermines any claim of irreparable harm. A delay in bringing suit "may, 'standing alone, . . . preclude the granting of preliminary injunctive relief,' because the 'failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (citations omitted); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Delay in seeking enforcement of [preliminary injunction] rights . . . tends to indicate at least a reduced need for such drastic, speedy action.").

Plaintiffs attack as constitutionally deficient New York's mandatory detention of alleged parole violators pending final revocation hearings. Mandatory detention has been an integral part of New York's parole revocation laws and regulations for over 40 years. *See, supra*, at 5-7. There is no reason why Plaintiffs could not have brought this challenge to New York's laws and regulations requiring mandatory detention long ago. Plaintiffs' delay in initiating this lawsuit to revamp New York's parole revocation procedures to include a release suitability review warrants denial of its preliminary injunction application. *See Citibank, N.A.*, 756 F.2d at 277 (ten-week delay in seeking injunction held to preclude relief); *Gidatex, S.r.L. v. Campeniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) (noting that "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months").

III.  **THE BALANCE OF EQUITIES TIPS DECIDEDLY IN FAVOR OF THE PUBLIC'S INTEREST IN HAVING THE PAROLE BOARD AND LEGISLATURE DETERMINE WHETHER PAROLEES SHOULD BE DETAINED PENDING THEIR REVOCATION HEARINGS**

A plaintiff's application for preliminary injunctive relief may be awarded only if "the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)); *see also*

23

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (quoting *Weinberger,* 456 U.S. at 312).

The public interest is better served by having the Parole Board continue its decades-long implementation of legislative policy mandating detention of alleged parole violators pending their final revocation hearings.  Indeed, the New York Legislature is currently considering a bill that would amend New York's parole revocation statute to provide alleged parole violators with precisely the same type of release suitability review Plaintiffs' seek here.  Amer Decl. at ¶ 6.  The bill, which was referred to committee in both the Senate and Assembly earlier this year (denoted as S1343B in the Senate and A05493-A in the Assembly), would augment the existing procedures with, *inter alia*, a "recognizance hearing" to be held within 24 hours of the execution of the parole warrant before a local criminal court to determine whether the parolee should be released on his own recognizance pending the final revocation hearing.  *Id.* at ¶¶ 7-8, Exhs. C and D.

In contrast, Plaintiffs fail to demonstrate how upending New York's revocation procedures to require a new level of evaluation by a neutral decision-maker, with its attendant costs paid from the public fisc, will benefit the public.  Plaintiffs point to the irreparable harm they suffer "as a result of defendants' constitutional violations" (Plaintiffs' MOL at 23), but they have made no showing of constitutional violations.  New York's revocation procedures afford Plaintiffs the notices and hearings they are entitled to as a matter of due process in accordance with *Morrissey. See, supra,* at Point I.  They are entitled to nothing more under the Due Process Clause.  Nor will they suffer any irreparable harm due to the increased risk of COVID-19 infection if the Court does not grant them their requested injunction mandating a "release suitability review" because they can seek release during the pendency of this action through a state habeas petition under CPLR Article 70.  *See, supra,* at Point II.

Accordingly, the balance of the equities tips against having this Court issue a preliminary injunction that would rewrite New York's laws and regulations governing parole revocation procedures requiring mandatory detention of alleged parole violators by creating a burdensome and costly new release suitability review.  In the absence of a constitutional infirmity, the wisdom of adopting such a new procedure is for the Legislature and Parole Board to determine, not a court.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction in its entirety, and grant such other and further relief as the Court deems just and proper.

Dated:  New York, New York
     April 10, 2020

                                            LETITIA JAMES
                                            Attorney General
                                            State of New York

                                            By:_____/s/  Andrew Amer_____
                                            Andrew Amer
                                            Special Litigation Counsel
                                            Amanda Yoon
                                            Assistant Attorney General
                                            28 Liberty Street
                                            New York, New York 10005
                                            (212) 416-6127
                                            andrew.amer@ag.ny.gov
                                            amanda.yoon@ag.ny.gov

                                            Attorney for Defendants