**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGMENT
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/20/20

---

MICHAEL BERGAMASCHI, *et al.*, on behalf of
themselves and all others similarly situated,

                    Plaintiffs,

-against-

ANDREW M. CUOMO, Governor of New York
State, in his official capacity, *et al.*,

                    Defendants.

---

No. 20 Civ. 2817 (CM)

## ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

McMahon, C.J.:

Plaintiffs Michael Bergamaschi and Frederick Roberson bring this civil rights action on

behalf of all New York City persons on parole who are or will be accused of violating conditions

of parole and mandatorily detained pending their final hearing on a parole warrant, as required by

9 N.Y.C.R.R. § 8005.7(5) and § 8004.3. The defendants are Governor Andrew M. Cuomo and

Tina M. Stanford, Chairperson of the New York State Board of Parole ("Parole Board"), sued here

in their official capacities. Plaintiffs allege that the mandatory detention regulations violate their

right to due process under the United States and New York Constitutions – specifically, in that

they are constitutionally entitled to a hearing on their suitability for release pending adjudication

of the alleged parole violation.

Plaintiffs seek a preliminary injunction, ordering to afford all members of the plaintiff class

"an immediate evaluation" on "their suitability for release" by a "a neutral decisionmaker" based

on an assessment of the "seriousness of their alleged parole violations, likelihood of returning for

1

the final hearing" and whether they "pose[] a public safety risk." (Pls.' Mem. of Law in Supp. ("Pls.' MOL"), Dkt. No. 19 at 20, 24-25).

Plaintiffs' motion for a preliminary injunction is DENIED.

## BACKGROUND

*I.    New York's Parole Revocation Procedures*

New York, like every other state, has a procedure known as "parole," pursuant to which certain prisoners who have not yet completed their sentences of incarceration are released into the community on conditions and under the supervision of a parole officer. If a parolee violates the terms of his parole – that is, if s/he does something that is not permitted by the rules that restrict his/her liberty, or fails to do something that is required by those rules – s/he is subject to having parole revoked, and being returned to complete the rest of his/her sentence behind bars.

New York Executive Law § 259-i(3) and 9 N.Y.C.R.R. §§ 8004 and 8005 set out the procedures involved in parole revocation hearings.

Within three days of being arrested on a parole warrant, the parolee must be given notice of the charges and of his rights. N.Y. Exec. Law § 259–i(3)(c)(iii); 9 N.Y.C.R.R. § 8005.7.

Within fifteen days after the execution of the parole warrant, a preliminary hearing must be held before a hearing officer who has not had "any prior supervisory involvement over the alleged violator." N.Y. Exec. Law § 259-i(3)(c)(i). At the preliminary hearing, the parolee's parole officer must establish probable cause that a violation of a parole condition in an important respect occurred. N.Y. Exec. Law § 259-i(3)(c)(i) & (iv). The parolee has the right to appear and to present witnesses and evidence on his own behalf, as well as the right to confront and cross-examine adverse witnesses. N.Y. Exec. Law §§ 259-i(3)(c)(iii) & (iv); 9 N.Y.C.R.R. § 8005.3(c). A parolee can waive his/her right to a preliminary hearing, which results in an automatic finding of probable cause.

After the preliminary hearing, the hearing officer must issue a written decision, stating the reasons for the determination and citing to the evidence upon which the determination was based. N.Y. Exec. Law §§ 259-i(3)(c)(iii). If there is a finding of probable cause to believe that a violation has occurred, or if the parolee waives his right to a preliminary hearing, a final revocation hearing must be scheduled within 90 days. N.Y. Exec. Law §§ 259-i(3)(f)(i).

At the final revocation hearing, the parolee is entitled to a number of due process protections, including: (i) the right to compel witnesses to appear at the hearing and provide testimony; (ii) the right to subpoena and submit documentary evidence; (iii) the right of confrontation and cross examination; (iv) the right to submit mitigating evidence for the purpose of being restored to supervision; and (v) the right to representation of counsel. N.Y. Exec. Law § 259-i(3)(f)(iv) and (v). In the event the alleged violator is indigent and cannot afford counsel, an attorney will be assigned. N.Y. Exec. Law § 259-i(3)(f)(v).

If the hearing officer concludes that the parolee did not violate the conditions of his/her release "in an important respect," the charges are dismissed and the parolee is released back into the community.   N.Y. Exec. Law §§ 259-i(3)(f)(ix); 9 N.Y.C.C.R. § 8005.20(a). (*See generally*, Tomlinson Decl., Dkt. No. 25 ¶¶ 2-3.) If the hearing officer concludes that the parolee violated the conditions of release in an important respect, the parolee is returned to prison to serve the remainder of his or her sentence.

II.     *New York's Mandatory Detention Regulations*

Since 1978, pursuant to N.Y. Exec. Law § 259-i(3), if the parole officer has probable cause to believe that the parolee has violated a condition of his parole, a warrant may be issued for his temporary detention, in accordance with the rules of the Parole Board. The statute expressly

provides that the detention of any such person may be "further" regulated by rules and regulations of the Parole Board. N.Y. Exec. Law § 259-i(3)(a)(i).

The Parole Board's regulations mandate the detention of the alleged violators once there is probable cause to find that the alleged violator has violated one or more of the conditions of parole "in an important respect." 9 N.Y.C.R.R. § 8005.7(a)(5). A parole violation for conviction of a crime, whether felony or misdemeanor, qualifies as being a violation "in an important respect" and leads to mandatory detention. Detention continues until the final revocation hearing has concluded.

New York's policy of mandatorily detaining alleged parole violators *pendente lite* is not unique or unusual. In thirty states, alleged parole violators who are taken into custody by the police or corrections officers on a parole warrant are detained pending their final revocation proceedings. Cohen, *Law of Probation & Parole* § 1:1 (2d ed.) (available on Westlaw at LAWPROBPAR § 18:5); *see e.g.,* Mo. Rev. Stat, § 217.720 (West 2018); Ark. Code Ann. § 16-93-705 (West 2020); *see also* Compl. ¶ 47 (listing 20 states that do not have mandatory detention for parole violators pending the final revocation hearing).

Plaintiffs allege that the Parole Board regulations requiring detention pending a final revocation hearing (1) upon a finding of probable cause at the preliminary hearing; (2) when the parolee waives the preliminary hearing; or (3) where the parolee is convicted of a misdemeanor violates due process. Plaintiffs do not challenge as unconstitutional the mandatory detention of someone convicted of a felony, because a felony conviction warrants parole revocation. *See* N.Y. Exec. Law § 259-i.

### III.   *Procedural History*

The instant action was filed on Friday, April 3, 2020.  The complaint alleges two causes of action: one under the United States Constitution and one under the New York State Constitution.

4

The claims are parallel: each count asserts that the mandatory detention of accused parole violators between the time probable cause is found and the end of their revocation hearings violates the Due Process Clause of the relevant constitution. (Docket #1)

Plaintiff's motion for a preliminary injunction was filed the following Monday, April 6. The Attorney General appeared immediately for Defendants and the parties agreed to an expedited briefing schedule. The motion was fully submitted on April 13.

