UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------
MICHAEL BERGAMASCHI, *et al.*, on behalf
of themselves and all others similarly situated,

                                              Plaintiffs,                    20-cv-2817 (CM)

        - against -

ANDREW M. CUOMO, Governor of New York
State, in his official capacity, *et al.*,

                                              Defendants.
-------------------------------------------------------------


# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT


LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY  10005

*Attorney for Defendants*


Andrew Amer
  Special Litigation Counsel
Amanda Yoon
  Assistant Attorney General
    *of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

    A.    New York's Parole Revocation Procedures.......................................................3

    B.    Plaintiffs' Amended Complaint ........................................................................6

STANDARD OF REVIEW ....................................................................................................7

ARGUMENT........................................................................................................................8

  I.    THE DUE PROCESS CLAUSE DOES NOT REQUIRE NEW YORK
       TO PROVIDE A CUSTODY RELEASE HEARING TO PAROLEES ........................8

    A.  The State Has a Significant Interest in Mandatory Detention to Promote Public
       Safety and Avoid Substantial Fiscal and Administrative Burdens.......................10

      1.  Mandatory Detention Promotes Public Safety ..................................................10

      2.  The State Will Bear Enormous Fiscal and Administrative Burdens if Required to
          Provide Custody Release Hearings..................................................................12

           i.  Providing Notice for the Custody Release Hearings Would Cost the
              State $9.8 Million in the First Year And $8.6 Million in Each
              Subsequent Year...........................................................................14

           ii.  Providing Over 14,000 Custody Release Hearings Annually Would
              Cost the State $12.8 Million in the First Year and $12 Million in Each
              Subsequent Year...........................................................................15

           iii. Supervising Released Parolees Could Cost the State Millions per Year
              Depending on the Release Rate ........................................................16

           iv. Conducting Final Hearings for Released Parolees Would Cost the
              State at Least $11.4 Million in the First Year and $3.5 Million in Each
              Subsequent ..................................................................................18

    B.  There Is No Material Risk of an Erroneous Deprivation of a Parolee's Conditional
       Liberty Interest Under New York's Parole Revocation Procedures and No
       Probable Value of Adding a Custody Release Hearing .......................................20

    C.  The Private Interest of Parolees Is a Limited Conditional Liberty Interest ......................22

  II.   THE COMPLAINT SHOULD ALSO BE DISMISSED AGAINST THE
      GOVERNOR ON THE BASIS OF SOVEREIGN IMMUNITY AND
      ELEVENTH AMENDMENT IMMUNITY...........................................................23

CONCLUSION...................................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612 (2d Cir. 1998) ...................7

*Alden v. Maine*, 527 U.S. 706 (1999) ...........................................................................24

*American Hotel Intern. Group, Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373 (S.D.N.Y. 2009) ...........................................................................................................................9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................................7, 8

*Aron v. Becker*, 48 F. Supp. 3d 347 (N.D.N.Y. 2014) ..........................................25

*Bergamaschi v. Cuomo*, No. 20 Civ. 2817, 2020 WL 1910754 (S.D.N.Y. April 20, 2020) ............ 2, 9

*Calhoun v. New York State Div'n of Parole Officers*, 999 F.2d 647 (2d Cir. 1993) ............8

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................7

*Citizens Union of the City of New York, v. Attorney General of New York*, No. 16-CV-9592, 2017 WL 2984167 (S.D.N.Y. June 23, 2017) ...................................................24

*Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199 (2d Cir. 2009) ............................8

*Ex parte Young*, 209 U.S. 123 (1908) ...........................................................24

*Faheem-El v. Kimcar*, 841 F.2d 712 (7th Cir. 1988) ...........................................9

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968) ............................8

*Hans v. Louisiana*, 134 U.S. 1 (1890) .........................................................24

*In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367 (2d Cir. 2005) ....................24

*In re PCH Assocs.*, 949 F.2d 585 (2d Cir. 1991) ...............................................9

*Kelly v. New York State Civil Service Commission*, 632 F. App'x 17 (2d Cir. 2016) .........24

*Kentucky v. Graham*, 473 U.S. 159 (1985) ...................................................24

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...........................................passim

*Mathie v. Fries*, 121 F.3d 808 (2d Cir. 1997) ...............................................24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .....................8

*Mempa v. Rhay*, 389 U.S. 128 (1967) ...........................................................8

*Mitchell v. City of New York*, 841 F.3d 72 (2d Cir. 2016) .....................................8

*Morrissey v. Brewer*, 408 U.S. 471  (1972) .............................................passim

*Nichols v. Brown*, 859 F. Supp. 2d 1118 (C.D. Cal. 2012) ...................................25

*Papasan v. Allain*, 478 U.S. 265 (1986) .......................................................24

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ............................24

*Ricciardi v. Metro. Life Ins. Co.*, No. 16-CV-3805 (CM), 2019 WL 652883 (S.D.N.Y. Feb. 15, 2019) .......................................................................................................8

*S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481 (S.D.N.Y. 2015) .............................8

*Senno v. Elmsford Union Free Sch. Dist.*, 821 F. Supp. 2d 454 (S.D.N.Y. 2011) .........................8

*State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71 (2d Cir. 2007) ............24

*Steinberg v. Elkman*, 666 F. App'x 26 (2d Cir. 2016) .......................................................24

*United States ex rel. Carson v. Taylor*, 540 F.2d 1156 (2d Cir. 1976) ...............................20

*United States v. Sanchez*, 225 F.3d 172 (2d Cir. 2000) ....................................................23

*Wang v. Pataki*, 164 F. Supp. 2d 406 (S.D.N.Y. 2001) .....................................................25

**Statutes**

Ark. Code Ann. § 16-93-705 (West 2020) ....................................................................6

Mo. Rev. Stat, § 217.720 (West 2018) ........................................................................6

N.Y. Education Law § 305(2) .......................................................................................6

N.Y. Exec. Law § 259-i(3)(a)(i) ...............................................................................4, 6

N.Y. Exec. Law § 259-i(3)(c)(i) .................................................................................5

N.Y. Exec. Law § 259–i(3)(c)(iii) ..............................................................................5

N.Y. Exec. Law § 259-i(3)(c)(iv) ...............................................................................5

N.Y. Exec. Law § 259-i(3)(c)(iv) ...............................................................................5

N.Y. Exec. Law § 259-i(3)(f)(i) ..................................................................................5

N.Y. Exec. Law § 259-i(3)(f)(iv) ................................................................................5

N.Y. Exec. Law § 259-i(3)(f)(v) .................................................................................5

N.Y. Exec. Law § 259-i(3)(f)(ix) ................................................................................6

**Other Authorities**

Cohen, *Law of Probation & Parole* § 1:1 (2d ed.) .......................................................6

