UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

MICHAEL BERGAMASCHI; and : 
FREDERICK ROBERSON; on behalf of :
themselves and all others similarly situated, :
                                             :
                      Plaintiffs,            :          Case No. 1:20-cv-02817
                                             :
            v.                               :
                                             :
ANDREW M. CUOMO, Governor of New :
York State, in his official capacity; and TINA :
M. STANFORD, Chairperson of the New York :
State Board of Parole, in her official capacity; :
                                             :
                      Defendants.            :
                                             :

------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Philip Desgranges
Corey Stoughton
The Legal Aid Society
199 Water Street
New York, NY 10038
212-577-3367

Daniel R. Lambright
Molly K. Biklen
Christopher T. Dunn
NEW YORK CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300

*Attorneys for Plaintiffs*

Dated: November 20, 2020
        New York, N.Y.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

ARGUMENT ........................................................................................................................ 7

   I.   The Undisputed Material Facts Demonstrate That the Existing Process Is Not Sufficient to Protect Plaintiffs' Conditional Liberty Interest........................................................................ 7

     A.  The Defendants' Mandatory Detention Scheme Deprives the Plaintiffs of Their Conditional Liberty Interest, Inflicting Grievous Loss of a Valuable Interest. ...................... 9

     B.  Mandatory Detention Unnecessarily Incarcerates People Who Defendants Themselves Have Determined Are Not a Risk to Public Safety............................................................. 10

     C.  Mandatory Detention Destabilizes Peoples' Lives in Ways Counterproductive to the Public's Interest and Is Costly for Local Governments and Their Taxpayers. ..................... 16

   II.  The Defendants Are Not Entitled to Summary Judgment Because the Facts Material to Their Arguments Are Disputed................................................................................................ 22

   III.  This Suit Should Not Be Dismissed Against the Governor Because He Has Demonstrated Some Connection With the Enforcement of the Challenged Board Regulations. .................... 24

   CONCLUSION.................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Cases**................................................................................................................. **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................7

*Ex Parte Young*, 209 U.S. 123 (1908) ....................................................................24

*Faheem-El v. Klincar,* 841 F.2d 712 (7th Cir. 1988)....................................9, 10, 11, 15

*Fuentes v. Shevin*, 407 U.S. 67 (1972)..............................................................14, 22

*In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367 (2d Cir. 2005)....................................24

*Kapps v. Wing*, 283 F. Supp. 2d 866 (E.D.N.Y. 2003), *aff'd in part, vacated in part on other grounds*, 404 F.3d 105 (2d Cir. 2005) ............................................................8, 11

*Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989) ........................................8

*Mathews v. Eldridge*, 424 U.S. 319 (1976)...................................................8, 16, 22

*Mental Hygiene Legal Serv. v. Spitzer*, No. 07 CIV. 2935(GEL), 2007 WL 4115936 (S.D.N.Y. Nov. 16, 2007) ..............................................................................19

*Meza v. Livingston*, 607 F.3d 392 (5th Cir. 2010) ...................................................14

*Morrissey v. Brewer*, 408 U.S. 471 (1972)...............................................8, 9, 16, 19

*ODonnell v. Harris Cty., Texas*, 251 F. Supp. 3d 1052 (S.D. Tex. 2017) "), *aff'd as modified*, *ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018)....................................21

*Schall v. Martin*, 467 U.S. 253 (1984) ................................................................16

*United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004) ..........................................14

*Velasco Lopez v. Decker*, No. 19-2284-CV, 2020 WL 6278204 (2d Cir. Oct. 27, 2020) ............10

*Williams v. Illinois*, 399 U.S. 235 (1970) ............................................................22

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ...........................................................16

**Statutes, Rules, and Regulations**

Cal. Penal Code § 3000.08 (West 2017) ...............................................................22

Fed. R. Crim. P. 32.1(a)(6) ..............................................................................22

Fed. R. Civ. P. 56(a) ..................................................................................................7

N.J. STAT. ANN. § 30:4-123.62(g) (West 2019) .......................................................22

37 PA. ADMIN. CODE § 71.3(10) (West 2020) ...........................................................22

9 NYCRR § 8005.20(a) ............................................................................................11

9 NYCRR § 8005.20(c)(4) ..................................................................................11, 13

N.Y. Exec. Law § 259-i(3)(v)-(viii) ..........................................................................15

N.Y. Exec. Law § 259-i(3)(a)(i) ...............................................................................20

N.Y. Exec. Law § 259-i(3)(b) ...................................................................................20

Exec. Order 202, 202.76 ...........................................................................................24

## PRELIMINARY STATEMENT

Parole gives people an opportunity to regain their freedom and rebuild their lives among family and community rather than serving their full sentences in prison. Over the last several years, however, New York has increasingly cut this opportunity short by arresting people for technical violations of parole rules. As rates of re-incarceration have ballooned, attention has turned to the procedural drivers of New York's bloated parole system and calls for reform have grown louder. One of the most significant procedural defects in the parole process is a rule mandating the automatic incarceration of every person subject to a warrant accusing them of a parole violation.

The absurdity of this rule is established by the fact that the majority of people mandatorily detained are eventually deemed by the Board of Parole not to be a threat to public safety. Those individuals are then released back to the community, having suffered unnecessary harms such as the loss of employment and government benefits, homelessness, the interruption of rehabilitative programs, and an inability to care for family members, all of which are counter-productive to the defendants' interests in public safety and rehabilitation. The high rate of erroneous deprivations of liberty is further confirmed by the defendants' discretionary release this spring of hundreds of people subjected to mandatory detention following a determination that they presented no risk to public safety. This temporary experiment with due process revealed both the constitutional flaws of the current system and the necessity of additional process to reduce unnecessary incarceration.

These undisputed facts are dispositive of the pending cross-motions for summary judgment as they belie the defendants' claims about public safety and establish a significant threat to important liberty interests that more than justifies the fiscal and administrative costs of a hearing to protect those interests.