The court held a telephone conference with the parties on Tuesday, April 7, at which time I expressed the view that the preliminary and permanent injunction motions should be consolidated and heard on a fuller record, albeit on an expedited basis. The parties insisted that this was neither necessary nor desirable. The Attorney General expressed the view that the case presented a straightforward question of law that could be decided on the papers. Plaintiffs' counsel echoed that view – although having presented evidence in support of the motion, he could not possibly have meant that the case presented nothing but a straightforward question of law. I interpreted his comments to mean that Plaintiffs wanted the motion for preliminary relief to be decided immediately and on the papers in view of the COVID-19 ("COVID") crisis, which had precipitated the filing of this action.

I take the case as it is handed to me. This is a decision on a motion for a mandatory preliminary injunction that would give plaintiffs, *pendente lite*, all the relief they are seeking from this lawsuit– nothing more.

IV.    *What This Case Is – And Is Not – About*

Before turning to the merits of Plaintiffs' motion for a preliminary injunction, it is imperative to clarify what this case is about – and what it is not about.

This case challenges the lawfulness of a New York State regulation that requires the mandatory detention of an alleged parole violator between the time when it is determined that there is probable cause to believe a violation was committed (either at a preliminary hearing, because the preliminary hearing was waived, or because the parolee has been convicted for the misdemeanor that causes the parole violations) and the time when his/her final revocation hearing concludes. It alleges that such detention violates the Fourteenth Amendment's Due Process Clause. Plaintiffs contend that due process requires that an alleged parole violator be given an opportunity – ideally, at the preliminary hearing – to demonstrate that detention is not required despite the finding of probable cause because he presents neither a risk of flight nor any danger to society. In brief, Plaintiffs argue that due process requires that an alleged parole violator be offered the opportunity to establish an entitlement to something that looks and sounds very much like bail *pendente lite*.

That is all this case is about.

This case is not about the COVID pandemic, or the wisdom of incarcerating any particular group of people in a high-risk location (a correctional facility) during said pandemic. The lawsuit was brought against the backdrop of that pandemic, and apparently the threat posed by COVID has "concentrate[d] the mind wonderfully" on a provision of New York law that has been in place, its constitutionality unchallenged, for over four decades. But COVID has nothing to do with whether the mandatory detention regulation is or is not constitutional. If due process requires that alleged parole violators be given access to the equivalent of a pre-trial arrestee's bail hearing, then that constitutional flaw has existed in New York State's parole revocation process from the beginning. And if the regulation adopted is those many years ago was not unconstitutional then, the pandemic does not make it unconstitutional now.

This case is also not about conditions of confinement during the pandemic on Rikers Island, or in any other facility where alleged parole violators are housed. If it were, federal injunctive relief would not be appropriate, since any prisoner at any time is free to bring a petition for a writ of habeas corpus in the New York State Supreme Court, pursuant to Article 70 of New York's Civil Practice Law and Rules, on the ground that the conditions of his/her confinement are unlawful. The record reflects that numerous such petitions have been brought, and many granted by justices of the New York State Supreme Court. (Amer Decl., Dkt. No. 27, at ¶¶ 2-5 & Ex. A.)

This case is not about the wisdom of the mandatory detention regulation that has been in force in New York for over forty years. The wisdom of policy decisions is for lawmakers and regulators to debate. The only issue before this court is constitutionality.

This case is not about the lawfulness or the sufficiency of recently-devised procedures carried out by Defendants to ascertain whether particular alleged parole violators should or should not be released, despite the pendency of a parole revocation hearing, in light of the pandemic. Those procedures, and their results, are described in an addendum to this opinion, because the parties have discussed them in their papers and because they have been the subject of some of the news coverage about this action. However, the *ad hoc* procedure devised to address what we all hope and pray will be a one-time crisis are not challenged as unconstitutional; so aside from noting that the State has taken steps (insufficient though Plaintiffs deem them to be) to release some members of the class notwithstanding the mandatory detention regulation herein challenged, the court sees no need to address them.

This case is not about whether New York's statutory and regulatory scheme for dealing with alleged parole violations complies with the minimum standards of due process identified by the United States Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471 (1972). In particular,

Plaintiffs do not challenge as violative of due process the fact that state law gives the Parole Board ninety days, rather than sixty days, to hold a revocation hearing following a finding of probable cause – a deviation from *Morrissey* (discussed below), but perhaps one that can be justified as "reasonable" given the sheer volume of parole hearings that are held in a city as populous as New York City. In any event, Plaintiffs do not challenge the constitutionality of the timing of the final revocation in this lawsuit.

Finally, this case is not about whether New York actually abides by its parole regulatory procedure. There is evidence in the record suggesting that the Parole Board does not, in all cases, provide mandatorily detained individuals with revocation hearings within the statutorily prescribed ninety days. However, Plaintiffs do not challenge this failure as *per se* unlawful (although they do argue that this fact is somehow relevant to the alleged due process requirement that the class members have an opportunity to be admitted to bail *pendente lite*). And if it were *per se* unlawful not to hold a revocation hearing within the prescribed ninety days, Plaintiffs have recourse to the courts by way of state habeas challenging the lawfulness of their continued detention beyond the "reasonable" period of time within which the State must hold and decide their revocation hearing.

All of these issues are mentioned, some at length, in Plaintiffs' papers, but none is actually the subject of a due process challenge.  They are, therefore, window dressing. The one and only gravamen of Plaintiffs' complaint is their claim that then-mandatory detention, *pendente lite*, of parolees for whom there is probable cause to believe they have violated the terms of their parole – without any opportunity to argue for release until such time as a revocation hearing can be held – violates the Due Process Clause of the federal and state constitutions.

## STANDING

As both named plaintiffs have been released from Rikers Island – one pursuant to the review process ordered by the Governor and one by a Justice of the New York State Supreme Court on a writ of habeas corpus – the question arises as to whether there is anything left to decide.

The hearing process complained of is by its very nature temporary, and it is unlikely that individuals would have their constitutional claim decided before he is either convicted or released. Other class members undoubtedly have a continuing live interest in the case. Therefore, Plaintiffs' claims belong to the class of cases which is capable of repetition, yet evading review. In such cases, "termination of [the] class representative's claim does not moot the claim of the unnamed members of the class." *Gerstein v. Pugh*, 420 U.S. 103, 100 n.11 (1975) (internal citations omitted).

## STANDARD FOR GRANTING RELIEF

This is a case in which Plaintiffs seek a mandatory injunction. While Plaintiffs argued in their Reply Brief that they were seeking only an injunction against the enforcement of the mandatory detention regulation (*see* Pls.' Reply, Dkt. No. 32, at 10), on the very same page of the very same document, Plaintiffs demanded that the court . . .

> . . . enjoin the defendants' mandatory detention scheme, and order the defendants to provide the following: (1) for all individuals currently detained, immediate review of their case, notice, and an opportunity to be heard on their suitability for release; and (2) for all future individuals arrested for a parole violation, a prompt hearing on whether they may be suitable for release with notice, a neutral decision-maker, and, if detention is required, an explanation as to why and the evidence relied on, either on the record or in writing.

(*Id.*) If that is not a request for mandatory injunctive relief – relief that "alter[s] the status quo by commanding some positive act," *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) – then I cannot imagine what such a request would look like.