NYS Register (October 15, 1986), No. PAR-41-86-00070-EP, Filing No. 2245 ...................12

P. Villettaz, G. Gillieron, M. Killias, *The Effects on Re-Offending of Custodial vs. Non-Custodial Sanctions: An Updated Systematic Review of the State of Knowledge*, Campbell Systematic Reviews (Jan. 2015) .......................................................................................................21, 22

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................7

**Regulations**

9 N.Y.C.C.R. § 8005.20(a) ...........................................................................................6

9 N.Y.C.R.R. § 8003.2 .................................................................................................22

9 N.Y.C.R.R. § 8004.2 ...................................................................................................4

9 N.Y.C.R.R. § 8005.3 ...................................................................................................5

9 N.Y.C.R.R. § 8005.3(c)...................................................................................................................5

9 N.Y.C.R.R. § 8005.7(a)(5)..............................................................................................................6

**Constitutional Provisions**

U.S. Const. amend. XI...................................................................................................................24

Defendants Andrew M. Cuomo, Governor of the State of New York, and Tina M. Stanford, Chairperson of the New York State Board of Parole ("Parole Board"), sued here in their official capacities (collectively, "Defendants"), respectfully submit this memorandum of law in support of their motion for summary judgment seeking dismissal of this case in its entirety under Fed. R. Civ. P. 56.[1]

## PRELIMINARY STATEMENT

For decades, New York's parole revocation procedures have afforded parolees all the due process to which they are entitled under the Supreme Court's landmark decision in *Morrissey v. Brewer*, 408 U.S. 471 (1972). The Parole Board provides parolees with notice of any parole violations and two prompt hearings – a preliminary hearing to determine probable cause within 15 days of arrest and a final revocation hearing on the merits within 90 days. Along with a majority of states, New York detains alleged parole violators pending their final revocation hearing if the parole warrant is not lifted at the preliminary hearing stage.

Plaintiffs claim these long-standing procedures must be changed to include a new custody release determination by a neutral decision-maker on the suitability of releasing each parolee pending the final revocation hearing based on factors such as flight risk and danger to the community. *See* Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Injunction ("Plaintiffs' PI MOL"), Dkt. No. 19, at 20, 24-25. And they seek to do so by judicial fiat under the guise of a due process challenge rather than through lobbying for legislative and regulatory policy changes, even though (as the Court previously noted) a bill is currently pending before the New York Legislature

---

[1] On September 17, 2020, Plaintiffs' counsel filed a Suggestion of Death as to Plaintiff Bergamaschi. *See* Dkt. No. 56. Because Plaintiff Roberson's status as a named plaintiff has not changed, Plaintiff Bergamaschi's passing has no effect on the Court's jurisdiction to hear and decide this case. As the caption has not been amended, Defendants will continue to refer to "Plaintiffs" in the plural to avoid confusion.

that, if enacted, would provide the relief Plaintiffs seek and potentially render this action moot. *See Bergamaschi v. Cuomo*, No. 20 Civ. 2817, 2020 WL 1910754, at *16 (S.D.N.Y. April 20, 2020). Indeed, the 20 states that afford alleged parole violators the opportunity to seek release from custody pending their final revocation hearings all do so as a result of policy choices reflected in statutes or regulations. Research has failed to uncover *any* court decision holding that a state must provide an alleged parole violator with a custody release hearing as a matter of due process.

The Court has already determined that ascertaining what process is due to alleged parole violators involves balancing the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976): (1) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the private interest that will be affected by the official action. *See Bergamaschi*, 2020 WL 1910754, at *12-13. These three factors all weigh in favor of granting Defendants summary judgment.

First, New York's existing parole revocation procedures ensure that an alleged parole violator is taken into custody only where there is a determination made that the parolee poses a risk to public safety or to the parolee's own health and welfare, thus promoting the State's significant interest in protecting the safety of both the public and the parolee (Point I.A.1). Second, the burden on the State to afford alleged parole violators a custody release determination would be enormous. The total price tag to the State would be *at least* an initial start-up cost in the first year of $35 million and $25 million in recurring annual costs thereafter (Point I.A.2). Third, the evidence shows that there is no material risk of "erroneous" probable cause findings at the preliminary hearing stage under New York's parole revocation procedures, and, thus, Plaintiffs cannot demonstrate a probable value to society of a custody release hearing (Point I.B). Fourth, settled precedent establishes that a parolee's private

interest is only a limited conditional liberty interest, and therefore that interest cannot tip the balance in Plaintiffs' favor (Point I.C).

Because Plaintiffs have no constitutional entitlement under the Due Process Clause to a custody release determination pending their final revocation hearings, the advisability of affording alleged parole violators such a hearing is for the Legislature and Parole Board to assess and decide whether to adopt – which they are currently in the process of doing.

Finally, the Court should grant summary judgment to the Governor on the basis of Eleventh Amendment immunity regardless, because he plays no role in the enforcement of New York's parole revocation procedures (Point II).

Accordingly, the Court should grant Defendants' motion for summary judgment in its entirety.

## STATEMENT OF FACTS

### A.  New York's Parole Revocation Procedures

Parole is an alternative method by which a prisoner may complete his or her sentence; admission to parole status does not terminate a prisoner's sentence.  *See Morrissey*, 408 U.S. at 477. "[T]he essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id.*  These conditions restrict a parolee's activities substantially beyond the ordinary restrictions imposed by law on an individual citizen. *Id.*  A Parole Officer plays an integral role in guiding the parolee into constructive development with the ability to enforce the conditions by revoking the parole and returning the parolee to prison. *Id.*

Not every violation of parole conditions automatically leads to revocation.  In New York, before a decision is made to issue a parole violation warrant based upon a parolee's alleged violation of parole conditions, the Department of Corrections and Community Supervision ("DOCCS") conducts a thorough examination and evaluation of the allegations to assess the level of risk to the

community posed by the parolee's release.  Declaration of Timothy O'Brien, dated October 22, 2020 ("O'Brien Decl."), at ¶ 5.  The initial assessment whether to issue the warrant is made by the Parole Officer handling the case, with the involvement of a Senior Parole Officer and a Bureau Chief, in DOCCS's Community Supervision Unit ("Community Supervision").  *Id.*  If the Parole Officer, in consultation with the Senior Parole Officer and Bureau Chief, determines that the parolee's release does not pose a risk to public safety or the parolee's health and welfare, including those situations where there is an opportunity to employ graduated sanctions or other alternative measures to a parole violation warrant to obtain a positive behavioral outcome, then the Senior Parole Officer will not issue the warrant.  *Id.*  The Senior Parole Officer will issue a warrant only where there is a determination that the parolee poses a public safety risk or a risk to the parolee's own health and welfare, and then only with the approval of the Bureau Chief where the violative conduct does not involve a new criminal arrest, an alleged violation of the law, or absconding from supervision.  *Id.*; *see* N.Y. Exec. Law § 259-i(3)(a)(i); 9 N.Y.C.R.R. § 8004.2.