## STATEMENT OF FACTS

New York sends more people back to prison for technical parole violations than every other state except one.[1] *See* Plaintiffs' Counter Statement of Material Facts In Support of Plaintiff's Cross Motion for Summary Judgment ("Facts") ¶ 56. In 2018, the last year for which New York's prison return data is publicly available, a total of 8,768 parolees were sent back to prison, 7,438 (85%) of whom were incarcerated for rule violations. Facts ¶ 57. The proportion of parolees returned to prison for rule violations has significantly increased since the 1980s. *See* Facts ¶ 58. Of the people who were released from prison to community supervision in 1985 and later returned to prison within three years, 55% were reincarcerated because of a rule violation. *Id.* As of 2012, 82% of such individuals were reincarcerated merely because of a rule violation. *See id.*

For people accused of violating parole in New York, re-incarceration begins long before they even have a hearing to contest their charges. New York's Board of Parole mandates jail for every person scheduled for a final parole revocation hearing where the Board determines if the alleged violations occurred. *See* Facts ¶¶ 76-77. Because the lives of people on parole are so highly regulated, violations of parole can include a wide range of non-criminal activity. *See* Facts ¶¶ 60, 72. The Board of Parole requires that people released under its supervision follow a set of universal parole conditions, like reporting to their parole officer, and in some cases special parole conditions

---

[1] When accounting for those sent back to prison to complete drug treatment programs, New York sends more people back to prison for rule violations than *every* state in the country—sending over 1,800 more people back to prison than the next highest state. *See* Probation and Parole in the United States, 2016, U.S. Dept. of Justice Bureau of Justice Statistics (April 2018) at 22. The U.S. Department of Justice's Bureau of Justice Statistics released an updated probation and parole report towards the close of discovery. It confirms that in 2018 New York continued to send more people back to prison for technical parole violations than every other state except one when excluding prison drug treatment programs, and that it leads the entire country when accounting for those programs. *See* Probation and Parole in the United States, 2017-2018 (Aug. 2020), *available at* https://www.bjs.gov/content/pub/pdf/ppus1718.pdf

specific to each individual, such as a curfew or attendance in treatment programs. *See* Facts ¶ 60. If parole officers believe that a parolee has violated these conditions in an "important respect," a term the regulations do not define, the senior parole officer may issue a parole warrant requiring their incarceration in the local jail where the arrest took place. *See* Facts ¶¶ 65-67, 69. Many of these warrants are issued for technical rule violations such as losing a job, or missing a counseling session or substance abuse programming meeting. *See* Facts ¶ 72. In 2018, 67% of parole warrants were for someone not being where they are supposed to be or for violating other rules of supervision. Facts ¶ 73.

In March 2020, before people were released from jail in response to the COVID pandemic, the average daily population of alleged technical parole violators detained in New York City jails was 738, and it was 947 in the jails throughout the rest of the state. Facts ¶ 59. Under the Board's mandatory detention regulations, each parolee for whom probable cause is established or who waives their preliminary hearing must be detained pending their final revocation hearing without any hearing on whether their detention is necessary. *See* Facts ¶ 76.

**Mandatory Detention Destabilizes Peoples' Lives, Undermines Their Rehabilitation, and Is Counterproductive to Public Safety**

The Board's mandatory detention regulations cause people on parole to languish in New York City jails for months, and the overwhelming majority of those people harmed by mandatory detention are Black and Latinx. In 2019, the average length of incarceration for parolees detained in New York City jails for alleged technical parole violations was 63 days, and the average length of incarceration for parolees detained for new arrests was 136 days. Facts ¶ 94. For both groups, the overwhelming majority of those detained were Black or Latinx. *See* Facts ¶ 95 (89% of those held on technical violation warrants and 91% of those held on warrants for new arrests were Black or Latinx).

Reincarceration for approximately two to four months pending a final hearing can have enormously detrimental effects on the lives of parolees and their families. A period of reincarceration can produce financial instability for individuals already attempting to scrape by. Parolees lose jobs and crucial government benefits, reducing streams of income. *See* Facts ¶¶ 96-97. When named plaintiff Frederick Roberson was incarcerated for technical parole violations pending a final hearing, his disability-related Supplemental Security Income (SSI) benefits were suspended. *See* Facts ¶ 98. During the time that it took to reapply, the benefits remained suspended and he lost his income for three months, causing his family to fall three months behind on their mortgage payments. *See* Facts ¶¶ 98, 100. When putative class member Samuel Murphy was incarcerated twice this year pending a final hearing on technical parole violations, both his disability-related SSI and Supplemental Nutrition Assistance Program (SNAP) benefits were automatically suspended. *See* Facts ¶ 99. Between the time he spent incarcerated and time spent reapplying for these benefits, he lost six months of income. *See id.* Without his SNAP benefits, Mr. Murphy has had to rely on friends and the hotel for the homeless where he is staying for food. *See* Facts ¶ 100.

Reincarceration interferes with the ability of parolees to maintain stable housing, potentially causing homelessness. *See* Facts ¶ 101. For already homeless parolees, reincarceration can cause them to lose a placement in a shelter. *See* Facts ¶ 102. Parolees who are completing outpatient alcohol treatment, drug treatment, domestic violence treatment, and other programs have their participation in those programs interrupted for their period of reincarceration, *see* Facts ¶ 103, undermining the rehabilitative impact of these programs. Declaration of David Muhammad Decl. ("Muhammad Decl.") ¶29. For example, mandatory detention interrupted Mr. Murphy's

ability to attend his treatment-focused programs, including Narcotics and Alcoholics Anonymous. *See* Facts ¶ 104.

Reincarceration can also be emotionally damaging to parolees and their family members. Parolees are ripped from their family members and loved ones who often rely on them for support. *See* Facts ¶ 105. Mr. Roberson, for example, was unable to care for his son and grandchild while he was reincarcerated on a technical violation. Facts ¶ 106. He could not assist with their medical needs, nor could he provide support to his ailing father who was recently diagnosed with cancer. Facts ¶ 107

Incarceration's resulting homelessness, unemployment, and the interruption of treatment programming has a negative effect on public safety, *see* Facts ¶ 108, including possible "increased crime rates." Muhammad Expert Report at 9 (attached as Ex. 1 to the Muhammad Decl.). By unnecessarily destabilizing the lives of parolees who can safely be released pending their final hearing, the defendants' mandatory detention scheme is counterproductive to public safety and the rehabilitation of people on parole. Muhammad Expert Report at 9 (attached as Ex. 1 to Muhammad Decl.).