9

Because Plaintiffs seek mandatory injunctive relief *pendente lite*, they must comply with a considerably heightened standard of proof. In addition to demonstrating that lack of injunctive relief would work irreparable harm and that a preliminary injunction is in the public interest – both of which are necessary for obtaining preliminary injunctive relief, *see N. Am. Soccer League, LLC v. United States Soccer Federation, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)) – Plaintiffs must show "a clear and substantial likelihood of success on the merits," *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). This requires proof "that their cause is considerably more likely to succeed than fail." *Abdul Wali v. Coughlin*, 754 F.3d 1015, 1026 (2d Cir. 1985); *see also Soccer*, 883 F.3d at 37. It is not enough for a plaintiff seeking a mandatory injunction to demonstrate just a "likelihood of success on the merits;" and it is certainly not a enough for him to demonstrate the existence of a "serious questions on the merits and a balance of hardships decidedly favoring the moving party," which has traditionally been an alternative to a likelihood of success on the merits in this Circuit. *North Am. Soccer League, supra.*, 883 F.3d at 37. [1]

The plaintiff is required to "carry the burden of persuasion by a clear showing for each factor." *Abbott Labs. v. Adelphia Supply USA,* No. 15 CV 5826, 2015 WL 10906060, at *5 (E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Labs. v. H&H Wholesale Servs., Inc.*, 670 Fed. Appx. 6 (2d Cir. 2016).

---

[1] This court continues to believe that the oft-repeated Second Circuit "sufficiently serious question going to the merits" standard is not a permissible replacement for a showing of a likelihood of success on the merits, given what seems to me the clear language of the United States Supreme Court in the case of *Munaf v. Geren*, 553 U.S. 674, 690 (2008): "A difficult question . . . is, of course, no reason to grant a preliminary injunction." *See also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 19 (2008) (vacating preliminary injunction entered on the basis of lower court finding "serious question" regarding interpretation of environmental regulations). However, I see no need to contest this issue with the Court of Appeals in a case where, because of the nature of plaintiffs' request, there is no question that the "serious question" standard cannot possibly apply.

## PLAINTIFFS ARE NOT ENTITLED TO MANDATORY PRELIMINARY INJUNCTIVE RELIEF

*I.     Plaintiffs Have Alleged Irreparable Harm.*

To demonstrate irreparable harm, a plaintiff must show that an "actual and imminent" injury will occur that "cannot be remedied if a court waits until the end of trial to resolve the harm." *Singas Famous Pizza Brands Corp. v. New York Advertising LLC*, 468 F. App'x 43, 45 (2d Cir. 2012); *accord Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005). "At the preliminary injunction stage, the only cognizable harms are those that cannot be remedied at the end of trial if the movant were to prevail." *Freedom Holdings*, 408 F.3d at 115. The harm alleged must "be imminent, not remote or speculative" and "incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984). "Imminent risk to life, health or safety is also an irreparable harm." *Graham v. Decker*, No. 20-cv-2423, 2020 WL 1847568, at *7 (S.D.N.Y. Apr. 13, 2020).

Plaintiffs argue that the Parole's Board mandatory detention of individuals scheduled for a final parole revocation hearing violates due process. Plaintiffs argue that this constitutional violation is the principal irreparable harm they seek to avoid. (*See* Pls.' MOL at 11.) If indeed Plaintiffs have a constitutional right to release pending a final parole revocation hearing, then they have sufficiently alleged irreparable injury by its deprivation. Their other arguments for irreparable harm are superfluous.

Defendants argue that the existence of state habeas as a remedy for any illegal incarceration Plaintiffs might suffer as a result of the mandatory detention regulation means that the harms that

arise from their illegal incarceration (assuming it to be such) are not "irreparable." But this is too clever by half.

Defendants principally rely for this argument on *Weinberger v. Romer-Barcelo*, 456 U.S. 305 (1982). In *Weinberger,* the Court stated that, "Th[is] Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Id.* at 305. But that doctrine has been employed to deny injunctions primarily where the harm could be remedied by monetary relief. *See e.g.*, *Sierra Club v. Hennessy*, 695 F.2d 643, 647 (2d Cir. 1982); *Sherwyn Toppin Mktg. Consultants, Inc. v. City of New York*, No. 08-cv01340, 2009 WL 10706652, at *2 (E.D.N.Y. June 19, 2009); *Adams v. Warner Bros. Pictures Network*, No. 05-cv-5211, 2005 WL 3113425, at *1 (E.D.N.Y. Nov. 22, 2005); *In re Holtmeyer*, 229 B.R. 579, 583 (E.D.N.Y. 1999). This case does not involve a claim for money damages; there is no contention that legal (as opposed to equitable) relief could right the alleged wrong.

Moreover, the issue in *Weinberger* was whether a district court could, in its discretion, *decline* to enjoin conduct that violated a federal statute in favor of a less extreme equitable remedy – not whether a court lacks the power to enter an injunction if some other equitable remedy is available. *See* 456 U.S. at 309–11. *Weinberger* involved an alleged violation of the Federal Water Pollution Control Act by the United States Navy, which "discharge[d]…any pollutant" (the occasional artillery shell that landed in a river during training exercises) into navigable waters without having a permit. *See id.* at 306–08. After balancing the equities, the district court declined to enjoin the Navy's weapons training and instead ordered the Navy to apply for a permit. *See id.* at 309–11. The First Circuit vacated and remanded, holding that the district court had "an absolute statutory obligation" to enjoin the statutory violation. *See id.*

The Supreme Court reversed the First Circuit's decision. It concluded that, unless the text of a statute suggests that Congress intended that any violation thereof *must* be met with an immediate prohibitory injunction, courts were not required to enjoin any and every statutory violation, but could instead impose other available equitable remedies. *See id.* at 312–16. *Weinberger* did not hold, as the defendants suggest, that a federal court could not enjoin unconstitutional behavior if there existed some less extreme equitable remedy.

Defendants also argue that the forty-year delay in seeking "the specific preliminary injunctive relief they seek undermines their claim of irreparable harm." (Defs.' Opp'n, Dkt. No. 28, at 23.) This argument is silly. "Ongoing unlawful deprivations of liberty and the threat of unlawful detention and reimprisonment would violate plaintiffs' constitutional rights and therefore constitute quintessential irreparable harm." *Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010).

The *Hardy* court rejected a similar argument under similar circumstances. In *Hardy*, the plaintiff class challenged the New York State Department of Correctional Services' ("DOCS") practice of imposing and enforcing special conditions of release, known as post-release supervision ("PRS"), which became effective after the expiration of the plaintiffs' maximum determinate sentences. N.Y. Penal Law § 70.45. *See id.* at 616–9. Plaintiffs alleged that any such post-release conditions had to be imposed by a judge and could not be imposed administratively. Although plaintiffs alleged that the constitutional right at issue was established by the Supreme Court in 1936 in *Hill v. U.S. ex rel Wampler*, 298 U.S. 460 (1936)[2] – and was reaffirmed by the Second Circuit in 2006 in *Earley v. Murray*, 451 F.3d 71, 76 (2d Cir. 2006) – DOCS had been imposing

---

[2] New York added § 70.45 to the Penal Law some fifty years after the Supreme Court decided *Wampler*, in 1998, *see* 1998 Sess. Law News of N.Y. Ch. 1 (S. 7820).