Among the factors that the Parole Officer considers in assessing whether the parolee poses a risk to public safety or the parolee's health and welfare are: (i) the conduct giving rise to the alleged violation of parole conditions; (ii) the underlying offense; (iii) the parolee's criminal history; (iv) the parolee's history of compliance with the conditions of supervision; (v) any aggravating or mitigating circumstances; and (vi) the supervision level assigned under the Correctional Offender Management Profiling for Alternative Sanctions ("COMPAS") assessments/case plan tool.  O'Brien Decl. at ¶ 6. By following this procedure to determine whether to issue a warrant for an alleged parole violation, DOCCS ensures that an alleged parole violator is taken into custody only where there is a determination made that the parolee poses a risk to public safety or the parolee's own health and welfare.  *Id.* at ¶ 7.  As a result, mandatory detention of the alleged parole violator pending the final hearing serves the State's interest in protecting the safety of both the public and the parolee.  *Id.*

New York Executive Law § 259-i(3) and 9 N.Y.C.R.R. § 8004 and § 8005 set forth the procedures involved in parole revocation hearings once a parole violation warrant is issued. First, within three days of initial detention pursuant to the parole warrant, the parolee is given notice of the charges and of his rights. N.Y. Exec. Law § 259–i(3)(c)(iii); 9 N.Y.C.R.R. § 8005.3. Unless the detained parolee has been convicted of a new crime, he has a right to request a preliminary hearing before a hearing officer who had not had "any prior supervisory involvement over the alleged violator," which then takes place within 15 days of the execution of the parole warrant. N.Y. Exec. Law § 259-i(3)(c)(i). At the preliminary hearing, the hearing officer determines whether there is probable cause that a violation of parole condition occurred. N.Y. Exec. Law § 259-i(3)(c)(iv). The parolee has the right to appear and to present witnesses and evidence on his own behalf, as well as the right to confront and cross examine adverse witnesses. N.Y. Exec. Law §§ 259-i(3)(c)(iii) & (iv); 9 N.Y.C.R.R. § 8005.3(c). After the preliminary hearing, the presiding hearing officer issues a written decision stating the reasons for the determination and citing to the evidence upon which the determination was based. N.Y. Exec. Law §§ 259-i(3)(c)(vi). If a finding of probable cause is made at the preliminary hearing or where the parolee has waived his right to a preliminary hearing, a final revocation hearing is scheduled to occur within 90 days. N.Y. Exec. Law § 259-i(3)(f)(i).

At the final revocation hearing, the parolee is entitled to a number of protections, including: (i) the right to compel witnesses to appear at the hearing and provide testimony; (ii) the right to subpoena and submit documentary evidence; (iii) the right of confrontation and cross examination; (iv) the right to submit mitigating evidence for the purpose of being restored to supervision; and (v) the right to representation of counsel. N.Y. Exec. Law §§ 259-i(3)(f)(iv) and (v). In the event the alleged parole violator is indigent and cannot afford counsel, an attorney will be assigned to afford representation. N.Y. Exec. Law § 259-i(3)(f)(v). If the hearing officer does not find that a violation of release in an important respect was committed, the charges are dismissed and the parolee is released

5

back to supervision.   N.Y. Exec. Law § 259-i(3)(f)(ix); 9 N.Y.C.C.R. § 8005.20(a); *see generally*, Declaration of Rhonda Tomlinson, dated October 23, 2020 ("Tomlinson Decl."), at ¶ 4.

Since 1978, under N.Y. Exec. Law § 259-i(3), if the Parole Officer has probable cause to believe that the parolee has violated a condition of his parole, a warrant may be issued for his temporary detention in accordance with the rules of the Parole Board.  That law expressly provides that the detention of any such person may be "further" regulated by rules and regulations of the Parole Board.  N.Y. Exec. Law § 259-i(3)(a)(i).  The Parole Board's regulations mandate the detention of the alleged violator once there is probable cause to find that the alleged violator has violated one or more of the conditions of parole *in an important respect*.  9 N.Y.C.R.R. § 8005.7(a)(5) ("If the preliminary hearing officer finds that there is probable cause to believe that the alleged violator has violated one or more of the conditions of parole in an important respect, he *shall* direct that the alleged violator be held for further action pursuant to section 8004.3 of this Title.") (emphasis added).

New York's mandatory detention is not unique or unusual.  Indeed, in a majority of States, alleged parole violators who are taken into custody by the police or corrections officers on a parole warrant are detained pending their final revocation proceedings.  Cohen, *Law of Probation & Parole* § 1:1 (2d ed.) (available on Westlaw at LAWPROBPAR § 18.5); *see, e.g.,* Mo. Rev. Stat, § 217.720 (West 2018); Ark. Code Ann. § 16-93-705 (West 2020); *see also* Am. Compl. ¶ 47 (listing only 20 states that do not have mandatory detention for alleged parole violators pending the final revocation hearing).

### B.  Plaintiffs' Amended Complaint

Plaintiffs bring their action, on behalf of a purported class comprising "all people on parole in New York City who are or will be detained pending final hearing on a parole warrant pursuant to" New York's parole revocation procedures, to force this Court to adopt an alternative procedure to mandatory detention of alleged parole violators pending their final revocation hearings.  Am. Compl. at ¶¶ 10, 65.  Plaintiffs invoke the Court's jurisdiction pursuant to 42 U.S.C. § 1983 and assert only

one claim under the Due Process Clause of the U.S. Constitution. *Id.* ¶¶ 67, 70-71. They seek a mandatory injunction compelling the Parole Board to significantly augment the existing parole revocation procedures to include a new assessment to evaluate "each person's suitability for release pending their final revocation hearings where each person on parole has the opportunity to be heard and present evidence." *Id.* at 23. In their motion for a preliminary injunction, Plaintiffs provide further detail on this new release suitability review that is in form and substance a bail hearing; specifically, it must be conducted by a "neutral decision-maker," who must consider factors such as whether the parolee is a flight risk or presents a public safety risk and must support any denial of release by a reasoned decision in writing or on the record. Plaintiffs' PI MOL at 20, 24-25.