**Mandatory Detention Leads to the Erroneous Detention of People Who Could Be Released**

The Board's only interest in mandatory detention is in maintaining public safety. *See* Facts ¶ 74. But for two reasons, it is clear that many people who can be safely released back into the community are unnecessarily detained. First, once they do receive a hearing before an administrative law judge (ALJ) that addresses their risk to public safety, the vast majority of people detained on parole violations are released. *See* Facts ¶ 86-89. An ALJ who sustains a parole violation at the final hearing must revoke the person's parole. *See* Facts ¶ 78. The ALJ then orders a response ranging from incarceration in prison or placement in a drug treatment program to release

back to community supervision. *See* Facts ¶ 79. After revoking someone's parole, the ALJ can only release the person back to community supervision if the ALJ "find[s] . . . that restoration to supervision *would not have an adverse effect on public safety*." *See* Facts ¶ 80 (emphasis added).

The majority of parolees detained on parole warrants in New York City are released back to community supervision at their final hearing. *See* Facts ¶¶ 86-89. Based on data produced by the defendants for March 1, 2019 and February 29, 2020, 71% of final revocation hearings in New York City with technical parole violation warrants resulted in the person being released to the community. *See* Facts ¶ 87. During that same period, 55% of final revocation hearings in New York City with warrants for new arrests resulted in the person being released to the community. *See* Facts ¶ 86. The rates remain similarly high when looking at the 2019 calendar year. In 2019, 64% of parolees accused of a technical parole violations were released after their final hearing. *See* Facts ¶ 88. For those detained on a parole warrant based on new arrests, 55% were released from jail after their final hearing. *See* Facts ¶ 89.

Second, the defendants' discretionary release of alleged technical parole violators during the COVID pandemic also shows that many detained parolees are unnecessarily detained and can be safely released back into the community. In March 2020, in order to reduce the spread of COVID-19 in correctional facilities, Governor Cuomo directed DOCCS to review for release all parolees incarcerated on technical violation warrant. *See* Facts ¶ 90. The overarching requirement for discretionary release was whether parolees posed an undue risk to public safety such that they could be released back into the community. *See* Facts ¶ 91. After conducting this review, DOCCS determined that 760 out of 1534 parolees statewide (49.5%) did not pose an undue risk to public safety and were released back into the community. *See* Facts ¶ 92. In New York City, DOCCS

estimated that 400 of the 600 alleged technical parole violators (66%) in mandatory detention could be released because they did not pose an undue risk to public safety. *See* Facts ¶ 93.

## ARGUMENT

Named plaintiff Frederick Roberson and the putative class (collectively "plaintiffs") are entitled to judgment as a matter of law because the undisputed facts establish that the Board's mandatory detention regulations requiring that every person scheduled for a final parole revocation hearing be detained pending that hearing without any opportunity to be heard violates due process.[2] To obtain summary judgment, the plaintiffs must establish that "there is no genuine dispute as to any material fact and [that the plaintiffs' are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Drawing on undisputed facts, the risk of erroneous deprivation of the plaintiffs' important liberty interests resulting from the Board's mandatory detention rule plainly outweighs any fiscal and administrative burden of holding hearings, especially taking into account the public savings that would result from reduced incarceration, and that such hearings better serve the State's interest in public safety. The defendants' motion, on the other hand, must be denied because they misapply the law and primarily rely on disputed facts in their arguments about both public safety and administrative cost.

## I.   THE UNDISPUTED MATERIAL FACTS DEMONSTRATE THAT THE EXISTING PROCESS IS NOT SUFFICIENT TO PROTECT PLAINTIFFS' CONDITIONAL LIBERTY INTEREST.

When interests within the meaning of due process are at stake, the principle that people have the "right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation and

---

[2] Named plaintiff Michael Bergamaschi passed away on August 5. *See* Suggestion of Death (ECF No. 56).

internal quotation marks omitted). Courts examine due process challenges in two steps: asking first, whether plaintiffs have a liberty or property interest, and second, whether the procedures that exist to protect their interest are constitutionally sufficient. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005). Here, the Supreme Court has already resolved the first question by recognizing that the conditional liberty interest of people on parole is a "liberty interest" within the meaning of due process. *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972). As for the second question, the Supreme Court in *Mathews v. Eldridge* provides the framework for determining whether existing procedures are constitutionally sufficient and what, if any, additional process is due. *Mathews,* 424 U.S. at 335.

Under *Mathews*, due process requires weighing three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. Each factor weighs in favor of finding that the defendants' mandatory detention scheme violates due process: the plaintiffs' conditional liberty interest is valuable and losing it constitutes a grievous loss; by not affording people on parole an opportunity to be heard, the defendants' mandatory detention scheme empirically results in a high rate of erroneous detentions, and a release hearing would reduce that rate; and, finally, the public's interest in public safety and successful rehabilitation of parolees is not served by mandatory detention and in fact is harmed by it, and a release hearing would significantly reduce the public's fiscal burdens.

### A. The Defendants' Mandatory Detention Scheme Deprives the Plaintiffs of Their Conditional Liberty Interest, Inflicting Grievous Loss of a Valuable Interest.