PRS on the named plaintiffs between 2004 and 2007, and on members of the plaintiff class thereafter, yet no suit was filed until April 2008. *Hardy*, 701 F. Supp. 2d at 617–18.

The defendants argued, "….because plaintiffs have not made timely attempts to challenge the conditions of their PRS, plaintiffs cannot prevail on an argument that they will be irreparably harmed without immediate relief." *Id.* at 619. Rejecting this argument, the court reasoned, "The possibility that plaintiffs already have suffered injuries by being subjected to allegedly illegal PRS does not eliminate the irreparable nature of any injuries that they will suffer in the future without injunctive relief, and the Court does not find that any delay in filing this lawsuit justifies the denial of interim relief from an ongoing alleged constitutional violation." *Id.* (citing *Five Borough Bicycle Club v. City of New York*, 483 F. Supp. 2d 351, 361 (S.D.N.Y. 2007), *aff'd*, 308 F. App'x 511 (2d Cir. 2009)).

Here too, the fact that New York's mandatory detention scheme for alleged parole violators has gone unchallenged for decades by generations of other parole violators does not undercut the irreparable harm argument made by today's imprisoned parole violators on the basis of that their alleged constitutional rights are being violated currently. What forty years of failure to challenge the constitutionality of this procedure suggests about the merits of Plaintiffs' lawsuit is another matter altogether.

II.      *Plaintiffs fail to show a clear or substantial likelihood of success on the merits of their federal claim.*

Plaintiffs assert that the Parole Board's mandatory detention of parolees pending their final revocation hearings violates due process, according to "the well-established principles set forth in long-standing Supreme Court precedent." (Dkt. No. 19, Pl.'s PI Br., at 2.)

Defendants argue that New York's mandatory detention regulation cannot possibly be constitutionally infirm, because New York's parole revocation procedures comport with the Supreme Court's dictates in *Morrissey v. Brewer*, 408 U.S. 471 (1972) – a position that requires not only denial of preliminary injunctive relief, but the ultimate dismissal of this lawsuit (though they have not moved for such).

Both sides are wrong. A close reading of the cases cited by both sides reveals no binding authority striking down the type of mandatory detention scheme used in New York state. It is equally true that those cases do not clearly hold, after explicit consideration of the issue, that mandatory detention without an opportunity for "bail" pending a revocation hearing is constitutional. But Plaintiffs assuredly have not demonstrated that they have a clear and substantial likelihood of success on the merits. Indeed, Defendants may well have the better of the argument.

### A. Morrissey Sets A Standard

In the landmark decision of *Morrissey v. Brewer*, 408 U.S. 471, 487-89 (1972), the Supreme Court held that if a state that affords persons convicted of crimes the opportunity to complete a portion of their incarcerative sentence at liberty in the community – parole – it may not revoke that parole without providing certain minimum due process protections. However, parolees in parole revocation proceedings are not entitled to "the full panoply of rights," that are accorded defendants in a criminal prosecution prior to conviction. *Morrissey*, 408 U.S. at 480 (*citing Mempa v. Rhay*, 389 U.S. 128 (1967)).

Both the facts of *Morrissey* and its procedural posture differ from this case. In *Morrissey*, the Iowa Board of Parole exercised its authority to revoke the petitioners' parole based on the written report of his parole officer, without holding any sort of hearing. *Id.* at 473. After exhausting their state remedies, Iowa state parolees filed federal habeas petitions, alleging that

15

Iowa's revocation scheme violated due process because it allowed parole to be revoked without a hearing. *Id.* at 474.

The Supreme Court began its analysis with a discussion of the concept of parole – its purpose and function. "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey*, 408 U.S. at 477. Those rules, which are less restrictive than confinement in a prison, often substantially restrict a parolee's activities "beyond the ordinary restrictions imposed by law on an individual citizen." *Morrissey*, supra, at 478. As the Court recognized, parolees are not simply barred from committing new crimes; they are often prohibited from using certain otherwise lawful substances (alcohol), from associating with certain undesirable persons (persons who have been convicted of crimes), and from undertaking specific activities that most adults can freely enjoy without first obtaining the permission of the parole officer (changing employment or living quarters, traveling outside the immediate community, and the like). And of course, parolees must regularly report to their parole officers, where they must account for their behavior and obtain guidance and instruction. *Id.* For a compendium of the types of restrictions that New York parolees must live under, see 9 N.Y.C.R.R. § 8003.2 (listing New York's standard parole release conditions).

Obviously, many parole violations to not entail the commission of criminal conduct. However, every parole those restriction is "essential" to the reintegration process. So is swift and certain punishment for violation of those restrictions. The *Morrissey* Court expressly recognized that, "The enforcement leverage that supports the parole conditions derives from the authority to return the parolee to prison to serve out the balance of his sentence if he fails to abide by the rules." *Morrissey*, 408 U.S. at 478–79.

Not every violation of conditions will automatically lead to revocation. Indeed, not every violation leads to the issuance of a parole warrant. New York, under DOCCS Directive 9050 titled "Community Supervision Revocation Process," several steps such as a case conference with a bureau chief and investigation of the possible violation must first be undertaken before the issuance of a parole warrant is considered for a technical violation, and such a warrant is then issued only by a Senior Parole Officer or higher, if the violations are believed to be "in an important respect." See Executive Law § 259-i(3)(a)(i); 9 N.Y.C.R.R. § 8004.2. (Annucci Decl. at ¶ 9, Ex. 1.) And even a final finding of a violation does not automatically result in revocation under New York's scheme; besides reincarcerating the parolee for the balance of the term of sentence, the presiding officer also has the authority to maintain the status quo by continuing the parolee's post-release supervision, or place the parolee is a "parole transition facility for a period not to exceed on hundred eighty days." Executive Law § 259-i(3)(e)(x).

"Implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole." Morrissey, supra. at 479. But while parole might seem similar to release on bail, the two are not equivalent. A parolee is not presumed innocent; he has been convicted of a crime and is still serving his sentence. Indeed, a parolee even while living in the community, is often formally described as "in custody," *Morrissey*, 420 U.S. at 483. Parole thus creates only a conditional liberty interest, and revocation of parole deprives the parolee "only of the conditional liberty properly dependent on observance of special parole restrictions." *Id.* at 480. As the Supreme Court recognized, parole revocation "is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations." *Id.*

That said, the court concluded that "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." And while, "Given the previous conviction and the proper imposition of conditions, the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole….the State has no interest in revoking parole with some informal procedural guarantees." *Id.* at 482-3.

The Court then went on to discuss what those "informal procedural guarantees" might entail. It concluded that due process imposed two requirements.

The first was that, within a short period following a parolee's arrest on a parole violation warrant, someone other than the parolee's parole officer (the person who caused his arrest) should make a determination that there was probable cause to believe that the charged violation(s) did in fact occur. The Supreme Court indicated that this determination could be made by an administrative, not a judicial officer, as long as the individual was "neutral and detached" from the decision to violate the parolee.