## STANDARD OF REVIEW

A moving party is entitled to summary judgment where all submissions, taken together, show there is "no genuine dispute as to any material fact," and the party is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322–23. A fact is considered "material" if it "affect[s] the outcome of the suit under the governing law," and there is a "genuine issue" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the burden of proof at trial would fall on the moving party, its "submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). On the other hand, if the burden of proof would fall on the nonmoving party, it is sufficient for the party to show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322; *see also Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d

Cir. 2009).  If the moving party meets its burden, the nonmoving party must then "set out specific facts showing a genuine issue for trial" to avoid summary judgment.  *Anderson*, 477 U.S. at 248.

The court views the evidence in the light most favorable to the nonmoving party.  *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016).  To raise a genuine issue of material fact, the nonmoving party's evidence must be more than "mere allegations or denials" and must "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968) ); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party must "set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481, 496 (S.D.N.Y. 2015) (quoting *Senno v. Elmsford Union Free Sch. Dist.*, 821 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2011) ); *see also Ricciardi v. Metro. Life Ins. Co.*, No. 16-CV-3805 (CM), 2019 WL 652883, at *7 (S.D.N.Y. Feb. 15, 2019).

## ARGUMENT

## I.   THE DUE PROCESS CLAUSE DOES NOT REQUIRE NEW YORK TO PROVIDE A CUSTODY RELEASE HEARING TO PAROLEES

In the landmark decision of *Morrissey v. Brewer*, the Supreme Court held that where a state provides a system of parole, it may not revoke a person's parole without providing minimum due process protections.  408 U.S. 471, 487-89 (1972).  To satisfy minimum due process protections, a state "must provide a preliminary probable cause hearing . . . as well as a final revocation hearing, at which a parolee may present evidence and confront witnesses."  *Calhoun v. New York State Div'n of Parole Officers*, 999 F.2d 647, 652 (2d Cir. 1993) (citing *Morrissey*, 408 U.S. at 487-89).  The minimum due process protections afforded to parolees in revocation proceedings are fewer than those afforded to criminal defendants because parolees are not entitled to "the full panoply of rights" that are accorded to a defendant in a criminal prosecution.  *Morrissey*, 408 U.S. at 480 (*citing Mempa v. Rhay*, 389 U.S. 128 (1967)).

In denying Plaintiffs' motion for a preliminary injunction, the Court discussed at length the *en banc* decision from the Seventh Circuit in *Faheem-El v. Kimcar*, 841 F.2d 712 (7ᵗʰ Cir. 1988), which addressed the same due process challenge to mandatory detention under the Illinois parole revocation procedures that Plaintiffs raise here. *See Bergamaschi v. Cuomo*, No. 20 Civ. 2817, 2020 WL 1910754, at *12-13 (S.D.N.Y. April 20, 2020). The Court noted that in *Faheem-El*, the Seventh Circuit majority remanded the case for the district court to assess whether mandatory detention violated due process "using the balancing test announced by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976)." *Bergamaschi*, 2020 WL 1910754, at *13. In a subsequent order, this Court indicated that the governing standard for assessing Plaintiffs' due process challenge is the balancing test announced in *Mathews*.[2] *See* May 18, 2020 Order (Dkt. No. 39) at 1-2 (ruling that "the ONLY discovery that will be permitted is discovery relating to the *Mathews v. Eldridge* factors").

In *Mathews*, the Supreme Court decided that ascertaining what process is due involves balancing the following three factors: (1) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the private interest that will be affected by the official action." 424 U.S. at 335 (citations omitted). Balancing

---

[2] Defendants argued in opposition to Plaintiffs' motion for a preliminary injunction that *Morrissey* foreclosed Plaintiffs' due process argument, a position embraced by the five-member minority in *Faheem-El*. *Bergamaschi*, 2020 WL 1910754, at *11-12. The Court rejected that argument, holding instead that the due process issue remains an open question and requires application of the *Mathews* balancing test. As this ruling is now law of the case, Defendants will not press the argument again on this motion, although they expressly reserve the point for appeal. *See In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) (holding under law of the case doctrine, "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation"); *American Hotel Intern. Group, Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 378 (S.D.N.Y. 2009) (same).

these factors demonstrates that Defendants are entitled to summary judgment for the reasons discussed below.

### A. The State Has a Significant Interest in Mandatory Detention to Promote Public Safety and Avoid Substantial Fiscal and Administrative Burdens

#### 1. Mandatory Detention Promotes Public Safety

In *Morrissey*, the Supreme Court recognized that a state has "several interests" in revoking parole. 408 U.S. at 483. As explained by the Court:

> The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty. Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners *there is a risk that they will not be able to live in society without committing additional antisocial acts.* Given the previous conviction and the proper imposition of conditions, the State has an *overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial* if in fact he has failed to abide by the conditions of his parole.

*Id.* (emphasis added). To be sure, *Morrissey* recognizes that a state has no interest in revoking parole without "some informal procedural guarantees." *Id.* But New York easily satisfies that minimal requirement not only by affording alleged parole violators with two prompt hearings, but also by the procedures that are in place when deciding whether to issue a parole violation warrant in the first instance.

Before a decision is made to issue a parole violation warrant based upon a parolee's alleged violation of parole conditions, DOCCS conducts a thorough examination and evaluation of the allegations to assess the level of risk to the community posed by the parolee's release. O'Brien Decl. at ¶ 5. Among the factors that the Parole Officer considers in assessing whether the parolee poses a risk to public safety or the parolee's health and welfare are: (i) the conduct giving rise to the alleged violation of parole conditions; (ii) the underlying offense; (iii) the parolee's criminal history; (iv) the parolee's history of compliance with the conditions of supervision; (v) any aggravating or mitigating circumstances; and (vi) the supervision level assigned under the Correctional Offender Management

Profiling for Alternative Sanctions ("COMPAS") assessments/case plan tool.  *Id.* at ¶ 6.  By following

this procedure, DOCCS ensures that an alleged parole violator is taken into custody *only* after a

determination is made that the parolee poses a risk to public safety or to his own health and welfare,

thus serving the State's significant interest in protecting the safety of both the public and the parolee.

*Id.* at ¶ 7.

Data tracked by DOCCS's Division of Program, Planning, Research & Evaluation ("Research

Division") confirms that mandatory detention serves the Government's significant interest in

protecting the safety of the public and the parolee.  There were 23,275 inmates released on parole

from DOCCS's custody to community supervision during the 2016 calendar year.  *Id.* at ¶ 8, Exh. A.

For this population of 23,275 parolees, a large majority violated their conditions of parole and had

their parole revoked, with more than half returned to custody:

- 32% (7,476) had their parole revoked within one year of release, of which 26% (6,118) were returned to prison;

- 23% (5,345) had their parole revoked within one to two years of release, of which 16.5% (3,837) were returned to prison; and

- 15% (3,439) had their parole revoked within two to three years of release, of which 10.5% (2,442) were returned to prison.