It is undisputed that the defendants' mandatory detention scheme deprives people on parole of their conditional liberty interest pending their final parole revocation hearing. The defendants concede that the private interest affected by mandatory detention in the parole revocation process is the conditional liberty interest of people on parole. *See* Defs.' Mem. of Law at 22 (ECF No. 62) (citing *Morrissey*); *see also Faheem-El v. Klincar,* 841 F.2d 712, 724 (7th Cir. 1988) ("During the period pending their final parole revocation hearing, before it is conclusively established whether a condition of parole has been violated, parolees are detained. In other words, the liberty interest is impaired before wrongdoing has been demonstrated."). The Supreme Court has already determined that this conditional liberty is "valuable." *Morrissey*, 408 U.S. at 482. As the Supreme Court explained, the "liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. . . . [s]ubject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id*. It continued, "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Id.* (internal citation omitted).

There is also no genuine dispute that mandatory detention creates a substantial disruption to people's lives and livelihoods. Mandatory detention can cause people to lose their housing and their jobs. Timothy O'Brien Dep. 162:20-163:4 (attached as Ex. J. to the Declaration of Philip Desgranges ("Desgranges Decl."). For people on parole who are unable to work because of a disability, mandatory detention deprives them of their SSI disability-related income and their SNAP benefits for at least a month after their release. Declaration of Frederick Roberson ("Roberson Decl.") ¶ 7; Declaration of Samuel Murphy ("Murphy Decl.") ¶ 16. Mandatory

detention also prevents people alleged to have violated their parole from being with and caring for their family. Roberson Decl. ¶ 9. For example, Mr. Roberson was separated from his wife and children for two months, and he lost three months of his SSI disability income causing his family to fall three months' behind on their mortgage payments and their utility bills. Roberson Decl. ¶¶ 7, 9. The defendants minimize the value of a parolee's liberty interest by stressing its conditional nature, *see* Defs.' Mem. of Law at 22, but *Morrissey* and the undisputed facts, *see* Facts ¶¶ 96-107, all establish the "grievous loss" parolees face from mandatory detention.

### B. Mandatory Detention Unnecessarily Incarcerates People Who Defendants Themselves Have Determined Are Not a Risk to Public Safety.

It is undisputed that the Board's only interest in mandatory detention is maintaining public safety. O'Brien Dep. 35:3-35:22. As a result, people who can be safely released into the community but instead are jailed for months as they wait for their final parole revocation hearing are subjected to "inappropriate detention." *See Faheem-El*, 841 F.2d at 725. That is, the Board does not have an interest in detaining people whose release would not negatively impact public safety. *See Velasco Lopez v. Decker*, No. 19-2284-CV, 2020 WL 6278204, at *10 (2d Cir. Oct. 27, 2020) (finding that the government has no interest in detaining a noncitizen during removal proceedings "who it cannot show to be [] a danger to his community"). That the Board inappropriately detains people who could be safely released to the community pending their final hearing is demonstrated by (i) the Board's ultimate release of large numbers of people who are deemed not to be a threat to public safety at their final hearing; and (ii) the Board's review of alleged technical parole violators during the COVID-19 pandemic resulting in the release of hundreds of incarcerated people on the basis that they were not a threat to public safety.

First, that the majority of individuals charged with parole violations are released at the final revocation hearing is evidence of a substantial risk of erroneous deprivation under the defendants'

mandatory detention scheme. *See Faheem-El*, 841 F.2d at 725-26 (explaining that the "errors"

resulting from Illinois' mandatory detention of people accused of violating parole fall into two

categories: people who were found to have violated parole and yet were continued on parole, and

people who were found to have not violated parole). Parolees who are released at their final hearing

back to community supervision are released either because there was no finding of a violation, *see*

9 NYCRR § 8005.20(a), or because the Board sustained a violation but determined that releasing

the person back to community supervision "would not have an adverse effect on public safety."

*See* 9 NYCRR § 8005.20(c)(4).

Years of undisputed data from the defendants and the Mayor's Office of Criminal Justice

(MOCJ) document the high error rate from the Board's use of mandatory detention. *See Kapps v.

Wing*, 283 F. Supp. 2d 866, 876 (E.D.N.Y. 2003) (finding erroneous deprivation where, inter alia,

initial benefit determinations were overturned in 55.3% of cases that went to a fair hearing), *aff'd

in part, vacated in part on other grounds*, 404 F.3d 105 (2d Cir. 2005). In 2017, after the Board

detained them for an average of 57 days in NYC jails, 38% of people accused of technical

violations were released after their final hearing. *See* Mayor's Office of Criminal Justice's 2018

Report at 4 (attached as Ex. C to the Barber Decl.). For those whom the Board detained on a parole

warrant based on new arrests, 56% were released from jail after their final hearing after an average

of 99 days on misdemeanor charges or 169 days on felony charges. *See* Mayor's Office of Criminal

Justice's 2018 Report at 4 (attached as Ex. C to the Barber Decl.).

While data for 2018 is not available, data produced by the defendants show that the high

error rates have increased with time. From March 1, 2019 to February 29, 2020, 71% of final

revocation hearings in New York City with technical parole violation warrants and 55% of

hearings with warrants for new arrests resulted in the person being released to the community. *See*

Barber Decl. ¶ 7 (citing DOCCS data produced in discovery). MOCJ data released for the 2019

calendar year further confirms these escalating error rates. After the Board detained them for an

average of 64 days in NYC jails, 64% of parolees accused of a technical parole violation in 2019

were released after their final hearing. *See* Mayor's Office of Criminal Justice's 2020 Report at 3

(attached as Ex. B to the Barber Decl.). For those whom the Board detained on a parole warrant

based on new arrests, after an average of 136 days in jail, 55% were released after their final

hearing. *See id* at 4. According to the plaintiffs' expert, this "non-custody determination rate is

unheard of in other states and suggests a fundamental flaw in the New York State system" and

indicates that the majority of parolees "are not public safety risks and should be released pending

their final hearings." Muhammad Expert Report at 10 (attached as Ex. 1 to Muhammad Decl.)