With respect to this preliminary hearing, the Court deemed it essential that the parolee be given notice of the hearing, a statement of its purpose, and a list of the alleged parole violations. At the hearing "the parolee may appear and speak in his own behalf; he may bring [evidence and witnesses] to the hearing officer [and] on request of the parolee, person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence," unless there was a risk of harm if the informant's identity were disclosed. *Morrissey*, supra, 487.

18

At the conclusion of this preliminary hearing, "the officer should determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation. Such a determination would be sufficient to warrant the parolee's continue detention and return to the state correctional institution pending the final decision." *Id.*

Despite imposing these procedural protections, the court emphasized that the preliminary hearing should be a relatively informal proceeding: "No interest would be served by formalism in this process." *Id.*

The second thing required by due process is a final revocation hearing, "if desired by the parolee." This second hearing "must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." At this hearing, too, the parolee must have an opportunity to be heard "to show, if he can, that he did not violate the conditions, of, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation."

The court added that the revocation hearing "must be tendered within a reasonable time after the parolee is taken into custody.  A lapse of two months [before the final revocation hearing] . . . would not appear to be unreasonable." *Id.* at 488.

The Supreme Court concluded this discussion by disclaiming any intention to write a code of procedure for revoking parole; "that is the responsibility of the states." *Id*. It said, rather, that its job was limited to deciding "the minimum requirements of due process," which included the following: "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and

detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." The Court declined to decide whether a parolee was entitled to the assistance of counsel; that is not an issue in the case at Bar, since New York provides for legal representation at a revocation hearing.

In sum, *Morrissey* confers procedural rights: a preliminary hearing to ensure that there is probable cause to believe that the parolee violated the terms of parole, followed by a merits hearing to resolve contested facts and to determine whether those facts warrant revocation. *Id.* at 484-488. Both hearings must be held within a reasonable period of time; the court concluded that two months was not unreasonable, though without ruling out the possibly that it might be, or that a longer period might not be.

*(i)     Defendants' Argument*

The *Morrissey* Court did not have before it the precise question raised here: namely, whether it is constitutional to detain an alleged parole violator between the preliminary (probable cause) and permanent revocation hearings without giving the violator a chance to offer arguments about why s/he should be released *pendente lite* – a concept similar to bail. Nonetheless, Defendants argue that *Morrissey* decided that issue. They point to the sentence quoted above: "*Such a finding* [of probable cause to hold the parolee for the final decision of the parole board on revocation] *would be sufficient to warrant the parolee's continue detention and return to the state correctional institution pending the final decision.*" (Emphasis added). This, the State argues, explicitly authorizes the mandatory imprisonment of any alleged parole violator as to whom probable cause of a violation has been found to exist – i.e., it blesses the procedure adopted by New York some four decades ago and in force ever since.

To buttress its argument, the State cites the Second Circuit's opinion in *Calhoun v. New York State Div. of Parole Officers*, 999 F.2d 647, 652-53 (2d Cir. 1993) (citing *Morrissey*, 408 U.S. at 487-89), in which the Circuit held that New York's procedures for parole revocation "generally satisfy due process," as well as *Galante v. Warden, Metro. Corr. Center*, 573 F.2d 707, 708 (2d Cir. 1977), for the proposition that an alleged parole violator -- even one accused of a parole violation that is not in and of itself a crime (a so-called "technical violation") -- need not be admitted to bail pending his revocation hearing.

Plaintiffs, on the other hand, argue that defendants both misconstrue the critical sentence in *Morrissey* and read too much into *Calhoun* and *Galante*. They urge that the only case ever to consider the precise question facing this court – *Faheem-El v. Klincar*, 841 F.2d 712 (7th Cir.

21

1988) – ended in their favor, which makes it likely that they will succeed in this lawsuit at the end of the day.

Plaintiffs are correct that the Second Circuit has never affirmatively held that mandatory detention prior to a parolee's final revocation hearing is constitutional under *Morrissey.* It certainly did not do so in *Calhoun* – a case in which the plaintiff waived his right to a preliminary hearing, challenged only the "state's failure to provide a final parole revocation hearing," and never raised the issue of mandatory detention. *Id.* at 654. The Circuit was not asked to rule on whether the State's mandatory pre-hearing detention satisfied due process, and the reference to the state's "general" compliance with due process cannot be read to imply otherwise.

As for *Galante,* the case did not concern New York State parole at all, but the now-defunct federal parole process, 18 U.S.C. § 4161 *et seq.*, which was abolished on November 1, 1987, as part of the Comprehensive Crime Control Act of 1984 (Pub. L. 98-473). *Galante* filed a petition for a writ of habeas corpus (not an action pursuant to 42 U.S.C. § 1983, as Petitioners do here), on the ground that he was being held in violation of his due process rights pending a parole violation hearing. He argued that he was entitled to bail *pendente lite* because the alleged parole violations were not crimes, but were purely technical.[3] The Second Circuit concluded that the trial judge did not abuse his discretion by denying Galante bail. In so deciding the Circuit observed that, "Bail pending a parole revocation hearing is therefore granted only in 'most unusual circumstances' *Argo v. United States, supra.*, at 1378, or when 'extraordinary or exceptional circumstances'…make the grant of bail necessary to make the habeas remedy effective." *Calley v. Calloway*, 496 F. 2d 701-702 (5th Cir. 1974). These statements do not suggest that detention of a

---

[3] The precise technical violation committed by the notorious mobster Carmine Galante was associating while on parole with others who had been convicted of crimes—other members of the Bonnano Crime Family, of which he was the head.

parolee pending a hearing on his alleged violation was mandatory under the old federal parole scheme – otherwise, the district court would have had no discretion to abuse.

But while *Galante* neither addresses the precise scheme before this court nor holds exactly what Defendants argue it held, the Circuit did state without equivocation that Galante, as a parolee, "no longer enjoys the benefit of a presumption of innocence *and has no constitutional right to bail*." *Id.* at 708. This statement has never been questioned or walked back in the half century since *Galante* was decided – which augurs poorly for the Second Circuit's looking favorably on plaintiffs' argument that mandatory detention pending a parole revocation hearing violates due process.

### (ii)    *Plaintiffs' Argument*

Plaintiffs rely principally on the only appellate court decision that addresses the constitutionality of a mandatory detention scheme for alleged parole violator *pendente lite*: *Faheem-El v. Klincar*, 841 F.2d 712 (7th Cir. 1988). According to Plaintiffs, the Seventh Circuit, sitting *en banc*, correctly interpreted *Morrissey* to require the state to provide the parolee with an opportunity to present individualized evidence relevant to "the suitability of releas[e] . . . pending his or her final revocation hearing," *id.* at 726. If this Court follows the reasoning in *Faheem-El*, Plaintiffs claim, it will find that New York's mandatory detention scheme is unconstitutional.

But Plaintiffs exaggerate the scope of the *Faheem-El* decision, which neither struck down a mandatory pre-revocation detention scheme like the one at issue here nor ordered that amenability to release (a/k/a bail) be considered  at a *Morrissey* preliminary probable cause hearing –the precise relief Plaintiffs are seeking from this court.