*Id.* at ¶ 9.  Over the entire three-year period following their release to supervision in 2016 for this

cohort of 23,275 parolees, 7 out of every 10 violated their conditions of parole in an important respect

and had their parole revoked.  *Id.* at ¶ 10.  And for 53% of the cohort, their parole was revoked and

they were returned to custody in a State correctional facility rather than being restored to community

supervision, which is an indication that the nature of their sustained parole violation was sufficiently

serious to warrant incarceration.  *Id.*

Finally, the regulatory history confirms that the intent of mandatory detention of alleged parole

violators is to serve the State's compelling interest in promoting public safety.  Specifically, the

Emergency Rulemaking Notice ("Notice") from 1986 notes that detention of alleged parole violators is necessary for the "preservation of public safety; and preservation of the general welfare." NYS Register (October 15, 1986), No. PAR-41-86-00070-EP, Filing No. 2245 (attached as Exhibit 1). Additionally, the Notice explains that the regulatory purpose is to aid the Parole Board in the exercise of its "authority to retake and temporarily detain parolees and conditional releases where necessary to protect the public safety," and that "[t]his regulation is necessary for the Division of Parole to carry out its statutory mandate to protect the public safety." *Id.*

### 2. The State Will Bear Enormous Fiscal and Administrative Burdens if Required to Provide Custody Release Hearings

In an effort to downplay the burdens that would be imposed on the State if required to provide a release determination to alleged parole violators, Plaintiffs have suggested that the determination can be made during the preliminary hearing that the State already affords to parolees. This is wrong for a number of different reasons. Rather, any release determination would need to be conducted through the procedure of an additional new custody release hearing that would impose enormous costs and administrative burdens on the State.

First, a large percentage of alleged parole violators voluntarily waive their right to a preliminary hearing, and so for them there is no preliminary hearing that could, even in theory, include a custody release evaluation. The number of alleged parole violators who were taken into custody on a parole violation warrant from March 1, 2019 to February 29, 2020 – the most recent 12-month period before the COVID-19 pandemic prevented the Parole Board from conducting in-person revocation hearings – totals 14,392 parolees. O'Brien Decl. at ¶ 16, Exh. B. Of those, 10,679 parolees (or 74.2%) waived their right to a preliminary hearing. *Id.*

Second, in order to evaluate the suitability of a parolee for release, Community Supervision staff would need to prepare a release report to assist the individual making the release determination that would be based on an independent investigation into the parolee's history and interviews with the

parolee and any relevant witnesses to address the relevant factors of flight risk and danger to the community. *Id.* at ¶ 17. This type of report would need to be prepared by someone in a new job function that does not currently exist within Community Supervision and would require individuals possessing investigatory skills. *Id.* As a practical matter, there would not be sufficient time to prepare this release report within the time-frame required for holding the preliminary hearing, nor would it make any sense for Community Supervision staff to spend the time and effort to prepare such a report unless and until there is either a probable cause finding made at the preliminary hearing or the parolee waives the right to a preliminary hearing; if neither of those happens, and the warrant is lifted at the preliminary hearing stage, then the parolee is released and there is no need for a release report. *Id.*

Finally, because of the subject matter of a custody release decision – determining whether an alleged parole violator should be released into the community based on considerations of flight risk and public safety – the hearing should be presided over by an administrative law judge ("ALJ") in the Parole Board's Bureau of Adjudication, who has a law license, legal training, and experience practicing for at least four years in a relevant area of the law, rather than a Preliminary Hearing Officer, who is not required to be a lawyer or have legal practice experience. Tomlinson Decl. at ¶ 10. This is necessary to ensure that case law is properly applied and that the proceedings stay narrowly focused on the custody release issue and not devolve into a consideration of the merits of the parole violation warrant, which should only be addressed at the final revocation hearing. *Id.* Moreover, it is important that the individual presiding over the custody release hearing be a lawyer with legal practice experience to avoid any appearance of impropriety. *Id.*

For these reasons, a custody release determination would require a totally new custody release hearing for each alleged parole violator whose warrant is not lifted at the preliminary hearing stage to assess whether he should be released pending the final revocation hearing. For the period March 1, 2019 to February 29, 2020, there were 14,392 alleged parole violators whose warrants were lodged

during this period and who remained in custody following the preliminary hearing stage.  O'Brien Decl. at ¶ 16, Exh. B.  If the State had been required to make a release determination for alleged parole violators during this period, then the State would have needed to conduct 14,392 custody release hearings; this figure serves as an appropriate estimate of the number of such hearings the Bureau of Adjudication would need to conduct each year going forward if Plaintiffs prevail in this action. Tomlinson Decl. at ¶ 13; O'Brien Decl. at ¶ 19, Exh. B.

The need to conduct this many new custody release hearings per year would impose enormous burdens on the State in four distinct areas.  First, DOCCS would need to serve an appropriate notice on each of the alleged parole violators for the new hearing.  O'Brien Decl. at ¶¶ 17, 19.  Second, the Bureau of Adjudication would need to conduct the new hearings, which would require significant additional staffing.   O'Brien Decl. at ¶ 24; Tomlinson Decl. at ¶ 14; Declaration of Melissa McLaughlin, dated October 22, 2020 ("McLaughlin Decl."), at ¶ 9.  Third, Community Supervision would need to hire additional staff and equipment to supervise any alleged parole violators who are released to supervision pending their final revocation hearings as a result of the new custody release hearings.  O'Brien Decl. at ¶ 27; McLaughlin Decl. at ¶¶ 14-17.  And fourth, DOCCS would need to create new hearing facilities throughout the State to conduct final revocation hearings for released parolees because those individuals would no longer be in custody at the local jails where their final revocation hearings would otherwise have been held.  Tomlinson Decl. at ¶ 18.  The specific burdens associated with each of these areas are real and significant.

### i. Providing Notice for the Custody Release Hearings Would Cost the State $9.8 Million in the First Year And $8.6 Million in Each Subsequent Year

If there were a new custody release hearing, each alleged parole violator would need to receive appropriate notice by personal service that would include not only the time and place of the hearing, but also a copy of the release report prepared by Community Supervision staff to assist the ALJ in

making the release determination.  O'Brien Decl. at ¶¶ 17, 19; *cf. Morrissey*, 408 U.S at 486-87 (requiring that "the parolee should be given notice that the [preliminary] hearing will take place," its purpose, and the alleged violations), 408 U.S. at 491 (Brennan, J., concurring) ("For each hearing the parolee is entitled to notice of the violations alleged and the evidence against him . . . ."). Based on the staffing currently required to serve notice on parolees for the preliminary hearings, DOCCS would need to hire additional staff at an annual cost of $8.27 million in salary, benefits, and other additional pay to prepare release reports and serve notice on parolees for the additional new custody release hearings every year.  McLaughlin Decl. at ¶ 5; O'Brien Decl. at ¶¶ 20-21.  In addition to these staffing costs, the State would incur additional costs for office space and furniture for the additional staff, as well as other costs associated with providing notice based on current expenses incurred for providing notice of the preliminary hearing, including interpreters, vehicles, information technology, supplies, and training.  McLaughlin Decl. at ¶ 6-7; O'Brien at ¶ 22.  These additional costs total another $1,550,400 in the first year with recurring costs of $292,835 in subsequent years.  McLaughlin Decl. at ¶¶ 6-8.