Although the majority of these parolees charged with technical violations or new arrests

were released back to community supervision after a violation was sustained, they were still

subjected to the "perverse" practice of being deprived of more liberty *before* they were adjudicated

than *after* the charges against them were sustained. *Mental Hygiene Legal Serv. v. Spitzer*, No. 07

CIV. 2935(GEL), 2007 WL 4115936, at *14 (S.D.N.Y. Nov. 16, 2007) (observing that the

detention of a person pending a civil commitment trial is "perverse" because he will "be deprived

of more liberty *before* he is adjudicated in need of treatment, . . .  than New York seeks to impose

*after* he is shown by clear and convincing evidence to need treatment"). Here, their detention is

even more perverse because these parolees are jailed ostensibly for public safety reasons for

months until their final hearing only for the Board to decide at that hearing that their release would

not have an adverse effect on public safety.[3] *See* 9 NYCRR § 8005.20(c)(4).

---

[3] Mr. O'Brien's declaration further illustrates how perverse this is. Mr. O'Brien states that the
Board's decision to return a parolee to prison where there is a sustained parole violation indicates
that the Board deemed the violation "sufficiently serious to warrant incarceration." O'Brien

Second, the undisputed facts show that defendants' discretionary release of alleged technical parole violators during the COVID-19 pandemic resulted in the release of hundreds of people whom the Board determined did not pose an undue risk to public safety. In response to Governor Cuomo's March 2020 directive that the Board identify for release alleged technical parole violators jailed during the pandemic, the Board deployed a new discretionary release review process that focused on whether qualifying individuals presented "an undue risk to public safety." Annucci Decl. ¶ 4 (attached as Ex. A to Desgranges Decl.); Annucci Mem. (attached as Ex. 2. to the Annucci Decl.); *see also* DOCCS COVID-19 Report, "Releases," (Ex. F of the Desgranges Decl.). The Board reviewed the cases of 1,534 alleged technical parole violators detained in jails across the state, including 600 detained in NYC jails. Annucci Decl. ¶ 6 (attached as Ex. A to Desgranges Decl.). Based on the Board's own public safety criteria, it determined that nearly half of the statewide technical parolee population could be released from jail because they did not pose an undue risk to public safety, and approximately 66% of the alleged technical parole violators in New York City.[4] *See id*.; Annucci Mem. (attached as Ex. 2. to the Annucci Decl.); *see also* DOCCS COVID-19 Report, "Releases," (Ex. F of the Desgranges Decl.).

Both the large numbers of people who are ultimately released after their final hearing and this discretionary review process demonstrate that, even if the facts the defendants proffer about the Board's consideration of public safety risk during the parole warrant process were undisputed (which they are not), that process is not sufficient to meet due process. *See* Defs.' Mem. of Law at

---

Decl. ¶ 10. Conversely, this would mean that in 2019 the majority of parolees were detained on a parole warrant in NYC jails for months before the Board determined that their sustained violations were not sufficiently serious for such incarceration.

[4] According to MOCJ's own data, 379 people who were detained on parole violations had their warrants lifted due to the Governor's release COVID-19 protocol between March 16, 2020 and April 30, 2020. *See* "NYC Criminal Justice System: COVID-19 Impact," MOCJ, *available* at https://criminaljustice.cityofnewyork.us/covid-19-impact/.

10 (stating that "procedures that are in place when deciding whether to issue a parole violation warrant" affords parolees informal procedural guarantees). Whatever its precise contours, that one-sided, informal process is empirically ineffective at preventing the unnecessary incarceration of people who are ultimately deemed by the defendants themselves not to be a risk to public safety. This comes as no surprise, as courts have often found that "human error will inevitably occur" in similar one-sided review processes. *See, e.g., Meza v. Livingston*, 607 F.3d 392, 423 (5th Cir. 2010) (finding that the Texas parole board's system for imposing sex offender conditions on parolees who were not convicted of a sex offense carries a "high risk" of error because the decisions are based on the review of a packet of information presented to the Board and "the parolee has no opportunity to correct false information or provide an explanation for any adverse information"); *United States v. Abuhamra*, 389 F.3d 309, 322, 328 (2d Cir. 2004) (rejecting *ex parte* process in post-verdict bail application). As the Supreme Court explained, "when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations . . . can be prevented. . . fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) (citation and internal quotation marks omitted).

The defendants claim that their mandatory detention scheme produces few errors because, for the few parolees who had a preliminary hearing at which probable cause was found, the majority of those had a charge sustained at their final hearing. Defs.' Mem. of Law at 12, 20. But whether preliminary hearings effectively determine the existence of probable cause of a parole violation is irrelevant. As the Seventh Circuit explained and common sense confirms, there is a "substantial difference between the determination that there is probable cause to believe a condition of parole has been violated (the issue at the preliminary revocation hearing) and a

determination that an individual should be detained pending his or her final revocation hearing." *Faheem-El*, 841 F.2d at 726. The preliminary hearing is an insufficient safeguard because public safety is not considered there. *See* N.Y. Exec. Law § 259-i(3)(v)-(viii) (explaining that the only consideration at the preliminary hearing is whether "there is probable cause to believe that [person] has violated one or more conditions of his or her release in an important respect."). Thus, while defendants' facts on this point are undisputed, they are immaterial.

A release suitability hearing is required to mitigate the risk of detaining people who do not pose a public safety risk. Consistent with well-established law and even accounting for the conditional nature of the plaintiffs' liberty interest, due process requires the following additional safeguards: (1) a prompt hearing where the people detained on a parole warrant have an opportunity to be heard on their suitability for release and to rebut the Board's justifications for detention; (2) notice of when the Board will conduct this hearing and the reasons supporting the Board's request for detention; (3) a neutral decision-maker, such as someone from the Board not involved in the decision to arrest and detain the parolee;[5] and (4) if detention is required, an explanation as to why and the evidence relied on, either on the record or in writing. *See, e.g.,* *Morrissey*, 408 U.S. at 486-87, 489 (requiring similar protections at the preliminary and final hearings to ensure that the parole violation will be based on verified facts and an informed use of discretion); *Wolff v. McDonnell*, 418 U.S. 539, 565 (1974) (requiring written decision-making for prisoners because it "helps to assure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly"). These requirements of notice, an opportunity to be heard in

---

[5] Notably, the Board says that it would be improper for non-lawyers to make custody decisions, *see* Defs.' Mem. of Law at 13, yet that's what is routinely done now in the defendants' purported pre-warrant review process.

a meaningful time and manner, and reasoned decision-making protect "against erroneous and unnecessary deprivations of liberty." *Schall v. Martin*, 467 U.S. 253, 274 (1984). They are therefore immensely valuable to preventing the inappropriate detention of people on parole. The high release rates at final revocation hearings in New York City further prove the value that hearings have in finding people who can be safely released to the community.