In *Faheem-El*, the plaintiff parolee argued that the Illinois's mandatory detention statute violated his right to due process by denying him "an immediate bail hearing" that would authorize

his release pending his final revocation hearing. 841 F.2d at 716. The district court held that due process required the parole board to provide the plaintiff with a bond hearing and granted a motion for a preliminary injunction. *Id*. at 722. The Seventh Circuit, sitting *en banc*, reversed; the preliminary injunction was vacated. The vote was 6-5; the court split, not over vacatur of the injunction (as to which all eleven members agreed), but over whether *Morrissey* compelled the dismissal of plaintiff's complaint -- a proposition that accords with defendants' argument here, and which commanded the votes of five of the eleven members of the Seventh Circuit.

In *Faheem-El*, the plaintiff allegedly violated his parole by committing an act that constituted a crime under Illinois law – but a crime as to which, under state law, he had an entitlement to assessment for suitability of release on bail pending adjudication of his criminal case. He was bailed by the State but was then arrested on a parole violation warrant and incarcerated pursuant to Illinois's mandatory pre-revocation incarceration rule. He argued both that he should have been admitted to bail on the parole warrant (an Eighth Amendment violation) and that due process required the state to give him a bail hearing on the parole warrant (a Fourteenth Amendment argument, exactly the one made here).[4] The district court agreed with Faheem-el on both grounds.

Insofar as is relevant here, all eleven members of the Seventh Circuit concluded that Illinois' parole revocation procedures complied "with the minimum procedures outlined in *Morrissey*," and that plaintiff was not entitled to a bail hearing before a judge, because any due process interest plaintiff might have had in a judicial bail hearing "is outweighed by the state's interest in regulating parole." *Id.* at 723-4.

---

[4] As no Eighth Amendment is made in this case, that analysis will not be further discussed.

Having dispensed with that possibility, the court went on to consider whether the plaintiff had a due process right to an individualized determination of his suitability for release at the preliminary probable cause hearing. The majority noted that *Morrissey* "clearly implies that . . . the parolee could be incarcerated pending the final revocation hearing," even though "the issue was not before the [Supreme] Court" in that case. *Id.* at 724. Of course, *Morrissey* does far more than "imply" this: the Supreme Court flatly stated that incarceration was permissible, as discussed above. (*See supra.*, Section 2(i).).

But the six-judge majority (in a footnote, see n. 14) interpreted the phrase "probable cause to hold the parolee for the final decision of the parole board on revocation" as at least suggesting that the officer holding the probable cause hearing might have to make a decision on whether to "hold" the parolee – with "hold" apparently read as meaning "incarcerate" rather than as "bind over for a hearing on the merits"[5] To the *Faheem-El* majority, this meant that mandatory detention might constitute a due process violation under certain circumstances, and that whether it did violate due process should be assessed using the balancing test announced by the Supreme Court in *Matthews v. Eldridge*, 424 U.S. 319 (1976). That test requires comparing the magnitude and risk of burdens on the individual to the burdens with the costs to the state of implementing the additional protections. 841 F.2d at 726-27. The majority remanded the case so that the parties could develop the record on the additional burdens and costs the state would face by augmenting its parole revocation procedures to include some sort of hearing on pre-revocation release.

Five of the eleven judges on the *en banc* panel, while agreeing that the preliminary injunction should be vacated, disagreed with the remand order. Speaking for three of the five, Judge Easterbrook flatly said that the relevant language in *Morrissey* – the sentence stating that a

---

[5] One ordinarily finds "probable cause" to conclude that a crime or misdeed has been committed; it is not customary in our profession to find "probable cause" that someone should go to jail.

probable cause determination "would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision" – meant that the Supreme Court had already decided there was no problem with mandatory detention pending a final determination of whether the parolee had indeed violated.   841 F.2d at 730 (Easterbrook, J., concurring) (quoting *Morrissey*, 408 U.S. at 487). In his view, *Morrissey* answered the mandatory detention question once and for all – even if that precise issue was not presented to the Supreme Court (and it indubitably was not). As long as an alleged parole violator receives a prompt determination that there is probable cause to believe he violated his parole, mandatory detention is permissible (at least pending a reasonably prompt hearing). Judge Easterbrook thus said, "It is unnecessary for us to balance interests under the Due Process Clause, and unwarranted to invite the district judge to take more evidence and strike his own balance." *Id.* Two other judges of the Seventh Circuit, Judges Wood and Ripple, echoed Judge Easterbrook's conclusion that *Morrissey* foreclosed Faheem-El's argument.

Judge Easterbrook did indicate that there was a troubling aspect to Faheem-El's detention, but it was not its mandatory nature – rather, it was its length. He observed that the Supreme Court has blessed a two month period of detention between the preliminary and final hearings as "not unreasonable," but then noted that Faheem-El "waited a lot longer than that [for his final hearing], and evidence in the record suggests that other parolees wait longer too." Because "the district court … did not consider whether Illinois routinely holds parolees between stages for more than two months," Judge Easterbrook suggested that this, rather than a *Matthews* balancing, would be a proper issue for exploration on remand. Judge Ripple also said it would be appropriate for the district court to consider on remand, "the claim that Illinois has routinely disregarded the mandate of *Morrissey*" by not holding sufficiently timely hearings.

As the above discussion makes clear, Plaintiffs read far too much into *Faheem-El.* The case made no changes to the content of Illinois's preliminary probable cause hearings, or to its mandatory detention statute.

In this case, Plaintiffs adopt the same approach that Faheem-El did: they challenge the mandatory detention of parole violators as a categorical violation of due process, while ignoring the possibility that a subset of the proposed class might possess a narrower but colorable due process claim arising out of delays in the holding of their revocation hearings. As was true in *Faheem-El*, some evidence in the record supports this: Department of Corrections databases show that the state has failed to meet the 90-day statutory deadline for revocation hearings for 17% of the parolees in Plaintiffs' proposed class. (Dkt. No. 17, Shames Decl. ¶ 9.)  But that information is offered only as background, ostensibly to justify why plaintiffs should be allowed out pending their finals hearings; it is not the basis of some independent constitutional claim. It is, therefore, interesting but irrelevant.

In sum, Plaintiffs' argument that *Faheem-El* clearly entitles them to the drastic relief of a mandatory preliminary injunction thus hangs on the thread of a decision that denied a preliminary injunction to a putative class of parolees, and in which a slim majority never finally decided whether mandatory detention of parolees pending final revocation hearings constituted a per se constitutional violation, while a vocal and not small minority decided definitively that it did not.  That is a far cry from a clear showing to an entitlement to relief.