### ii.    *Providing Over 14,000 Custody Release Hearings Annually Would Cost the State $12.8 Million in the First Year and $12 Million in Each Subsequent Year*

Conducting an estimated 14,392 custody release hearings per year would require significant additional staffing in order to conduct the hearings and provide adequate administrative support and security, including 15 ALJs, two supervising ALJs, and 56 Community Supervision and DOCCS personnel.  O'Brien Decl. at ¶ 24; Tomlinson Decl. at ¶ 14; McLaughlin Decl. at ¶ 9.  The total recurring annual cost for this additional staff would be $8.76 million, including salaries, benefits, and other additional pay.  McLaughlin Decl. at ¶ 9.

Providing these new custody release hearings would also require the State to find additional hearing facilities at significant cost.  While the local correctional facilities in the Upstate regions may be able to handle the additional hearings without requiring additional space, that is not the case for

the Downstate region, where the revocation hearings are primarily conducted at the Donald Cranston Judicial Center ("Judicial Center") on Rikers Island. Tomlinson Decl. at ¶ 16. Prior to the suspension of in-person hearings due to COVID-19, the Judicial Center was operating at maximum capacity in order to accommodate all of required preliminary hearings and final revocation hearings. *Id.* Based on the number of parolees detained at Rikers Island pending their final revocation hearings during the period from March 1, 2019 to February 29, 2020, the Bureau of Adjudication would have needed to conduct 5,121 new custody release hearings for the Downstate region alone. *Id.* at ¶¶ 14, 16. Because DOCCS neither owns nor operates the Judicial Center at Rikers Island, DOCCS would need to establish new hearing facilities, but not at the Judicial Center, to conduct custody release hearings for parolees detained at Rikers Island if the State is required to make release determinations going forward. *Id.* at ¶ 16. The cost of creating and maintaining the new hearing facilities to accommodate custody release hearings for parolees detained at Rikers Island pending their final revocation hearings, based on the size of the rooms at the Judicial Center and how they are outfitted, and necessary office space statewide for the additional staff would be an initial cost in the first year of $841,940, with recurring annual costs of $82,862 in subsequent years. McLaughlin Decl. at ¶ 10.

Finally, the State would incur additional costs associated with conducting custody release hearings for court reporters, interpreter services, mini-coaches, information technology, security equipment, travel expenses, and supplies. *Id.* at ¶ 11. The initial one-time cost in the first year for these items will total $3,156,901, with recurring costs of $3,091,697 in each subsequent year. *Id.*

### iii. *Supervising Released Parolees Could Cost the State Millions per Year Depending on the Release Rate*

There would also be additional costs associated with community supervision of released parolees that will vary depending on the percentage of parolees released as a result of the custody release hearings. As a threshold issue, any alleged parole violator who has been released as a result of a custody release hearing has either received a probable cause finding that he has violated the

conditions of parole in an important respect or waived the right to a preliminary hearing.  O'Brien Decl. at ¶ 27.  For that reason, they must be supervised at the highest levels of supervision.  *Id.*  The highest levels of supervision range from a ratio of 10 parolees to 1 Parole Officer for Strict and Intensive Supervision and Treatment ("SIST") cases to 25 parolees to 1 Parole Officer for sex offender cases.  *Id.*  Accordingly, the *minimum* supervision level for alleged parole violators who are released pending their final revocation should be 25:1.  *Id.*

If 5% of parolees were released per year through custody release hearings, the minimum supervision level would require six additional staff at a cost of $624,000 per year, including salary, benefits, and other additional pay.  McLaughlin Decl. at ¶ 14.  The State would incur additional associated costs for office space, furniture, and other expenses (including GPS monitoring, information technology, supplies, and training) of $225,415 in the first year, with recurring annual costs of $181,845 in subsequent years.  *Id.* at ¶¶ 15-17.  If instead 25% of parolees were released per year through custody release hearings, the minimum supervision level would require 31 additional staff at a cost of $3.79 million per year, including salary, benefits, and other additional pay.  *Id.* at ¶ 14.  The State would incur additional costs for office space, furniture, and other expenses (including GPS monitoring, information technology, supplies, training, and mileage reimbursement) of $1,185,056 in the first year, with recurring annual costs of $931,632 in subsequent years.  *Id.* at ¶¶ 15-17.

Without knowing what the release rate would actually be if the State provided custody release hearings, it is difficult to estimate with any precision what the cost to the State would be for supervising released parolees.  Nevertheless, the above estimates based on release rates of 5% and 25% establish it will likely be millions of dollars per year.  To the extent Plaintiffs suggest that the additional costs to the State of supervising released parolees will be offset by savings on their custodial care that will terminate upon release, that is not the case.  Since fiscal year 2009-10, the cost of custodial care for alleged parole violators housed in local jails has been borne entirely by the local governments operating

17

the jails in which the alleged parole violators are detained pending their final revocation hearings, without any contribution or reimbursement by the State. *Id.* at ¶ 18. For purposes of applying the *Mathews* factors, the relevant issue is the fiscal burden on the *State* in providing the new procedure sought by Plaintiffs (*see Mathews*, 424 U.S. at 335), so any hypothetical savings realized by local governments as a result of releasing parolees from local jails would not be part of the equation.