### C.  Mandatory Detention Destabilizes Peoples' Lives in Ways Counterproductive to the Public's Interest and Is Costly for Local Governments and Their Taxpayers.

As the Supreme Court explained in *Mathews*, [i]n striking the appropriate due process balance the final factor to be assessed is the public interest," including "the administrative burden and other societal costs" associated with the additional process. *Mathews*, 424 U.S. at 347-48. The final *Mathews* factor accounts for the "Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources." *Id.* While the defendants claim that only the State government's interest can be considered, they cite no authority that supports narrowing the "public" to the State government. *See* Defs.' Mem. of Law at 17-18. Indeed, when weighing the final *Mathews* factor, the Second Circuit recently considered the financial burdens on taxpayers derived from the federal government's detention of noncitizens who could be safely released pending their removal proceedings. *Velasco Lopez*, 2020 WL 6278204, at *8 n. 11. Mandatory detention is counterproductive to the public's interests in: (i) public safety; (ii) the successful rehabilitation of parolees; and (iii) preserving scarce resources.

Defendants do not dispute that mandatory detention can result in unemployment, homelessness, and interruptions in anti-violence or similar treatment-focused programming. O'Brien Dep. 162:20-163:4. It is also undisputed that homelessness, unemployment, and the interruption of anti-violence programming have a negative effect on public safety. O'Brien Dep. 128:10-15. As the plaintiffs' expert explained, unnecessary incarceration can "destabilize families,

disrupt employment, contribute to homelessness, and can lead to increased crime rates." Muhammad Expert Report at 9 (attached as Ex. 1 to the Muhammad Decl.). As a result, "[i]ncarcerating people who do not pose a genuine risk to public safety, whether accused of a technical violation or a new arrest, will likely *negatively* impact public safety." *Id.* (emphasis in original). For this reason, the defendants are mistaken in arguing that there is no probable value to society in releasing alleged parole violators.[6] *See* Defs.' Mem. of Law at 21-22. As the Second Circuit explained, the government has a "paramount" interest in "minimizing the enormous impact of incarceration in cases where it serves no purpose." *Velasco Lopez*, 2020 WL 6278204, at *8 (describing how incarceration "separates families and removes from the community breadwinners, caregivers, parents, siblings and employees.").

Defendants argue that mandatory detention protects public safety but, even taking their facts as true, those facts do not establish the point. First, defendants offer evidence of the Board's intent behind its mandatory detention regulations, but that intent does nothing to refute the undisputed empirical evidence that mandatory detention is counterproductive to public safety because it detains people who are ultimately deemed not to be a public safety risk at their final revocation hearing.[7]

---

[6] The defendants' reliance on a meta-analysis cited in the plaintiffs' expert report is misplaced. Defs' Mem. of Law at 21. As the plaintiffs' expert explains, incarceration can destabilize people's lives and, as a result, if non-carceral options are as effective as carceral options in reducing recidivism then non-carceral options are better for society because they don't have the same destabilizing effect. Muhammad Decl. ¶31-32. The Board's own deposition testimony admits as much, that detention can result in people losing their jobs, their housing, and can interrupt their treatment-focused programming. O'Brien Dep. 162:20-163:4.

[7] The regulatory history on which the defendants rely to explain the State's intent is irrelevant not only because the question of intent is irrelevant, but also because it is not the history of the mandatory detention regulations at issue. *See* Ex. 1 to Defs.' Mem. of Law at 42-43. Instead, the State relies on the regulatory history of regulations issued eight years after the Board began its mandatory detention scheme and those regulations simply identify the parole officers permitted to issue warrants. *See id.*

Second, defendants claim that data about parole recidivism establish that mandatory detention is necessary for public safety. But this argument conflates violating parole conditions with public safety risk. *See* Muhammad Decl. ¶ 26. The recidivism chart on which the defendants rely, *see* Defs.' Mem. of Law at 11, includes parole revocations for technical violations.[8] O'Brien Dep. 141:18-142:10. The defendants do not point to any facts showing that failure to adhere to a long list of supervision rules equates to a risk for public safety, and, indeed, the large number of people released after their technical violations are sustained makes clear that it does not. Further, the Board's recent discretionary review process underscores the hundreds of parolees detained on technical violation warrants who could be safely released prior to their revocation hearings because they did not pose an undue risk to public safety. *See* Annucci Decl. ¶ 6 (attached as Ex. A to Desgranges Decl.).

Finally, defendants argue that consideration of public safety in the pre-warrant review process *a fortiori* establishes that detained parolees are public safety risks, but that assertion is not supported by the facts. Notwithstanding defendants' characterizations, the pre-warrant review process does not require a level of risk to proceed with issuing a parole warrant. O'Brien Dep. 50:5-9. While the Board claims that the "alleged violative behavior" is the most important factor for assessing risk in the revocation process, it has no tool or criteria for assessing implications of that behavior on public safety, balancing this factor against the many relevant factors, or ensuring

---

[8] The defendants make false data conclusions based on this recidivism chart. The chart includes final hearing decisions for 10,592 parolees who received a total of 16,260 revocations, meaning the total revocation number may double or even triple count parolees who had multiple revocations. *See* O'Brien Dep 133:14-134:3. As a result, the Board's claim that 7 out of 10 parolees released in 2016 had their parole revoked from 2016-19 is false because the 23,275 parolees released are compared to the 16,260 revocations during that three-year period, rather than the number of parolees with revocations. *See* Recidivism Chart (attached as Ex. A to the O'Brien Decl.).

that overly generalized notions of risk do not drive the decision. O'Brien Dep. 60:20 – 62:5. *See Mental Hygiene Legal Serv.*, 2007 WL 4115936 at *12 (rejecting generalized notions of danger as insufficient to deny someone release pending a merits hearing). As a result, it is undisputed that Board officials issue warrants for people who are ultimately released at their final hearing because they do not pose any real risk to public safety.