The other authorities cited by Plaintiffs are not helpful because the plaintiffs in those cases stood in shoes far different than do alleged parole violators.  For example, in *Mental Hygiene Legal Serv. v. Spitzer*, No. 07 cv 2935 (GEL), 2007 WL 4115936 (S.D.N.Y. Nov. 16, 2007), the court struck down a provision of New York State law than mandated the continued detention of

convicted sex offenders between the time they completed their criminal sentence (including any term of parole) and the holding of a final civil commitment hearing. *Id.* at *15. The mandatory detention at issue in *Mental Hygiene* cannot be analogized to the detention of the members of the plaintiff class. Plaintiffs are parolees. They are still completing the terms of their sentences. They have been released into society, but "on parole" -- at sufferance and subject to numerous conditions. A neutral and detached officer has found probable cause to believe that they have violated one of more of the rules they are required to follow as a condition of being in society rather than being in jail. It is precisely because, "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence," that a parolee's due process rights are circumscribed. *Morrissey*, 408 U.S. at 477. An individual who has completed his sentence of incarceration, by contrast – even if he is a sex offender -- has fully "paid his debt to society" and does not have a liberty interest that can be in any sense described as "circumscribed." He is entitled to go free, and he cannot be detained further without receiving the full panoply of due process rights.

For two reasons, *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015), *judgment vacated*, 2018 WL 1143819 (U.S. Mar. 5, 2018), is of no help to plaintiffs. In *Lora*, the Second Circuit ruled that an alien being held for a deportation hearing could not be jailed for more than six months without having a bond hearing. Plaintiffs cite the case for the proposition that persons accused of technical violations of law must have an opportunity to post bond. But the Court of Appeal's decision authorized a mandatory incarceration scheme to endure for at least six months – twice the period allowed under New York's mandatory detention scheme for alleged parole violators -- in the face of a "technical" violation of immigration laws, which could lead to deportation. This certainly suggests that the Circuit would not find unconstitutional  a mandatory incarceration of two or three

months, in the face of a finding of probable cause to believe that a convicted criminal had violated the terms of his parole (even "technically") and was facing re-incarceration.

Moreover, the Supreme Court vacated *Lora* in light of *Jennings v. Rodriguez*, 138 S.Ct. 830, 200 L.Ed.2d 122 (2018) – a case in which the high court held that the text of section 1226 of the Immigration and Naturalization Act unambiguously foreclosed any right to a bond hearing pending deportation. In *Jennings*, the Supreme Court invited the Ninth Circuit to take up the question of whether the indefinite detention of aliens awaiting deportation hearings violated the Constitution – an issue the Court of Appeals (like the Second Circuit in *Lora*) had carefully sidestepped. The Second Circuit was directed to reconsider *Lora* in light of *Jennings*. It has yet to do so post-*Jennings*, in light of "substantial uncertainty" that exists in the "new legal landscape." *See Hechavarria v. Sessions*, 891 F.3d 49, 58 (2d Cir. 2018). Just last week, the Ninth Circuit held, in *Aleman Gonzalez v. Barr*, No. 18-16465, 2020 WL 1684034 (9th Cir. Apr. 7, 2020), that an alien not subject to imminent release or removal (*i.e.* held under Section 1231 instead of section 1226), is entitled to a bond hearing, again after six months of detention. *Id.* at *18. Whether that decision will survive Supreme Court review is uncertain at best.

But none of these cases suggests that "the new legal landscape" would afford alleged parole violators speedier bond hearings than were made available in *Lora*, -- a period much longer than the period challenged in this case.

* * * * * * * * * * * * * * ** * * * * * * * * * * * * * * * * * * * * * * *

As should be clear from the above discussion, Plaintiffs have not come close to establishing a clear likelihood that the law entitles them to success on the merits of their federal constitutional claim. Not a single precedent – not even the one they deem most favorable to their cause—stands for the proposition they ask this court to adopt. Where, as here, preliminary injunctive relief would

give the plaintiffs everything for which they ask at the end of the case, much more of a showing is needed to demonstrate that they have a clear entitlement to relief. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).

As Plaintiffs have failed to show "that their cause is considerably more likely to succeed than fail," *Abdul Wali v. Coughlin*, 754 F.3d 1015, 1026 (2d Cir. 1985); see also *Soccer, supra.*, 883 F.3d at 37, there is no need to prolong the discussion. The motion for a preliminary injunction on Plaintiffs' federal constitutional claim is denied. *See Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LAP), 2007 WL 3254421, at \*9 (S.D.N.Y. Nov. 2, 2007), *aff'd*, 270 F. App'x 56 (2d Cir. 2008); *Greenlight Capital, L.P. v. Apple, Inc.*, No. 13 CV 900 (RJS), 2013 WL 646547, at \*12 (S.D.N.Y. Feb. 22, 2013).

### III. *Plaintiffs Have Not Established a Likelihood of Success on the Merits of their State Constitutional Claim.*

Nor have Plaintiffs established a likelihood of success on the merits on their analogous claim under the New York state constitution.

First, as a jurisdictional matter, the Eleventh Amendment bars a federal court from awarding injunctive relief based on a claim arising under state law claim against state officials. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 121 (1984) ("a claim that state official violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment," including "state-law claims brought into federal court under pendent jurisdiction").

Second, as a substantive matter, the New York Court of Appeals has concluded, under the Due Process Clause of the state constitution, that a parolee detained pending a final revocation hearing has no due process right to bail. *People ex rel. Calloway v. Skinner*, 33 N.Y.2d 23, 33 (1973). Moreover, it did so by holding that any due process rights under the New York States

Constitution were co-extensive with those under the federal constitution – which means that Plaintiffs' failure to demonstrate a clear likelihood of success on the merits of their federal claim automatically means that they have failed to do the same under the state constitution.

## FURTHER PROCEEDINGS

Because the parties insisted on not consolidating the preliminary and permanent injunction phases of this lawsuit, the Court needs to turn to the prospect of further proceedings.

Given the importance of any challenge to the constitutionality of a state statutory and regulatory scheme, it behooves the parties to take a step back and consider where they are going.

The Plaintiffs have adduced some evidence of potential constitutional violations that are not alleged as claims for relief in the Complaint. I am thinking specifically of the potential violation identified by Judge Easterbrook – that is, a consistent, non-random failure by the State to hold parole revocation hearings in a timely manner consistent with *Morrissey*. Perhaps Plaintiffs will wish to amend their complaint to add additional claims for relief – although it is not clear to the court that a class action under Section 1983 is the proper vehicle for raising those issues. Lacking briefing on that issue, I simply note it and put it to the side.

I am certain defendants will eventually move for summary judgment. The plaintiffs may wish to have additional discovery before addressing such a motion. For that matter, defendants might wish to challenge Plaintiffs' evidence, or introduce evidence of their own that goes to the only question raised by the Plaintiffs' complaint, which is the constitutionality of the mandatory detention of alleged parole violators between the time when probable cause is found and the time when parole revocation – or not – is finally determined.

I am equally certain that the parties will not agree on what needs to happen with the record before the court can entertain further motions. I thus give them twenty days to come up with a plan

31

of action – or to submit separate letters of no more than three pages, explaining their respective positions. If plaintiffs take an appeal from the denial of their motion for a preliminary injunction, that deadline will become twenty days following the issuance of the mandate of the Second Circuit.

And, of course, the Legislature may well take the matter out of the hands of the courts. I understand that a bill to do away with mandatory detention *pendente lite* has been introduced before that body. A legislative solution would be best for all concerned. It may even be that the COVID disaster will cause the Legislature to view the issue of mandatory detention for all alleged parole violators in a new light, one more favorable to alleged parole violators. Like the minority judges in *Faheem-El*, this court commends the thoughts expressed by the majority in that case – as well as the arguments propounded by plaintiffs -- to the attention of Albany.