### iv. Conducting Final Hearings for Released Parolees Would Cost the State at Least $11.4 Million in the First Year and $3.5 in Each Subsequent Year

Under the current mandatory detention procedure, nearly all of the final revocation hearings are held at the local correctional facilities where the alleged parole violators are detained. Tomlinson Decl. at ¶ 18. For example, the facility with the largest number of detained alleged parole violators, Rikers Island, has a Judicial Center with multiple hearing rooms for holding preliminary and final revocation hearings. *Id.* For alleged parole violators who would be released to community supervision as a result of a new custody release hearing, it would not be possible to conduct their final revocation hearings within the correctional facility setting because they would no longer be in custody. *Id.* For these released parolees, the State would need to create and maintain suitable facilities, with hearing rooms, waiting areas, and holding cells, and provide necessary transportation and security. *Id.*

For the Upstate regions, the existing ALJ staff can handle the final revocation hearings for released parolees based on a release rate up to 25%, but an additional 34 and 66 DOCCS officers would need to be hired due to the many geographic areas that would need to be covered based on a 5% release rate and 25% release rate, respectively. *Id.* at ¶ 19; O'Brien Decl. at ¶ 32; McLaughlin Decl. at ¶ 20. For the Downstate region, the existing ALJ staff can cover the final revocation hearings assuming a 5% annual release rate, but one additional ALJ would be needed if the annual release rate was 25%, and DOCCS would need to hire 2 and 4 additional officers based on a 5% release rate and 25% release rate, respectively. Tomlinson Decl. at ¶ 19; O'Brien Decl. at ¶ 32; McLaughlin Decl. at

¶ 20.  The total annual cost for this additional staff would be $3.4 million at a 5% release rate and $6.9 million at a 25% release rate, including salary, benefits, and other additional pay.  McLaughlin Decl. at ¶¶ 20, 23.

The State would incur additional costs for office space, furniture, and other expenses (including information technology, vehicles, security equipment, and supplies) of $8,037,946 in the first year, with recurring annual costs of $133,128 in subsequent years assuming a 5% release rate, and $8,105,470 in the first year, with recurring costs of $144,456 in subsequent years assuming a 25% release rate.  *Id.* at ¶¶ 21-23.

*   *   *

Combining all four areas of additional burden imposed on the State by the need to conduct custody release hearings leads to one inescapable conclusion: the burden on the State would be enormous.  The chart below summarizes the costs:

| | Annual Costs | One-Time Costs | First Year (Annual + One-Time) |
|---|---|---|---|
| Notice[3] | $8,562,834 | $1,257,565 | $9,820,399 |
| Custody Release Hearing[4] | $11,938,559 | $824,282 | $12,762,841 |
| Supervision[5] | | | |
| @5% | $805,845 | $43,570 | $849,415 |
| @25% | $4,721,632 | $253,424 | $4,975,056 |
| Final Hearing for Released Parolees[6] | | | |
| @5% | $3,524,152 | $7,904,818 | $11,428,970 |
| @25% | $7,085,564 | $7,961,014 | $15,046,578 |
| Total | | | |
| @5% | $24,831,390 | $10,030,235 | $34,861,625 |
| @25% | $32,308,589 | $10,296,285 | $42,604,874 |

---

[3] McLaughlin Decl. at ¶ 8.
[4] *Id.* at ¶ 12.
[5] *Id.* at ¶ 17.
[6] *Id.* at ¶ 23.

The total price tag to the State for providing alleged parole violators with a custody release hearing would be a cost in the first year of between $34.9 million (at a 5% release rate) and $42.6 million (at a 25% release rate), with recurring annual costs in each subsequent year of between $24.8 million (at a 5% release rate) and $32.3 million (at a 25% release rate).  If the release rate exceeds 25%, the cost to the State would be even higher for supervision and conducting the final hearings for released parolees.  And this is just the fiscal burden that can be measured in dollars and cents.  It does not include the administrative burden on State personnel associated with, *inter alia*, hiring the required additional staff, overseeing the procurement process to sign leases and purchase the required equipment and furniture, or bidding out and supervising the construction of new hearing facilities.

The enormous fiscal and administrative burdens that would be imposed on the State weigh heavily against finding that alleged parole violators are entitled to an additional custody release hearing as a matter of due process.  *Mathews*, 424 U.S. at 335.

### B. There Is No Material Risk of an Erroneous Deprivation of a Parolee's Conditional Liberty Interest Under New York's Parole Revocation Procedures and No Probable Value of Adding a Custody Release Hearing

The Supreme Court and Second Circuit have noted that both the parolee and the State have an interest in avoiding the erroneous revocation of parole.  *Morrissey*, 408 U.S. at 484; *United States ex rel. Carson v. Taylor*, 540 F.2d 1156, 1161 (2d Cir. 1976) (noting erroneous revocation of parole is in "no one's interest – neither the public's nor the parolee's").  But that risk is not material under New York's revocation procedures because the overwhelming percentage of alleged parole violators who request a preliminary hearing at which probable cause for the charges is found then have their parole revoked following the final revocation hearing, which establishes that "erroneous" parole violation charges and probable cause findings are necessarily rare.

During the 12-month period between March 1, 2019 and February 29, 2020, the Bureau of Adjudication issued 3,334 final revocation hearing decisions in cases where a preliminary hearing was held and a finding of probable cause was made.  O'Brien Decl. at ¶ 12.  Of those cases, only 51 (or 1.5%) resulted in none of the charged violations being sustained.  *Id.* at ¶ 13.  In other words, in 98.5% of the cases where probable cause was found at the preliminary hearing resulting in the mandatory detention of the alleged parole violator, at least one of the parole violation charges was sustained.  This confirms that only in the rare instance (1.5% of the time) was there even an arguable "error" in finding probable cause at the preliminary hearing.[7]

Similarly, there is no reliable evidence showing that there is any probable value to society in releasing alleged parole violators pending their final revocation hearings.  In one large meta-analysis that reviewed numerous studies, the authors sought to determine the effects of non-custodial sanction versus custodial sanction on the rate of re-offending.  *See* P. Villettaz, G. Gillieron, M. Killias*, The Effects on Re-Offending of Custodial vs. Non-Custodial Sanctions: An Updated Systematic Review of the State of Knowledge*, Campbell Systematic Reviews (Jan. 2015), at 7.[8]  After excluding quasi-experimental studies using weaker designs, the authors concluded that "[t]he most credible interpretation of the evidence is that any difference between prison and alternative sanctions is a wash."  *Id.* at 50.  As the authors note (with particular relevance to this case):

> Criminal justice policy makers obviously have to consider many choices and constraints, and it may be good to know that, in terms of rehabilitation, short confinement [like the 90-day period for alleged parole violators] does not generally fare worse than 'alternative' sanctions. . . .  In the end, criminal law and procedure are searching for equity, and decisions on sentences and correctional arrangements should

---

[7]   Of course, even this extremely small percentage of cases does not actually involve an "erroneous" determination.  There is nothing inconsistent in finding "probable cause" for charges at the preliminary hearing, but then finding that there is not sufficient support to sustain the charges at the final hearing.

[8]   Available at  https://campbellcollaboration.org/better-evidence/custodial-vs-non-custodial-sanctions-re-offending-effects.html.

not be based on treatment considerations as long as there is no evidence of beneficial
or detrimental effects.

*Id.* at 59.

In short, there is no evidence suggesting there would be any probable value to society in terms
of enhanced public safety if the State were to adopt Plaintiffs' proposal for a custody release
determination for every alleged parole violator pending the final revocation hearing.