Beyond the question of public safety, mandatory detention does not advance, and likely hampers, the public's interest in the successful rehabilitation of parolees. As the Supreme Court explained, "[s]ociety has a stake in whatever may be the chance of restoring [a parolee] to normal and useful life within the law." *Morrissey*, 408 U.S. at 484. By unnecessarily destabilizing the lives of parolees who can be safely released pending their final hearing, mandatory detention is "counterproductive to the goal of rehabilitation." Muhammad Expert Report at 9 (attached as Ex. 1 to Muhammad Decl.); *see also* O'Brien Dep. 120:25-126:18; 162:20-163:4 (admitting that the incarceration of parolees can result in unemployment, homelessness, and interrupted programming).

Finally, the defendants' claim that an additional hearing will impose administrative and financial costs ignores the significant costs of incarceration and the substantial savings to the public that release pending a final hearing would provide, savings which—even taking all of defendants' facts as true—dwarf the costs of adding a hearing. Although the State does not carry the cost of incarceration on its budget, *see* Desgranges Decl., Ex. G, 2009-10 Budget Gap Closing Plan, the public—through local governments and the taxpayers that fund them—still bear the enormous fiscal costs from incarcerating alleged parole violators. *See id.*; N.Y. Exec. Law § 259-i(3)(a)(i), (b) (requiring local governments to house alleged parole violators in their jails). As

Governor Cuomo recognized, "[t]he enormous burden of unfunded [] mandates is breaking the backs of taxpayers, counties and municipalities across the state." *See* Desgranges Decl., Ex. H.

It is also undisputed that, in 2019, the annual cost for incarcerating a person in New York City jails was $337,524. *See* Barber Decl. ¶ 10 (citing the NYC Comptroller's Report). The cost of incarcerating the 1,535 people who, on average, are detained on parole warrants in NYC jails in 2019 was $518,099,340 (including $222,765,840 for alleged technical parole violators and $295,333,500 for parolees with new arrests). *See* Barber Decl. ¶ 10(a)(b). If release hearings were to reduce the detained parolee population by 400 people each year (26% of the total parolee population)—the estimated number of alleged technical violators the Board released in April 2020 because they did not pose an undue risk to public safety—the City of New York would save approximately $135,009,600 annually. *See* Barber Decl. ¶ 12. This estimate of the number of people who would be released is low because the Board likely would have released more people from NYC jails if they reviewed parolees with new arrests for release.[9]

As discussed in Section II, the defendants' projected fiscal burden is based on disputed facts. But even accepting the defendants' cost estimates as undisputed, those costs are significantly outweighed by the costs of incarceration the State externalizes onto New York City and other local governments across the state. The defendants estimate that the annual cost of providing custody release hearings to all alleged parole violators is $32,308,589, and that there would be a one-time cost of $10,296,285 in the first year. Defendants' Rule 56.1 Statement ¶ 54. When comparing the annual cost savings of considering individuals for release *just* in NYC to the statewide cost of the

---

[9] While this case is on behalf of a putative class of parolees detained on parole warrants in NYC jails, the defendants have introduced statewide costs into evidence. *See* Defendants' Rule 56.1 Statement ¶ 54. When factoring in the savings from providing release hearings for alleged parole violators detained in local jails in New York's remaining 57 counties, the annual cost savings for taxpayers could be significantly larger. *See* Barber Decl. ¶13.

release hearings, release hearings would significantly reduce taxpayer costs. The public would save an estimated $92,404,726 in the first year and $102,701,011 in each subsequent year if the Board provided release hearings. *See* Barber Decl. ¶ 15. Adding in the estimated savings for localities across the state would only increase the net savings. Ultimately, while costs may be shifted from local governments to the State, there can be no dispute that the addition of release hearings will not drain the public's scarce fiscal resources. *See, e.g., ODonnell v. Harris Cty., Texas*, 251 F. Supp. 3d 1052, 1145 (S.D. Tex. 2017) (explaining that "while Pretrial Services might incur some additional costs in supervising those who are now detained on a secured money bail they cannot pay, those costs are far less than the costs of detention. The issue is not added costs, but, more precisely, shifted costs"), *aff'd as modified*, *ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018).

As for the impact that a release hearing would have on the public's administrative resources, affording parolees a meaningful opportunity to be heard on their suitability for release will inevitably impose some administrative burden. But these are ordinary burdens that the Board is accustomed to providing in other contexts, and such burdens cannot outweigh the due process rights of people on parole. *See Fuentes v. Shevin*, 407 U.S. 67, 92 n. 22 (1972) (finding that a "hearing always imposes some costs in time, effort, and expense, and it is often more efficient to dispense with the opportunity for such a hearing. But these rather ordinary costs cannot outweigh the constitutional right."). Given the important constitutional concerns presented in this case, the government's administrative convenience should be subordinated to preventing inappropriate

detention[10] *Williams v. Illinois*, 399 U.S. 235, 245 (1970) (holding that constitutional imperatives "must have priority over the comfortable convenience of the status quo").

\* \* \*

As demonstrated above, the balancing of the private interests, risk of erroneous deprivation, and public interests, *see Mathews*, 424 U.S. at 335, requires that the plaintiffs be provided with release hearings to prevent their erroneous detention and that this Court enter judgment as a matter of law for the plaintiffs.

## II. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE THE FACTS MATERIAL TO THEIR ARGUMENTS ARE DISPUTED.

As argued above, the plaintiffs are entitled to summary judgment because, even accepting the defendants' disputed facts as true, their interests cannot outweigh the valuable liberty interest of parolees, the high risk of erroneous deprivations of that interest, and the significant value of additional process. Even if that were not the case, however, the defendants cannot meet their burden on summary judgment because the facts material to their arguments about the fiscal burden of additional process are disputed. *See* Plaintiffs' Responses to Defendants' Rule 56.1 Statement ("Facts") ¶¶ 21-23, 28-34, 42-45.