## CONCLUSION

The motion for a preliminary injunction is DENIED.

This constitutes a written opinion and order of the court.

The Clerk of Court is directed to mark the motion at Docket #12 off the court's list of open motions.

Dated: April 20, 2020

_____

Chief Judge

BY ECF TO ALL COUNSEL

## APPENDIX

The Court takes note of the following information in the record concerning the impact of COVID-19 on the conduct of parole hearings and on pre-hearing release procedures. This information is drawn from the Defendants' sworn affidavits. Plaintiffs do not ask this Court for any relief relating to any of the following.

*The Conduct of Parole Hearings*

On March 10, 2020, in response to the recommendations from the Center for Disease Control and the World Health Organization regarding the risk of exposure to COVID-19, the Criminal Justice Bureau at NYC DOC implemented a number of restrictions regarding operation of the Judicial Center on Rikers Island, which is where parole revocation hearings are held. This included ending all court hearings by 4:30pm, closing the Judicial Center promptly at 5pm, and eliminating all overtime for NYC DOC staff. (*Id*. at ¶ 5.)

Between March 11 and March 15, 2020, personnel from NYC DOC, the Bureau of Adjudication for the Parole Board ("Adjudication Bureau"), and The Legal Aid Society ("Legal Aid") discussed alternatives to in-person hearings for alleged parole violators, including the possibility of using Skype to conduct video conference hearings at the Judicial Center in the event the COVID-19 pandemic prevented in-person conferences. (*Id*. at ¶ 6.)

During the week of March 16, 2020, live preliminary hearings continued to take place at Rikers Island for defendants who were represented by attorneys on the county 18-b panels. (*Id*. at ¶ 9.) However, On March 16, 2020, Legal Aid notified personnel from DOCCS and NYC DOC via email that Legal Aid attorneys would not be attending final revocation hearings. (*Id*. at ¶ 8.)

DOCCS, NYC DOC and Legal Aid continued to explore technological options to utilize for hearings. The parties ultimately agreed on WebEx, an audio-based conferencing system. (*Id.* at ¶¶ 11-12.)

On or about March 23, 2020, all preliminary hearings at Rikers stopped because the hearing rooms were too small to allow for social distancing. (*Id.* at ¶ 13.) However, the infrastructure upgrades required in the Judicial Center and various other buildings at Rikers Island in order to use the WebEx system were implemented by NYC DOC, overseen by Brian Charkowick, Executive Director of Infrastructure & Operations at NYC DOC. (*Id.* at ¶ 16.) As might be expected, these changes could not be accomplished overnight.

On April 7, 2020, the WebEx system was successfully tested. (*Id.* at ¶ 18.) The next day DOCCS staff began the process of rescheduling the backlog of preliminary and final revocation hearings using the WebEx system. *Id.* Preliminary hearings resumed for parolees housed at Rikers Island on the morning of April 9, 2020. (*Id.* at ¶ 19.) Final revocation hearings at Rikers recommenced on April 13, 2020. (*Id.* at ¶ 20.)

All hearings at Rikers Island are required to comply with the restrictions put in place by NYC DOC on March 10, 2020, which require all hearings to conclude by 4:30 pm so that the Judicial Center can close promptly at 5pm. NYC DOC staff remain prohibited from working overtime. (*Id.* at ¶ 19.)

In addition, the Parole Board has modified its procedures to allow Legal Aid to submit plea agreements orally to the Parole Board, with subsequent signed confirmation. (*Id.* at ¶ 23.)

Plaintiff Bergamaschi's preliminary hearing, originally scheduled for March 24, 2020, was rescheduled for the morning of April 10, 2020. (*Id.* at ¶ 22.) The Preliminary Hearing Officer has ordered that his parole warrant be lifted; he has been released. (*Id.*)

Plaintiff Roberson waived his preliminary hearing.  (Compl. ¶ 61), His final revocation

hearing was scheduled for April 14, 2020 (Tomlinson Decl. at ¶ 21), well within the 90-day

period required under New York's parole revocation procedures. However, Roberson, along with

99 other alleged parole violators awaiting hearing, filed a petition for a writ of habeas corpus,

pursuant to CPLR Art. 70, in the New York State Supreme Court. After reviewing his medical

records, Roberson's release was ordered, and he was released on April 12, 2020. (Desgranges

Decl. ¶ 4.)

*Emergency Internal Review of Parolee Release Suitability*

In response to a directive from the Governor in the wake of the COVID-19 pandemic,

DOCCS staff, in coordination with Parole Board staff, undertook a review of parolees statewide

who were detained for so-called "technical" parole violations (i.e., those not involving the

commission of a new crime) or for absconding, to see whether some of them could have their

warrants lifted and be released prior to hearings. This was done in an effort to reduce the jail

population in the wake of the COVID-19 pandemic. (Dkt. No. 26, Annucci Decl. at ¶ 4.)

DOCCS staff, in coordination with Parole Board staff, developed criteria to determine whether

each parolee was eligible to participate in this discretionary review process.  To be eligible for

review, a parolee had to:  (i) have a risk score of 3 or 4 using the Correctional Offender

Management Profiling for Alternative Sanctions ("COMPAS") clinical assessment tool; (ii) not

have been convicted of a sex offense; (iii) not suffer from a significant mental illness, meaning

the parolee has not been assigned an Office of Mental Health 1-S designation; (iv) not have a

history of domestic violence; (v) not have engaged in misconduct involving either weapons or

violent conduct as the basis for the violation; and (vi) have an existing residence or have received

placement in an approved housing facility. (*Id.* at ¶ 5.) These criteria were devised to ensure the

35

safety of its employees, parolees housed at Rikers, and the public at large. Applying these criteria, DOCCS identified 1534 parolees eligible for discretionary release review. (*Id.* at ¶ 6.)

This discretionary release review process for all qualifying parole violators in custody on a parole warrant throughout the State was recently completed. (*Id.* at ¶ 6.) Out of a total of 1534 cases statewide in which alleged parole violators met the qualifying criteria -- approximately 600 of whom were detained at Rikers Island or elsewhere in New York City -- the Parole Board lifted the warrants of 760 parolees (or nearly half of the cases reviewed) and released them back into the community. (*Id.*)

With respect to the Plaintiffs, DOCCS staff, in coordination with Parole Board staff, applied the criteria to their situations and determined that neither was eligible for discretionary release. Plaintiff Roberson's COMPAS score disqualified him, while Plaintiff Bergamaschi has a history of domestic violence and a related alleged parole violation. (*Id.* at ¶ 7.)

The court is advised that, as long as the COVID-19 crisis lasts, DOCCS staff, in coordination with Parole Board staff, will continue to review all new qualifying alleged parole violators in custody for discretionary release under these criteria until the exigent circumstances created by the pandemic no longer exist. (*Id.* at ¶ 8.)

Between the discretionary release program just described and orders entered by state court judges in response to habeas petitions, roughly 20% of all inmates at Rikers Island were released prior to the commencement of this lawsuit. This has left entire buildings on Rikers Island empty and provided "space for segregating individuals and allowing for greater social distancing." (*Id.*, Ex. B at 5.)