Because there is no material risk of "error" under New York's parole revocation procedures
in finding probable cause at the preliminary hearing stage, and no evidence of probable value to society
of a custody release hearing, the second factor under *Mathews* does not support Plaintiffs' due process
argument. *Mathews*, 424 U.S. at 335.

### C.  The Private Interest of Parolees Is a Limited Conditional Liberty Interest

The Supreme Court began its analysis in *Morrissey* with a review of the purpose and function
of parole.  "The essence of parole is release from prison, before the completion of sentence, on the
condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey*, 408
U.S. at 477.  Parole is an established variation on imprisonment intended to help those convicted of
crimes reintegrate into society as constructive members of society as soon as they are able, without
being confined for the full term of the sentence imposed, while serving to alleviate the costs to society
of keeping an individual in prison.  *Id.*  In order to achieve these objectives, parolees are subject to
specified conditions for the duration of their parole term, conditions that often substantially restrict a
parolee's activities, but are essential to the reintegration process.  *Id.*; 9 N.Y.C.R.R. § 8003.2 (listing
New York's standard parole release conditions).

"The enforcement leverage that supports the parole conditions derives from the authority to
return the parolee to prison to serve out the balance of his sentence if he fails to abide by the rules."
*Morrissey*, 408 U.S. at 478–79.  The private interest of parolees is therefore only a limited, conditional
liberty interest; revocation of parole deprives the parolee "only of the conditional liberty properly

dependent on observance of special parole restrictions." *Id.* at 480. The reasoning that justifies releasing prisoners on parole also dictates that the revocation of parole need not involve "the full panoply of rights" and procedural safeguards provided to a defendant in a criminal proceeding. *Id.*

> Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts. Given the previous conviction and the proper imposition of conditions, the state has an *overwhelming interest* in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole.

*Id.* at 483 (emphasis added); *United States v. Sanchez*, 225 F.3d 172, 175 (2d Cir. 2000) ("The Supreme Court does not, however, attach to revocation proceedings the full range of procedural safeguards associated with a criminal trial because a probationer already stands convicted of a crime.") (internal citations omitted).

                              *     *     *

When balanced against the State's significant interest in promoting public safety, the enormous fiscal and administrative burdens that would be imposed on the State in having to provide more than 14,000 custody release hearings per year, the absence of any material risk of "error" in probable cause findings, and the lack of evidence that releasing alleged parole violators would improve public safety, the limited nature of a parolee's liberty interest does not come close to tipping the scales in favor of requiring the State to afford a custody release hearing as a matter of due process. *Mathews*, 424 U.S. at 335. Rather, the issue of whether the Parole Board should continue its policy of mandatory detention or provide alleged parole violators with a custody release hearing is a matter of legislative and regulatory policy that should be left to the Legislature and DOCCS, not the courts.

## II.   THE COMPLAINT SHOULD ALSO BE DISMISSED AGAINST THE GOVERNOR ON THE BASIS OF SOVEREIGN IMMUNITY AND ELEVENTH AMENDMENT IMMUNITY

Under the Eleventh Amendment, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United

States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has clarified that although "[t]his language expressly encompasses only suits brought against a State by citizens of another State, . . . the Amendment bars suits against a State by citizens of that same State as well." *Papasan v. Allain*, 478 U.S. 265, 276 (1986) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). The Eleventh Amendment thus "affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Sovereign immunity applies not only to the state itself but also to a state officer named in his official capacity because "[a] claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer." *Mathie v. Fries*, 121 F.3d 808, 818 (2d Cir. 1997) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court created an exception to sovereign immunity for state officers, but only for claims seeking prospective declaratory or injunctive relief. *Alden v. Maine*, 527 U.S. 706, 747 (1999); *see also State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007). However, if the state official does not have the authority to enforce the challenged legislation, the *Ex parte Young* exception does not apply. *See In re Dairy Mart Convenience Stores, Inc.,* 411 F.3d 367, 372-73 (2d Cir. 2005) (citing *Ex parte Young*, 209 U.S. at 154, 157); *Steinberg v. Elkman*, 666 F. App'x 26, 27-28 (2d Cir. 2016) (affirming dismissal of Governor Cuomo on sovereign immunity grounds because he had no connection with enforcement or review); *see also Kelly v. New York State Civil Service Commission*, 632 F. App'x 17, 18 (2d Cir. 2016) ("[T]he district court correctly concluded that *Young* does not apply here. The state officer against whom prospective relief is sought 'must have some connection with the enforcement of the act' that violates federal law.") (citations omitted); *Citizens Union of the City of New York, v. Attorney General of New York*, No. 16-CV-9592, 2017 WL 2984167, at *4 (S.D.N.Y. June 23, 2017) (holding state officer must have a particular duty to

enforce the statute in question and the demonstrated willingness to exercise that duty in order to avoid Eleventh Amendment immunity).

Plaintiffs allege no exercise of enforcement authority by the Governor over the parole revocation process; rather, they allege merely that the Governor has "issued an executive order declaring a state disaster emergency in response to documented cases of the spread of COVID-19 in New York," which has nothing to do with parole revocation procedure. Am. Compl. ¶ 25. This allegation does not support the necessary finding that the Governor could provide the relief requested in the Amended Complaint or be obligated to do so. *See Citizens Union,* 2017 WL 2984167 at *4 (holding state official's duty to execute the laws is not sufficient by itself to make that official a proper party to a suit challenging a state statute); *Aron v. Becker*, 48 F. Supp. 3d 347, 368 (N.D.N.Y. 2014) ("With respect to Governor Cuomo, the vast majority of courts to consider this issue have held that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute.") (citation and internal quotation marks omitted); *Wang v. Pataki*, 164 F. Supp. 2d 406, 410 (S.D.N.Y. 2001) (holding allegation that governor "is required to ensure that the laws of the State of New York are faithfully and fairly executed" was "insufficient to state a claim" against the governor); *see also Nichols v. Brown*, 859 F. Supp. 2d 1118, 1132 (C.D. Cal. 2012) (finding allegation that "[t]he Governor has the supreme executive power in the State and is responsible for the faithful execution of the laws of the State of California" is an insufficient, generalized connection).

The Court should thus grant summary judgment to the Governor on the basis of sovereign immunity and Eleventh Amendment immunity.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court grant summary judgment in their favor, and grant such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        October 23, 2020

LETITIA JAMES
Attorney General
State of New York

By:   /s/  Andrew Amer
Andrew Amer
Special Litigation Counsel
Amanda Yoon
Assistant Attorney General
28 Liberty Street
New York, New York 10005
(212) 416-6127
andrew.amer@ag.ny.gov
amanda.yoon@ag.ny.gov

*Attorney for Defendants*