The defendants' estimated costs for providing custody release hearings are overstated in several respects. *See* Facts ¶¶ 21-23, 28-34, 42-45. First, as part of the cost of providing notice, the defendants claim that they would need to hire new independent investigative staff to conduct

---

[10] Given that the federal government and numerous other states evaluate people accused of parole violations for release pending their final revocation hearings, the Board's administrative inconvenience derived from providing release hearings cannot be deemed overly burdensome. *See, e.g.*, FED. R. CRIM. P. 32.1(a)(6); N.J. STAT. ANN. § 30:4-123.62(g) (West 2019); 37 PA. ADMIN. CODE § 71.3(10) (West 2020); CAL. PENAL CODE § 3000.08 (West 2017).

investigations, write reports concerning a parolee's suitability for release, and serve those reports.[11] *See* Defs.' Mem. Of Law at 12-13. But parole officers are already required to investigate alleged parole violations and write reports that include *all* of the information the Board relies on to assess a person's public safety risk before the parole warrant is issued.[12] *See* DOCCS Directive No. 9050 at 5-7 (Ex. B to Desgranges Decl.); *see also* DOCCS Directive No. 9051 at 3-5 (Ex. C to Desgranges Decl.); O'Brien Decl. ¶ 6. Second, the defendants admitted that there are currently two downstate ALJ vacancies that they did not factor into their calculation of the number of judges needed for release hearings. Tomlinson Dep. 99: 20-25; 106:4-8. As a result, the defendants did not take into account that if fully staffed they would only need one new ALJ, rather than three, to conduct release hearings. In total, removing the costs of two ALJs and the investigative staff eliminates $6,920,213 from the defendants' annual costs, making the State's annual cost for providing release hearings $25,388,376 not including its one-time cost of $10,296,285 in the first year. *See* Barber Decl. ¶ 14(a)-(c).

Finally, the defendants' claim that every person released pending their final revocation hearing must be supervised at the highest risk level, and therefore the highest cost, is not supported by the record. Defs.' Mem. of Law at 16-17. Defendants' provide no justification for not tailoring supervision levels to the individualized risk of each person, *see* Muhammad Decl. ¶ 37, thus, it is disputed that these costs should be included in the defendants' estimate. *See* Facts ¶¶ 42-45.

---

[11] To the extent the Board seeks neutral investigators because it believes its parole officers are unfairly biased, it cannot credibly argue that its pre-warrant public safety review process adequately protects the conditional liberty interests of parolees.

[12] The same information the Board relies on to find someone a public safety risk in its pre-warrant review process can thus be included in the Board's notice to parolees and in any report to ALJs. Given that the Board has all this information in the pre-warrant stage, the Board can serve notice at the conclusion of a preliminary hearing or when the parolee has waived the hearing. *See* Facts ¶ 29.

**III.    THIS SUIT SHOULD NOT BE DISMISSED AGAINST THE GOVERNOR BECAUSE HE HAS DEMONSTRATED SOME CONNECTION WITH THE ENFORCEMENT OF THE CHALLENGED BOARD REGULATIONS.**

Governor Cuomo seeks to have this suit dismissed against him on the basis of the Eleventh Amendment because he claims the exception to sovereign immunity for state officers does not apply to him. *See* Defs.' Mem. of Law at 23-25. Under *Ex Parte Young*, a state official may be a "defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional" as long as the official has "some connection with the enforcement of the act." 209 U.S. 123, 157 (1908); *see also In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372-73 (2d Cir. 2005) ("So long as there is such a connection" between the state officer and enforcement of the act, "it is not necessary that the officer's enforcement duties be noted in the act"). By virtue of his declaration of a disaster emergency, and his subsequent executive orders and directives pursuant to his disaster emergency authority, Governor Cuomo has assumed control over the enforcement of the Board's regulations during the coronavirus pandemic. *See* Executive Orders 202 (Declaring a Disaster Emergency), 202.76 (Continuing Temporary Suspension and Modification of Laws through Dec. 19, 2020); *see also* Annucci Decl. ¶¶ 4, 5, 6 (attached as Ex. A to Desgranges Decl.).[13] Since assuming this disaster emergency authority, Governor Cuomo has suspended the enforcement of regulations governing the parole revocation process and has directed DOCCS to release people detained on parole warrants. *See id*. Thus, Governor Cuomo has "some connection with enforcement" because he has assumed authority over enforcement of the Board's regulations and demonstrated a willingness to use this authority.

---

[13] Governor Cuomo's executive orders are publicly available here: https://www.governor.ny.gov/executive-orders

**CONCLUSION**

For the foregoing reasons, the plaintiffs respectfully request that the Court deny defendants' motion for summary judgment, grant plaintiffs' cross motion for summary judgment, enjoin defendants' mandatory detention scheme, and order the defendants to provide the plaintiffs with the following process: (1) a prompt hearing where the people detained on a parole warrant have an opportunity to be heard on their suitability for release and to rebut the Board's justifications for detention; (2) notice of when the Board will conduct this hearing and the reasons supporting the Board's request for detention; (3) a neutral decision-maker, which can be an administrative law judge; and (4) if detention is required, an explanation as to why and the evidence relied on, either on the record or in writing.

Dated: November 20, 2020         Respectfully submitted,
       New York, N.Y.

/s/ Philip Desgranges
Philip Desgranges
Corey Stoughton
The Legal Aid Society
199 Water Street
New York, NY 10038
212-577-3367
pdesgranges@legal-aid.org
cstoughton@legal-aid.org

Daniel R. Lambright
Molly K. Biklen
Christopher T. Dunn
NEW YORK CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
dlambright@nyclu.org
mbiklen@nyclu.org
cdunn@nyclu.org

*Attorneys for Plaintiffs*