UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FREDERICK ROBERSON, on behalf of himself
and all others similarly situated,

$\qquad$ Plaintiffs,

-against-

ANDREW M. CUOMO, Governor of New York,
in his official capacity and
TINA M. STANFORD, Chairperson of the New
York State Board of Parole, in her official capacity

$\qquad$ Defendants.

No. 20 Civ. 2817 (CM)

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT, AND AMENDING THE CAPTION IN THIS ACTION[1]

McMahon, C.J.:

In this case, named plaintiff Frederick Roberson and the putative class ("Plaintiffs") filed suit against Defendants Andrew M. Cuomo, Governor of the State of New York, and Tina M. Stanford, Chairperson of the New York State Board of Parole (the "Board") (collectively, "Defendants" or the "State") challenging the constitutionality of New York's regulations for the detention of parolees who are awaiting final parole revocation hearings due to alleged violations of the conditions of their release. The parties have cross-moved for summary judgment. (Dkt. Nos. 57, 65.) This Court previously denied Plaintiffs' motion for a preliminary injunction (Dkt. No. 33); familiarity with that decision is presumed.

---

[1] This case was original brought by Michael Bergamaschi and Frederick Roberson as a class action. (Compl., Dkt. No. 1.) A notice of suggestion of death was filed as to Mr. Bergamaschi September 17, 2020. (Dkt. No. 56.) The Court hereby orders that the caption be amended by removing Mr. Bergamaschi as a party plaintiff.

For the reasons outlined below, Defendants' motion is GRANTED, and Plaintiffs' cross motion is DENIED.

## BACKGROUND

*New York's Parole Revocation Procedures*

Parole is an alternative method by which a prisoner may complete his or her sentence. Admission to parole does not terminate a prisoner's sentence; "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972). These conditions restrict a parolee's activities substantially beyond the ordinary restrictions imposed by law on an individual citizen. *Id.* at 478. A parole officer has the power to enforce the conditions of parole by revoking parole and returning the parolee to prison, but to do so, the officer must comply with minimum due process procedures, which the Supreme Court set forth in *Morrissey*: a preliminary hearing by someone other than the parole officer to confirm the existence of probable cause of a violation, and a final revocation hearing. Along with a majority of states, New York detains alleged parole violators pending their final revocation hearing if the parole warrant is not lifted at the preliminary hearing stage.

Not every violation of parole results in revocation. Before a decision is made to issue a parole violation warrant, the New York State Department of Corrections and Community Supervision ("DOCCS") conducts a thorough examination and evaluation of the alleged parole violation, including an assessment of the risk to the community posed by the parolee's release.[2]

---

[2] These facts are drawn from the declaration of Timothy O'Brien, the Director of Internal Operations for Community Supervision ("Community Supervision") with the DOCCS. (O'Brien Decl., Dkt. No. 59.) Plaintiffs quibble with Mr. O'Brien's testimony – not based on any inconsistencies, lack of credibility, or countervailing evidence, but based solely on their reading of DOCCS directives, New York Codes, Rules, and Regulations, and New York Executive Law. (*See* Pls.' Response to Defs.' Rule 56.1 Statement and Counterstatement of Additional Material Facts ("Pls.' Facts") at ¶¶ 1-6, Dkt. No. 71.) Such quibbling does not create a genuine dispute of fact as to Mr. O'Brien's testimony about what in fact occurs during DOCCS's parole revocation process.

This initial assessment is made by the parolee's parole officer, with the involvement of a Senior Parole Officer and the Bureau Chief in DOCCS's Community Supervision Unit. They evaluate factors including the nature of the conduct giving rise to the alleged violation; the nature of the parolee's underlying offense; the parolee's criminal history; the parolee's history of compliance or non-compliance with conditions of supervision; and the supervision level assigned to the parolee under the Correctional Offender Management Profiling for Alternative Sanctions ("COMPAS") assessment tool. They also consider whether there is an opportunity to employ graduated sanctions or alterative measures to obtain a positive behavior outcome.

If, after reviewing these factors, the parole officer and his supervisors determine that a parolee's release would not pose a risk to public safety or to the parolee's health and welfare, or if they conclude that graduated sanctions or another alternative measure might result in a positive behavior outcome, the Senior Parole Officer does not issue the parole violation warrant. Otherwise, with the Bureau Chief's approval, the Senior Parole Officer will issue the parole warrant. Only if the alleged violation consists of a new criminal arrest, an alleged violation of law, or absconding from supervision may the Senior Parole Officer issue a warrant without the Bureau Chief's approval. N.Y. Exec. Law § 259-i(3)(a)(i); 9 N.Y.C.R.R. § 8004.2.

If a parole warrant issues, the parolee is arrested. As outlined at length in this Court's earlier opinion, the Executive Law and the New York Code of Rules and Regulations require that notice of the charged violation be given to the parolee within three days of initial detention. Unless the parolee has been convicted of a new crime, s/he has the right to a preliminary hearing before a hearing officer who has had no prior supervisory involvement over the alleged violator. That preliminary hearing must take place within 15 days following execution of the parole warrant. At the preliminary hearing, the hearing officer determines whether there exists probable cause that a

violation of release "in an important respect" has been committed. The parolee has the right to appear and to present witnesses and evidence on his behalf, as well as the right to confront and cross examine witnesses. The hearing officer must prepare a written decision stating the reasons for the determination and citing to the evidence on which the decision was made.

If the hearing officer finds that there is no probable cause to believe the parolee violated one or more conditions of release in an important respect, the officer must dismiss the violation charges and release the parolee back to supervision. If there is a finding of probable cause – either by determination at the preliminary hearing or the parolee's waiver of the right to a preliminary hearing – a final revocation hearing is scheduled to occur within 90 days.

Every parolee has the right to be represented by counsel at a final revocation hearing, and counsel are assigned to represent indigent parolees. Parolees have the right to compel witnesses to appear at the hearing and provide testimony, the right to subpoena and submit documentary evidence, the right to confront and cross examine witnesses called to testify against them, and the right to present evidence in mitigation for the purpose of being restored to supervision. At the final revocation hearing, an administrative law judge ("ALJ") determines whether or not there is a preponderance of the evidence that the alleged violator violated one or more conditions of release in an important respect. If not, the ALJ must dismiss the violation charges and release the parolee to supervision. If so, the ALJ must revoke the parolee's parole. After parole is revoked, the ALJ may restore the parolee to supervision, place the parolee in a transition facility, or reincarcerate the parolee. *See* N.Y. Exec. Law § 259-i(3)(e).

These procedures were adopted by New York State to comport with the due process requirements announced by the United States Supreme Court in 1972 in *Morrissey*. They have been repeatedly held to provide due process to persons accused of violating parole – an accusation

that, owing to the fact that the parolee is still serving his or her sentence, does not trigger "the full panoply of rights" that attach in the context of a criminal prosecution. *Morrissey*, 408 U.S. at 480.

None of these procedures is challenged as unconstitutional.

Plaintiffs' challenge addresses what happens to the parolee between the finding of probable cause at the preliminary hearing (or the waiver thereof) and the final revocation hearing.

*Plaintiffs' Challenge to Mandatory Detention*

Pursuant to Executive Law § 259-i(3), if a parole officer has probable cause to believe that a parolee has violated the terms and conditions of parole, a warrant may (not must) be issued for temporary detention in accordance with the rules of the Parole Board. However, at the preliminary hearing, if the hearing officer finds that there is probable cause to find that the alleged violator has violated one or more of the conditions of parole "in an important respect," s/he "*shall* direct that the alleged violator be held for further action." 9 N.Y.C.R.R. § 8005.7(a)(5) (emphasis added). Probable cause can be made in one of three ways: it can be determined at a preliminary hearing; will be presumed if the parolee waives a preliminary hearing; or must be found upon presentation of proof that the parolee has been convicted of a new crime while under supervision. The Board will only order a final revocation hearing for a parolee after a finding of probable cause if the parolee is in custody or has absconded. *See* 9 N.Y.C.R.R. § 8004.3(d)(1).

Read together, these regulations mandate detention for all parolees awaiting a final revocation hearing.

Plaintiffs allege that this mandatory detention scheme – which is in force in 30 of the 50 states, and which has been followed unchallenged for over four decades – is unconstitutional. Invoking 42 U.S.C. § 1983 and the Due Process Clause of the United States Constitution, they ask this Court to do what the legislature has thus far not chosen to do – craft some alternative to

mandatory detention, in the nature of a "bail-like" procedure that would require evaluation of a parolee's suitability for release pending the final revocation hearing, at which the parolee would have rights akin to those attendant on a bail hearing, including the right to present evidence to a neutral decision maker, who would have to conclude, in a reasoned decision, in writing or on the record, that the parolee presented a public safety or flight risk in order to justify detention pending the final hearing.

The State contends that, in form and substance, Plaintiffs are alleging that a bail hearing is constitutionally required for parole violators. The Court is hard-pressed to disagree with that assessment, as the standard proposed by Plaintiffs is identical to that for fixing bail when a person is charged with a crime in a federal (but not a state) court.[3] *See* 18 U.S.C. § 3142.

*Procedural History*

Plaintiffs moved for a preliminary injunction on April 6, 2020, shortly after the onset of the COVID-19 pandemic. Defendants did not cross-move for dismissal of the complaint, but urged that the precise question had already been considered and decided, in *Morrissey* and in other cases. *See Galante v. Warden, Metro. Corr. Ctr.*, 573 F.2d 707, 708 (2d Cir. 1977) ("[A] mandatory releasee . . . no longer enjoys the benefit of a presumption of innocence and has no constitutional right to bail."); *see also Calhoun v. New York State Div. of Parole Officers*, 999 F.2d 647, 652 (2d Cir. 1993) ("New York provides procedures for parole revocation that generally satisfy due process.").

---

[3] Unlike the federal standard for bail, the New York standard excludes consideration of the defendant's perceived future dangerousness or risk to public safety. The sole concern of New York's bail law is securing the defendant's return to court when required. N.Y. Crim. Proc. Law § 510.30. If there were probable cause to believe that a condition of parole had been violated, it is likely that detention would result under the New York standard, on the theory that a person who would violate his parole in a significant respect cannot be trusted to return to court. That is not, however, the standard that Plaintiffs propose.

On April 20, this Court issued an opinion denying the preliminary injunction motion ("P.I. Opinion"). (Dkt. No. 33.) I concluded that Plaintiffs had not come close to demonstrating a likelihood of success on the merits, especially in view of their request for a mandatory injunction against the State. However, finding no case (let alone a controlling case) that, *after consideration of the precise question*, rejected Plaintiffs' constitutional challenge to a mandatory detention scheme like New York's, I concluded that the constitutionality of New York's scheme had to be evaluated using the factors discussed in *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) – a case decided four years after *Morrissey* that outlined how to evaluate a procedural due process challenge to "governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." In taking this course, I followed the view of a (bare) majority of the Seventh Circuit in an earlier case that challenged the constitutionality of an identical mandatory detention scheme, *Faheem-El v. Klincar*, 841 F.2d 712, 725 (7th Cir. 1988). I directed the parties to assemble a record that would allow the Court to undertake such an evaluation. (*See* Dkt. No. 39.)

After several months of discovery, the parties cross-moved for summary judgment.

## DISCUSSION

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Victory v. Pataki*, 814 F.3d 47,

58–59 (2d Cir. 2016). Courts must construe the evidence and draw all reasonable inferences in the non-moving party's favor. *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 71–72 (2d Cir. 2016). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Pippins v. KPMG, LLP*, 759 F.3d 235, 252 (2d Cir. 2014) (internal quotation omitted).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (internal citation omitted). "The non-movant then bears the burden of establishing the existence of elements essential to its case, which it would have to prove at trial. If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate." *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (internal citations omitted).

Plaintiffs assert a single cause of action: that Defendants' mandatory detention regulations, actions, and inactions violate the due process rights of people on parole in New York City who are subject to detention pending their final hearing on a parole warrant under the Fourteenth Amendment of the United States Constitution. (*See* Am. Compl. ("AC") ¶¶ 65, 70-71, Dkt. No. 38.) They seek a declaration that these regulations are unconstitutional, a permanent injunction thereof, and an order directing Defendants to conduct "suitability for release" hearings pending the final revocation hearing. (*Id.* at 23.)

In a suit brought to enforce procedural due process rights, "a court must determine (1) whether a [liberty or] property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011)

(citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002)). In this case, as discussed below, there is no dispute that one enjoys a limited, conditional liberty interest while on parole. (*See* Defs.' Br. at 22-23, Dkt. No. 62.) Accordingly, this Court is called upon only to determine what process is due.

In *Mathews v. Eldridge* the Supreme Court identified three factors that should be considered in ascertaining what process is due to an individual in a particular circumstance: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. 424 U.S. at 335 (citations omitted).

Due process requires that an aggrieved party be given the right to be heard at a meaningful time and in a meaningful manner. *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). However, "Due process does not, in all cases, require a hearing before the state *interferes* with a protected interest, so long as 'some form of hearing is [provided] before an individual is finally deprived'" of that interest. *Nnebe*, 644 F.3d at 158 (alterations and emphasis original) (quoting *Brody v. Vill. of Port Chester*, 434 F.3d 121, 134 (2d Cir. 2005) (quoting *Mathews*, 424 U.S. at 333)). "*Mathews* is the test for both when a hearing is required (i.e., pre- or post-deprivation) and what kind of procedure is due." *Nnebe*, 644 F.3d at 158 (quoting *Brody*, 434 F.3d at 135). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (quoting *Morrissey*, 408 U.S. at 481).

Balancing the *Mathews* factors in light of the evidence presented by the parties, Defendants have the better of the argument.

## I.      A Parolee's Private Liberty Interest is Limited

The parties agree that the private interest at issue is the liberty interest of an alleged parole violator. They also agree that the Supreme Court has held that this liberty interest is a limited one: "not . . . the absolute liberty to which every citizen is entitled, but only . . . the conditional liberty properly dependent on observance of special parole restrictions." *Morrissey*, 408 U.S. at 480.

As this Court noted in its decision denying Plaintiffs' motion for a preliminary injunction, the issue of bail (or something like bail, such as pre-hearing release) for alleged parole violators was not before the Supreme Court in *Morrissey*. However, the *Morrissey* court expressly blessed a "parolee's continued detention and return to the state correctional institution pending the final decision" where there was "probable cause to hold the parolee for the final decision of the parole board on revocation" – *i.e.*, "whether there is probable cause to believe [the parolee] has committed a parole violation." 408 U.S. at 487. Only Justice Douglas, in a dissent joined by none of his colleagues, asserted that "the parolee is entitled to the freedom granted a parolee until the results of the hearing are known and the parole board—or other authorized state agency—acts." *Morrissey*, 408 U.S. at 500 (Douglas, J., dissenting in part). That is simply not the law.

Additionally, the length of time that alleged parole violators are mandatorily detained after probable cause is found is not excessive. That, too, diminishes the liberty interest asserted by Plaintiffs in this case, because a limited "possible length of wrongful deprivation" narrows an already conditional liberty interest. *See Mathews*, 424 U.S. at 341.

"The possible length of wrongful deprivation of benefits (also) is an important factor in assessing the impact of official action on the private interests." *Id.* (internal alterations omitted) (quoting *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975)). Plaintiff Roberson brings this class action on behalf of those "detained pending their final hearing." (AC ¶ 65.) As explained above, alleged parole violators only proceed to a final hearing where this is a finding of probable cause – either

at a preliminary hearing, or because the parolee waives such a hearing. Thus, this lawsuit concerns only the period of detention between the date of the preliminary hearing[4] and the final hearing itself.

Under New York's regulations, a parolee's period of pre-hearing detention is limited to a maximum of 90 days by statute. That is a relatively short period of time. And New York pretty much adheres to that number; the average period of mandatory detention for all parole violators in New York City in 2019 was 90.77 days, regardless of the nature of their alleged violation.[5] While 90 days is three months – longer than the two months that the Supreme Court blessed in *Morrissey*, 408 U.S. at 488 – Plaintiffs declined the Court's invitation to amend their complaint to assert a claim that mandatory detention of more than two months (as opposed to all mandatory detentions before a final hearing) was unconstitutional. No such claim is being asserted in this case.

For many alleged paroled violators – especially those who, according to Plaintiffs, would be more amenable to pre-hearing release – the mandatory detention period is even shorter. In 2019, 62% of parolees were jailed on a parole warrant for what DOCCS refers to as a "technical" violation – conduct that violates the conditions of release, but that is not separately charged as a crime. Examples of "technical" violations include missing scheduled sessions with the parole officer, failing to attend mandated substance abuse programming, or communicating with victims of the parolee's crimes. The evidence shows that, in 2019, the average length of incarceration for parolees detained in New York City jails pending a final revocation hearing for "technical"

---

[4] A narrow category of putative class members is not entitled to a preliminary hearing: those who have been convicted of a misdemeanor while on parole that causes the parole violation (because the misdemeanor conviction establishes probable cause). (*See* AC ¶ 21.)

[5] This calculation is based on the average daily population and average length of stay of people charged with technical parole violations and pretrial detainees with parole violations tied to a new arrest in the Mayor's Office of Criminal Justice's 2020 Report. (Dkt. No. 68-2.)

violations was 63 days (two months) (Pls.' Facts ¶ 94) – precisely in line with the two month period that the Supreme Court viewed as tolerable in *Morrissey*. 408 U.S. at 488.[6]

When a parole violation is tied to a new arrest, as is the case in 38% of parole warrants, the average period of detention before the final hearing is longer – 136 days. But where there is probable cause to believe that a new crime has been committed, an alleged parole violator is less likely to assert credibly that s/he poses no danger to society or risk of flight – the two conditions that Plaintiffs want New York to apply in assessing amenability to pre-hearing release.

In any event, it is clear that the detention of parolees between their preliminary and final hearings is time-limited – *de jure*, for 90 days; *de facto*, on average, 91 days; and in cases of so-called "technical" violations, just 63 days.[7]

So the private interest under the first *Mathews* factor is a limited conditional liberty interest, and the "possible length of wrongful deprivation" is brief under Defendants' mandatory detention scheme. With the private liberty interest properly framed, it is apparent that the first *Mathews* factor tips slightly – but only slightly – in favor of Plaintiffs.

## II. There is No Material Risk of an Erroneous Deprivation of a Parolee's Conditional Liberty Interest Under New York's Existing Parole Revocation Procedures, and No Probable Value of Adding a "Bail-Like" Proceeding

Both the State and the parolee have an interest in avoiding the erroneous revocation of parole. *Morrissey*, 408 U.S. at 484; *see U.S. ex rel. Carson v. Taylor*, 540 F.2d 1156, 1161 (2d Cir.

---

[6] Significantly, the *Morrissey* court noted that "confinement" meant that the parolee could no longer "be gainfully employed" and was not "free to be with family and friends and to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482. As Plaintiffs argue, those same collateral harms result from the temporary loss of liberty attendant on pre-hearing detention. Yet the Supreme Court suggested, in the face of Justice Douglas's dissent, that this temporary loss of freedom *pendente lite* did not violate a parolee's liberty interest without due process.

[7] Plaintiff Roberson was incarcerated for two months. (*See* Roberson Decl. ¶ 5, Dkt. No. 66.) Putative class member Samuel Murphy was rearrested on February 12, 2020 and had a final hearing scheduled for March 27, but was released prior to his final hearing pursuant to a mass writ of habeas corpus. (*See* Murphy Decl. ¶¶ 4, 6, Dkt. No. 67.) Murphy was arrested on another parole warrant on August 20, 2020 and had his final parole hearing on September 20. (*Id.* ¶¶ 10, 12.)

1976). Thus, they also share an interest in avoiding the erroneous detention of alleged parole violators. However, Defendants' current procedures pose only a 1.5% risk of erroneous deprivation, and Plaintiffs' proposed bail-like "suitability for release" hearing does not include any additional procedure that would further mitigate that risk.

### A.    There is A Very Low Incidence of Erroneous Deprivation

The undisputed data submitted by Defendants establishes that erroneous probable cause findings – which lead to erroneous mandatory detention pending a final hearing – are rare under existing procedures. During the 12-month period between March 1, 2019 and February 29, 2020, the Bureau of Adjudication issued 3,334 final revocation hearing decisions in cases where a preliminary hearing was held and a finding of probable cause was made. Of those cases, only 51 (or 1.5%) resulted in none of the charged violations being sustained at final hearing. (Defs.' Rule 56.1 Statement ("Defs.' Facts") ¶ 55, Dkt. No. 61 (citing O'Brien Decl. ¶¶ 12-13, Dkt. No. 59)); *see* Pls.' Facts ¶ 55 (facts undisputed).) In other words, 98.5% of the time, where probable cause was found at a preliminary hearing, at least one of the alleged parole violations was sustained at the final hearing. Only in 1.5% of cases was probable cause found at the preliminary hearing, but no violation was sustained after a final revocation hearing. Even that is only arguably "error," since probable cause of a parole violation at the preliminary hearing is judged by a lesser evidentiary standard than is applied at a final revocation hearing, at which a violation must be proved by a preponderance of the evidence.

### 1.    "Revoke and Restore" Determinations are not "Errors"

Plaintiffs do not dispute the accuracy of these numbers. Nonetheless, they urge that there is an erroneous deprivation of liberty in a far higher percentage of cases. They base this argument on the premise that a parolee whose parole is revoked after a final hearing was detained "in error" if s/he is restored to release rather than being reincarcerated.

I reject that premise.

The source of this argument is the following statement in the (bare) majority opinion of the Seventh Circuit, sitting en banc, in *Faheem-El*:

> These "errors" essentially fall in two categories. First, even if a parolee violates parole, not all violations result in revocation. Statistics calculated by the Board indicate that from 1982 to 1986, between 5% and 11% of parolees . . . did not have their parole revoked. Second, not all parolees are found to have violated parole at the final revocation hearing.

841 F.2d at 726.[8]

I disagree with this statement. As far as this Court is concerned, an "*erroneous* deprivation" within the meaning of *Mathews* occurs only when the State mandatorily detains an alleged parole violator who is ultimately found not to have violated any of the conditions of his or her parole. Deprivation is not "erroneous" if any charge is sustained at a final hearing. Every finding of a parole violation necessarily means that the parolee failed to abide by at least one of the conditions on which his or her liberty was contingent. No one who violates parole has, from the moment the violation is committed, a *right* to be at liberty – there is no presumption of innocence that disappears only upon conviction. Ergo, temporary incarceration pending a final hearing could not possibly have worked any constitutional liberty interest violation if, at that final hearing – as is true in 98.5% of cases – some violation of parole is sustained.

Plaintiffs' position is that the decision of an ALJ to restore a parole violator to supervision after sustaining a violation renders pre-hearing incarceration "erroneous." With respect, that is wrong. If detaining a parolee as to whom there exists probable cause to believe that s/he has committed a parole violation were constitutionally suspect, Justice Douglas's position in *Morrissey* would have triumphed. It did not.

---

[8] Justice Douglas would have agreed with that assessment; his eight *Morrissey* colleagues obviously would not have so agreed.

While that alone should end the argument, Plaintiffs insist that there must be error in detaining someone who is restored to parole after a violation is sustained, because an ALJ cannot "revoke and restore" without making a finding that the parolee poses no risk to public safety. But that is an assessment of future risk, made at the time of the final revocation hearing.

This argument is also logically fallacious, because a person under sentence after conviction of a crime who cannot or will not follow the rules presents a danger to society without more. The Supreme Court said as much in *Morrissey*:

> The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty. Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is *a risk that they will not be able to live in society without committing additional antisocial acts*.

408 U.S. at 483 (emphasis added). This risk gives the State "an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole." *Id.* In other words, regardless of the risk a parolee poses going forward after a final revocation hearing, the predicate act – the violation of parole, which there is probable cause to believe the parolee has committed (and which, in almost every case, s/he has in fact committed) – carries with it a risk that the parolee cannot continuing living in society without threatening public safety by not following the rules.

Nor does the decision to "revoke and restore" necessarily mean that the adjudicated parole violation was not serious enough to warrant reincarceration. Just as "time served" can be an appropriate sentence after conviction of a crime, it can be an appropriate sentence for a parole violation. Any time served prior to a final revocation hearing is considered in determining the ultimate sentence to be imposed for the violation. Service of time pending a final revocation hearing is a matter in mitigation; and as the *Morrissey* court held, "The parolee must have an

opportunity to be heard and to show, if he can, that . . . if he did [violate the conditions of parole], that circumstances in mitigation suggest that the violation does not warrant revocation." 408 U.S. at 488. But the *Morrissey* court obviously believed that the moment at which such mitigating evidence became relevant for due process purposes was at the final revocation hearing – not at or near the time of a finding of probable cause. *See id.* at 487–88.

Plaintiffs argue that alleged parole violators who are ultimately returned to supervision are subject to a "perverse" practice of being deprived of more liberty before the charges against them are sustained than afterwards. (Pls.' Br. at 12). For this proposition they rely on *Mental Hygiene Legal Service v. Spitzer*, No. 07-cv-2935, 2007 WL 4115936, at *14 (S.D.N.Y. Nov. 16, 2007), *aff'd sub nom. Mental Hygiene Legal Services v. Paterson*, No. 07-5548-cv, 2009 WL 579445 (2d Cir. Mar. 4, 2009).

But *Mental Hygiene* is factually and logically inapposite. In *Mental Hygiene*, the plaintiffs, who had *completed* their sentences for sex offenses, were detained pending a post-sentence civil commitment hearing – not because they had committed some new offense or violated any condition of release, or even because they were found to be dangerous, but because they may have some sort of mental abnormality that requires civil management. *See id.* at *1, *11. Because their sentences had been fully served, they had an absolute liberty interest, not a conditional one. The *Mental Hygiene* court found it "perverse" that an individual who had completed his sentence on parole could be incarcerated pending a hearing on whether or not he needed continuing outpatient community treatment. *See id.* at *14.

Here, by contrast, Plaintiffs are still serving their sentences, so they are at all times subject to reincarceration. They are detained pending the final parole revocation hearing because there is probable cause to believe that they have violated the conditions of their early release – the very

conditions on which their conditional liberty depends – and to have done so "in an important respect."

## 2. COVID-19 Discretionary Releases Are Irrelevant

Plaintiffs also attempt to use COVID-specific numbers to illustrate that alleged parole violators have been erroneously detained. I find this evidence to be irrelevant.

Plaintiffs point to alleged technical parole violators who were released under an emergency directive to empty jails in response to the COVID-19 pandemic. Under this discretionary review, the Board determined that many could be released because they did not pose an "undue risk to public safety." (Annucci Decl. ¶ 4, Ex. 2, Dkt. No. 75-1; *see also* DOCCS COVID-19 Rep., Dkt. No. 75-6.) Thus, they argue, to the extent the Board considers a parolee's public safety risk prior to issuing a warrant, that process is not sufficient to meet due process.

This argument presumes that the decision to release parolees who pose no "undue risk to public safety" in the midst of a global health crisis equates to a finding that these parolees would be deemed safe for release in normal times, when state and national lockdowns have not closed businesses and significantly restricted travel, and when the threat of the rapid spread of an infection against which there is no defense does not loom over those in custody and the staff at those facilities. Many considerations have been altered by the health hazards of the pandemic. The parole violators who were released as a result of the pandemic were not released because of any constitutional liberty interest that they enjoyed; it was a matter of institutional grace during an unprecedented crisis.

Moreover, this argument is based on the same flawed premise discussed above: that the interim detention of a parolee who does not pose an "undue risk" to public safety has been "erroneously" detained. As explained above, this Court believes that the only error based on the conditional interest defined in *Morrissey* is the detention of a parolee whose violation of the

conditions of parole cannot be established by a preponderance of the evidence. Thus, these data are irrelevant to the Court's inquiry into whether any parolees were erroneously detained pending their final hearing.

In sum, the undisputed evidence establishes that there is very little risk of an erroneous deprivation of a parolee's limited and conditional liberty interest when detained pending a final revocation hearing. Plaintiffs have failed to present relevant evidence to the contrary.

**B.       No Probable Value of Bail-like Hearing**

*Mathews* also requires this Court to consider "the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards. Central to the evaluation of any administrative process is the nature of the relevant inquiry." 424 U.S. at 343 (citations omitted).

1.       The Pre-Mandatory Detention Procedures are Fair and Reliable

The procedures afforded an alleged parole violator by New York State prior to parole revocation are robust. In *Morrissey*, the Supreme Court recognized that, when the conditions of parole are violated, "the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole." 408 U.S. at 483. This public safety interest does not entitle a state to revoke parole – to deprive an individual of "conditional liberty," *id.* at 480 – without "some informal procedural guarantees," *id.* at 483. But New York affords due process protections that were fashioned shortly after *Morrissey* and in full conformity with the dictates of that decision. Ergo they are both fair and reliable.

New York reviews parole violations before a warrant issues, and only detains parolees pending a final hearing upon a finding of probable cause that the parolee has violated a condition of parole in an important respect. The *Morrissey* court assumed that "the parolee is arrested and

detained, usually at the direction of his parole officer," and due process required only that "some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available" – *i.e.*, the preliminary hearing. 408 U.S. at 485.

New York's pre-warrant review process exceeds the pre-warrant process envisioned by the *Morrissey* court. This process ensures that a warrant only issues after a determination is made that a parolee poses a risk to public safety or to his or her own health, and that lesser corrective measures will not suffice. Moreover, such a warrant, issued by a Senior Parole Officer, and often only with the approval of a Bureau Chief, only permits the detention of an alleged violator for 15 days, until a preliminary hearing can be held (or waived).

Plaintiffs attack the pre-warrant review process as one-sided, and therefore, unfair. But this process is more robust than arrest and detention "at the direction of [a parolee's] parole officer," because it also involves a Senior Parole Officer and a Bureau Chief – there are multiple layers of pre-arrest review.

Plaintiffs also argue that the pre-warrant review process is the *only* process afforded parolees before they are detained for 90 days. That is, of course, not true; there is a preliminary hearing, unless the parolee himself or herself waives it. Plaintiffs dismiss this because public safety is not considered at that stage; the only consideration is whether there is probable cause to believe that the parolee has violated one or more conditions of his or her release in an important respect. (*See* Pls.' Br. at 19.)

But this argument assumes the answer Plaintiffs want the Court to reach: namely, that parolees have a constitutional right to an assessment of risk to public safety. It also fails to take into account the fact that any parole violation carries with it an inherent risk to public safety,

because of the risk that the parolee cannot continuing living in society without obeying the rules that condition his or her liberty. *See Morrissey*, 408 U.S. at 483; *see also* Part II.A., *supra*. If no probable cause is found, the parole violation warrant is dismissed, and the parolee is released from jail. If there is probable cause to believe a parolee failed to abide by the conditions of release – the condition on which a parolee's liberty depends – the relevant danger to society (the danger inherent in any non-compliance with conditions) is established at a level sufficient to warrant the parolee's detention pending a final revocation hearing. And the risk that that decision will turn out to be erroneous is small to the vanishing point, because the evidence tells us that the final hearing almost always results in a finding that some violation occurred.

The existing procedures that proceed the detention of a parolee pending a final revocation hearing accord with *Morrissey* and are fair and reliable.

### 2.   Plaintiffs' Proposed Additional Safeguards Add No Value

Plaintiffs propose the additional safeguard of a bail-like "release suitability hearing" to mitigate the risk of detaining parolees who do not pose a public safety risk. Specifically, they assert that due process requires:

> (1) a prompt hearing where the people detained on a parole warrant have an opportunity to be heard on their suitability for release and to rebut the Board's justifications for detention; (2) notice of when the Board will conduct this hearing and the reasons supporting the Board's request for detention; (3) a neutral decision-maker, such as someone from the Board not involved in the decision to arrest and detain the parolee; and (4) if detention is required, an explanation as to why and the evidence relied on, either on the record or in writing.

(Pls.' Br. at 15.) As explained in Plaintiffs' earlier briefing, they consider the following considerations relevant to a parolee's suitability for release: the seriousness of the alleged parole violation, the parolee's likelihood of returning for the final hearing (*i.e.*, flight risk), and whether the parolee poses a public safety risk. (*See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. at 20, 24-25; Dkt. No. 19.)

While Plaintiffs' proposed procedures may result in the release of more parolees, they do not serve to prevent the only relevant error – mandatory detention of a parolee who has not in fact violated a condition of release.

As the Supreme Court acknowledged in *Mathews*, "procedural due process rules are shaped by the risk of error inherent in the truthfinding process." 424 U.S. at 344. In other words, the value of additional procedural safeguards is dependent on their ability to enhance truthfinding and minimize error. The bail-like hearing Plaintiffs propose would do neither.

As this Court has made abundantly clear, the only liberty interest Plaintiffs seek to protect is the conditional liberty interest of parolees as defined in *Morrissey*; and the only error this Court is concerned with is the State's mandatory detention of an alleged parole violator who is ultimately found not to have violated any of the conditions of parole. A parolee's suitability for release – which Plaintiffs have couched in terms of flight risk and public safety risk – has little to no bearing on whether s/he violated a condition of parole. "There can be a substantial difference between the determination that there is probable cause to believe a condition of parole has been violated (the issue at the preliminary revocation hearing) and a determination that an individual should be detained pending his or her final revocation hearing." *Faheem-El*, 841 F.2d at 725. In other words, the "process" Plaintiffs assert is "due" to parolees whose liberty interest is conditioned on their compliance with parole rules does not track that condition. Thus, it adds no value to the relevant inquiry, which is whether a parolee violated parole.

Plaintiffs also argue that release hearings would add "value" because they would avoid disruptions to a parolee's life and rehabilitation. Plaintiffs' expert, Mr. David Muhammad, opines that these disruptions can threaten public safety.[9] This policy argument has nothing to do with the

---

[9] Defendants argue that Mr. Muhammad's opinion that mandatory detention is "likely resulting in more crime, not less," (Muhammad Rep. at 9, Dkt. No. 69), is so devoid of a scientific basis and lacking in the "reasonable degree of

"process" parolees are due before they are detained, and therefore, is not relevant to the second *Mathews* factor. Any potential indirect positive externalities that may result if, as a result of this process, more alleged parole violators were released would only be relevant – if at all – to society's interest under the third *Mathews* factor. *See* Part III.A., *infra*.

Defendants have established by undisputed facts that there is only a *de minimis* risk of erroneous deprivation of the relevant liberty interest. There is no evidence that the proposed release suitability hearings would add value the existing procedures. Thus, the second *Mathews* factor weighs strongly in favor of Defendants.

## III.   The Government's Interest In Mandatory Detention *Pendente Lite* is Substantial

The third *Mathews* factor requires this Court to consider the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. 424 U.S. at 335. Mandatory detention serves the State's substantial interest in public safety and Plaintiffs' proposed release hearings would impose a significant burden on the State.

### A.   The State Has An Interest in Protecting the Public From Persons Who Do Not Comport Their Behavior with the Conditions of Their Parole

As the Supreme Court noted in *Morrissey*, the State has a strong public interest in ensuring that persons who are released on parole comply with the conditions of their release, and in protecting society from those who will not. The Supreme Court concluded that "the State's interests are several." *Morrissey*, 408 U.S. at 483. Specifically:

> The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty. Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts. Given the previous conviction and the proper

---

certainty" required of expert witnesses that it should be stricken. (*See* Defs.' Mot. to Strike, Dkt. No. 80.) As I am not persuaded by his arguments, there is no need to strike the testimony.

> imposition of conditions, the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole.

*Id.* It was for that reason that the *Morrissey* court stated, albeit in *dicta*, that at the preliminary hearing, "the [hearing] officer should determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation. *Such a determination would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision*." 408 U.S. at 487 (emphasis added).

This State interest is far from speculative. Parolees are still serving sentences following their conviction for crimes. Indeed, "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id.* at 477. Unfortunately, many parolees prove themselves incapable of following the rules to which they are subject as a condition of their provisional liberty.

Data tracked by DOCCS's Division of Program, Planning, Research & Evaluation (the "DOCCS Table") shows that 23,275 inmates were released on parole and into community supervision during the calendar year 2016. (*See* Ex. A to O'Brien Decl., Dkt. No. 59-1.) Within 3 years of their release, 45% of this cohort (10,592 parolees) violated their parole and had one or more parole violation sustained against them at a final hearing. As mentioned above, where a parole violation is sustained, the ALJ must revoke the parolee's parole. The DOCCS Table shows that for the 10,592 parolees whose parole was revoked, there were 16,260 revocations within 3 years.[10]

At the final revocation hearing, after the ALJ sustains a violation and revokes parole, s/he must then determine the appropriate punishment – send the parolee back to prison ("revoke and

---

[10] As Plaintiffs correctly point out, there were 16,260 revocations for only 10,592 paroles, which necessarily means that many of the 10,592 parolees had their parole revoked more than once over the 3-year period.

return to prison"), or immediately restore the parolee to supervision ("revoke and restore"). The DOCCS Table shows how many of the 16,260 revocations were held within 1, 2, and 3, years of release, and how many of those revocations resulted in "revoke and return to prison" versus "revoke and restore."

- 46% of revocations (7,476) occurred within just one year of release on parole. The punishment for 6,118 of those 7,476 revocations was a return to prison after the final revocation hearing.

- Another 33% of revocations (5,345) occurred during the second year of release, and the punishment for 3,837 of that cohort included a return to prison.

- Another 21% of revocations (3,439) occurred during the third year of release, and the punishment for 2,442 of these included a return to prison.

In short, over the three-year period following their release on parole, over 76% of the final hearings for this cohort resulted in a return to prison.

Beyond noting an arithmetic error in Defendants' original conclusions from the DOCCS Table, Plaintiffs' remaining arguments all derive from their contention that those who commit "mere," "simple," "minor" "rule violations" (by which Plaintiffs mean "technical" parole violators) pose no danger to the public. But this contention flies in the face of *Morrissey*, common sense, and the undisputed evidence.

First and foremost, "technical" does not mean "simple" or "minor." Those words are not synonymous. "Technical" violations encompass a host of dangerous conduct, such as absconding, failing to appear, or communicating with victims of the parolee's crimes.

Second, there is no evidence that New York mandatorily detains anyone who is accused of anything that could be deemed "simple" or "minor." The evidence suggests that DOCCS's pre-warrant review process weeds out any truly trivial violations before a parole warrant issues, or includes them only in a warrant that alleges multiple violations.

Certainly named plaintiff Frederick Roberson was not violated for anything simple or minor; he was charged with failing to complete his drug treatment program, failing to notify his parole officer of a change in his treatment program status, and alleged drug use, among other things. Roberson admitted in his moving declaration that he stopped attending his drug treatment program and relapsed. (*See* Roberson Decl. ¶ 4, Dkt. No. 66.)

Putative class member Samuel Murphy has been arrested for violating his parole twice since 2020. Both times, he failed to return to his approved residence, violated his curfew, changed his residence without approval, and failed to report. (*See* Murphy Decl. ¶¶ 4-5, 8-10, Dkt. No. 67.)

Plaintiffs may think these are merely minor rule violations; this Court does not. I say before as I have said previously: the mere fact that there is probable cause to believe a parolee has failed to comport with the conditions of his or her release presents a compelling reason to detain the parolee pending a final revocation hearing – especially in light of the statistics showing the frequency (98.5%) with which alleged violations are sustained after a preliminary hearing. Plaintiffs' argument to the contrary flies in the face of *Morrissey*, wherein the Supreme Court expressly held that "conditions of parole . . . prohibit, either absolutely or conditionally, behavior that is deemed dangerous to the restoration of the individual into normal society." 408 U.S. at 478.

But in addition to breaking the rules, the commission of such violations makes it difficult for the parole officer to keep track of the individual, to assess progress and compliance, and to fulfill the necessary counseling and oversight function that were recognized by the Supreme Court as being extremely important to the parole process and society's interest in the successful rehabilitation of parolees. *See Morrissey*, 408 U.S. at 478, 484. It is easy to see why DOCCS considers these behaviors as violations "in an important respect." If there is probable cause to believe that a parolee is refusing to engage in rehabilitative endeavors like drug treatment, or is

staying out after curfew and not obtaining necessary permissions before engaging in certain behaviors, s/he is engaged in behaviors that are the antithesis of successful reintegration into an orderly society.

There is, therefore, no question that the State has a strong public safety interest in preventing persons who are released on parole and who violate the conditions of their release from remaining in society pending their final parole hearing. For that very reason, a parolee's liberty interest is always subject to revocation – whether permanently, as in *Morrissey*, or for a limited period of time pending their final hearing, as here – as long as the State provides "some informal procedural guarantees." *Morrissey*, 408 U.S. at 483.

In this case the procedural guarantees Defendants provide – DOCSS evaluation prior to issuing a warrant, a preliminary hearing within 15 days, and a swift final revocation hearing – are robust. They are designed to minimize any interruption in a parolee's life (1) in the highly unlikely event that s/he did not actually violate the conditions of parole, and (2) in the event that "time served" seems to the ALJ an appropriate sentence for a proven violation. But at the same time, they serve Defendants' interest in public safety.

Plaintiffs focus on the robustness of the first of these procedural guarantees: the pre-warrant evaluation of whether a parolee has violated parole "in an important respect." As explained at length above, *see New York Parole Revocation Procedures*, *supra* at pp. 2-5, DOCCS takes great care to issue parole violation warrants only to parolees who pose a risk to public safety or their own health and welfare. The pre-warrant review process is expressly tied to the State's interest in promoting public safety. As. Mr. O'Brien declared under penalty of perjury, DOCCS considers the level of risk a parolee's release poses to public safety or the parolee's health and welfare, and

the Senior Parole Officer will only issue a warrant where there is a determination that the parolee poses a risk to the public or her/himself. (O'Brien Decl. ¶¶ 1, 5.)

Plaintiffs' objection to Mr. O'Brien's testimony on this point (*see* n.2, *supra*) fails to create a genuine issue of material fact. They challenge whether the consideration of public safety in the pre-warrant review process necessarily establishes that detained parolees are public safety risks. But Plaintiffs do not challenge the veracity of Mr. O'Brien's declaration. They merely point out that pre-warrant review does not require a *specific* level of risk to proceed with issuing a parole warrant, and that the primary purpose of the pre-warrant review is to determine if a parolee has violated a condition of release. (*See* Pls.' Facts ¶ 1.)

Contrary to Plaintiffs' assertion, the pre-warrant review process involves more than a "generalized notion that a person presents some degree of potential danger." It also requires an assessment that graduated sanctions or another alternative measure would not result in a positive behavior outcome for the specific parolee. *Cf. Mental Hygiene*, 2007 WL 4115936, at *12. Plaintiffs' objection is no more than "some metaphysical doubt" about what the Board considers during its pre-warrant review, which "will not defeat an otherwise properly supported motion for summary judgment." *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotations and citations omitted).

Having failed to discredit the State's interest in public safety, Plaintiffs argue that mandatory detention of alleged parole violators negatively impacts public safety because it unnecessarily jeopardizes a parolee's reintegration into society. But this argument only works if one assumes the conclusion Plaintiffs are required to prove, which is that mandatory detention is unnecessary. It is not possible to make that assumption.

There is no dispute that reincarceration may substantially disrupt a parolee's life. But, as explained above, the very types of "technical" violations that Plaintiffs consider trivial are violations of rules that are designed specifically to assist with the reintegration of parolees into a law-abiding life in the wider society. When there is probable cause to believe that those rules have been violated – which means that there is probable cause to believe that the parole violator is not successfully reintegrating – it is entirely appropriate for society to protect itself, via temporary and short-term detention *pendente lite*, from the possibility of further disruption. If the data showed that parole warrants supported by probable cause were routinely dismissed following a final revocation hearing – or even dismissed in a significant percentage of cases – the parolee's limited conditional liberty interest would doubtless weigh more heavily in comparison to this societal interest. But the data show the contrary: parolees accused of violations supported by probable cause at the preliminary hearing are found to have violated their parole in some significant respect 98.5% of the time. Mandatory detention occurs only when there is a near certainty that parole has been violated.

Defendants have established, by undisputed evidence, that their current procedures serve the government interest in public safety – both when expressly considered at the pre-warrant review stage, and when considered by way of the probable cause determination that a parolee violated a condition of release at the preliminary hearing stage. This aspect of the third *Mathews* factor weighs strongly in their favor.

### B.   The Administrative and Fiscal Burden of Providing "Bail-Like" Hearings Would be Immense

Plaintiffs contend that the burden of holding their proposed "bail-like" hearings would be slight. Indeed, they argue that this determination could and should be made "at or near" the time

of the preliminary hearing that the State already affords to parolees, and suggest that this would entail no burden at all. (*See* Muhammad Rep. at 9.)

Plaintiffs are wrong.

The procedure proposed by Plaintiffs as constitutionally required would require the State both to expand the scope of the preliminary hearings it already holds and to hold an additional 11,000 or so hearings that are today not held because a large percentage of alleged parole violators waive their right to a preliminary "probable cause" hearing. Between March 1, 2019 and February 29, 2020, 14,392 parolees were detained pending a final hearing. 10,679 of those parolees – nearly 75% – waived their right to a preliminary hearing. As a result, the "bail-like" hearings that Plaintiffs seek could not be held in the context of a preliminary hearing before a preliminary hearing officer. Pre-hearing release reviews would require a new type of hearing for every detainee – not just those who elected to demand a preliminary hearing – at a new facility, staffed with new personnel.

The cost of holding an additional 10,679 hearings a year is far from negligible. The State estimates the costs of conducting release hearings for all of the nearly 14,400 alleged parole violators per year:

(a) $9.8 million in Year 1 to cover the cost of providing notice of such hearings and $8.6 million in each subsequent year. This number includes not only the cost of providing notice of the time and place of the hearing – an amount that has to be negligible, since this information could be included in the notice that outlines the charges against the parolee – but also the cost of preparing and providing the parolee with notice of the evidence that will be used to argue that s/he represents a flight risk or presents a danger to the community. Such evidence (which the State believes would take the form of reports) is not now prepared. Nearly all of this cost is attributable to the additional staff that would be required to evaluate parolees for possible pre-hearing release and prepare reports and recommendations addressing that issue; it includes salary, benefits and facilities, as well as associated costs (including interpreters, information technology and training).

(b) $12.8 million in Year 1 to cover the cost of conducting the additional hearings, and $12 million during each subsequent year. This includes the cost of hiring 15 Administrative Law Judges, 2 supervising Administrative Law Judges, 56 Community Supervisors and other DOCCS hearing-related personnel – $8.76 million in salary, benefits and other pay alone. It includes approximately $3.1 million per year for additional court reporters, interpreters, transportation, information technology, security equipment, travel expenses and supplies. It also includes the cost of finding, furnishing and maintaining additional hearing facilities for the DOCCS Downstate Region, where the principal hearing facility – the Donald Cranston Judicial Center on Rikers Island – is already operating at maximum capacity. The State estimates that the Bureau of Adjudications would need to conduct 5,121 new hearings for the Downstate Region alone, and these hearings would have to be held somewhere other than the Judicial Center on Rikers Island. The new facilities would cost nearly $842,000 in the first year, with annual costs of nearly $83,000 thereafter.

(c) Additionally, there would be new costs associated with the supervision of alleged parole violators released pending their final revocation hearing. Without knowing how many parolees would be "bailed," the State cannot quantify the exact cost: assuming a 5% release rate it is estimated to be between $800,000 and $850,000 per year; assuming a 25% release rate the cost would escalate to something like $4.7 million per year.

(d) Finally, the State would need to find additional facilities in which to conduct final revocation hearings for released parolees, as nearly all such hearings are currently held at the local correctional facilities where alleged parole violators are detained. The additional cost of conducting final revocation hearings for released parolees – whose hearings could not take place in jails – would include over $7.9 million in one-time costs to acquire and set up new hearing facilities and anywhere from $3.5-7.1 million (depending on the release rate) in annual costs to maintain those facilities and hire additional hearing officers and staff.

In short, the cost of implementing the proposed "bail-like" hearings would be enormous, ranging from $34.9 million to $42.6 million, depending on the release rate.

Plaintiffs have no real answer for these numbers; they fail to raise a genuine dispute of material fact – the *material* fact being that holding bail-type hearings for every person who is accused of violating parole would run into the tens of millions of dollars each year. Plaintiffs do bring three challenges to Defendants' cost estimates, but none is persuasive and none would lead to a substantial cost reduction if it were persuasive.

*First*, Plaintiffs challenge the cost of additional investigative staff to prepare reports about an alleged parole violator's suitability release. They argue that any costs spent towards an additional investigation would be redundant because parole officers are already required to investigate parole violations and document information that would be relevant to assessing risk to public safety in their Violation of Release Reports pursuant to DOCCS Directives 9050 and 9051.

But the reports that parole officers prepare in accordance with these directives contain no evaluation of either risk or flight or danger to the community; there is no evidence in the record that parole officers ever evaluate flight risk – one of the essential factors to be considered at the "bail-like" hearing Plaintiffs insist is constitutionally required. Yes, the parole officer, rather than some new DOCCS investigative officer, could expand her investigation and report under Directive Nos. 9050 and 9051 to comprehend these "bail" factors; but the added burden of that additional work would necessarily mean that DOCCS would require additional parole officers. The cost of training someone – parole officer or investigator – to research and evaluate these factors (factors that are investigated and evaluated by specially trained Pre-Trial Services Officers in the Federal criminal system) will always exist. The State may have overestimated that cost to the dollar, but Plaintiffs do not suggest that this cost would be anything but significant. Plaintiffs' argument based on their reading of the DOCCS directives does not create a genuine dispute of fact.

*Second*, Plaintiffs argue that the State could hire two fewer ALJs because it failed to account for two downstate ALJ vacancies. But that argument misreads the uncontradicted testimony of Chief ALJ Rhonda Tomlinson, who stated that the Adjudication Bureau needs to fill the two existing vacancies just to handle the current revocation hearings, before taking into account the additional workload of the proposed custody release hearings. (Tomlinson Dep. at 99, Dkt.

No.77-1.) Moreover, even if Plaintiffs were right, the cost of two fewer ALJs is trivial in comparison to the overall cost of the process that Plaintiffs ask this Court to impose on the State.

*Third*, Plaintiffs disagree with Defendants' assertion that every released parolee would need to be supervised at the highest level of supervision. (*See* Pls.' Facts ¶ 42.) Mr. Muhammad opines that the "best practice" used by other jurisdictions is to tailor the supervision level to the parolee's case. (*See* Muhammad Decl. ¶ 37.)

That, however, is not a decision for Plaintiffs or this Court to make. If there is probable cause to believe that someone has violated parole – whether probable cause was found at the preliminary hearing or in light of a new conviction, or is presumed because the preliminary hearing was waived – there is reason to believe that s/he cannot follow the terms of parole. That being so, DOCCS could well conclude, in an exercise of its administrative discretion, that the alleged parole violator – *who is not presumed innocent* – would require supervision at a high level. Mr. O'Brien testified that, as a matter of public policy, such supervision is necessary. (O'Brien Decl. ¶ 27.) The fact that Plaintiffs' so-called expert's judgment differs from Mr. O'Brien's is irrelevant. DOCCS and DOCCS alone is entitled to make the policy determination about the level of supervision of alleged parole violators released pending a final hearing, and that determination need not conform to Mr. Muhamad's view of what "best practices" might be.

In short, while Plaintiffs may not agree with Defendants about the precise cost of these additional hearings, they cannot and do not seriously contest that new hearings would be costly. The Court considers it established without contest that the cost would run into the tens of millions.

Plaintiffs' principal rebuttal to Defendants' cost argument on the third *Mathews* factor is not that the cost estimates are inaccurate, but rather, that any costs incurred from the release hearings are far outweighed by cost savings from incarcerating fewer parolees.

It is undisputed that the all-in annual cost of incarcerating someone in New York City jails in 2019 was $337,524. (*See* "Defs.' Resp." at ¶ 114, Dkt. No. 78.) Using that number, and a plug number of 400 parole violators who are incarcerated at any given time, Plaintiffs' witness Jesse Barber estimates that the City would save $135 million per year if that number of parole violators were released pending their revocation hearings. Since the State's highest estimate of the out of pocket cost of holding release hearings is a mere $42.6 million, Plaintiffs argue that the third *Mathews* factor tips decidedly in favor of the parolees and against Defendants. Specifically, Plaintiffs urge that the government has an interest in "conserving scarce fiscal and administrative resources," which weighs in favor of hearings that would promote release. *See Mathews*, 424 U.S. at 348.

Defendants criticize Plaintiffs' numbers for a variety of reasons. They argue that Barber's calculation is unreliable because the 400 number was chosen arbitrarily and has no basis in reality.[11] They point out that the State would incur additional administrative costs – costs that cannot be quantified – in addition to the out of pocket costs of holding hearings, thereby makes its estimate of the actual cost of those hearings far too low.

I take it as a given that it will generally be more expensive to incarcerate a person than to release that person, even at a high level of supervision. The data in the record in this case certainly confirm that proposition. So if a comparison between the out of pocket cost of keeping alleged parole violators in jail versus the cost savings from releasing them were an important issue for consideration, Plaintiffs would have a point.

---

[11] Defendants note that this number is based solely on the number of parolees released through the *ad hoc* review procedures adopted in response to the COVID-19 pandemic, which, as explained above, used a materially different standard than the standard that would apply at a custody release hearing.

This Court does not believe that such a comparison is determinative of – or even particularly relevant to – an assessment of the third *Mathews* factor. But I do not reach this conclusion for the reason advanced by Defendants.

As Defendants point out, since 2009, the cost of custodial care for alleged parole violators who are housed in local jails has been borne entirely by local governments, without any contribution or reimbursement by the State. It is an unfunded mandate not borne by the State of New York. As a result, Defendants urge that the State will save no money by releasing accused parole violators *pendente lite*; all savings will be realized by local governments. This allegedly renders Plaintiffs' comparative cost argument irrelevant. Defendants also note that the case on which Plaintiffs principally rely for the proposition that inter-governmental cost-shifting needs to be taken into account in assessing the third *Mathews* factor – *ODonnell v. Harris County, Texas*, 251 F. Supp. 3d 1052, 1145 (S.D. Tex. 2017), *aff'd as modified*, 882 F.3d 528 (5th Cir. 2018), *and aff'd as modified sub nom. ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018) – does not involve shifting costs between different levels of government at all, but rather intra-governmental cost shifting among various departments within a single municipality.

I very much doubt whether the taxpayers of the State of New York – who are also the taxpayers of the several municipalities located within the State of New York – give a fig about which level of government is paying the cost of incarcerating alleged parole violators. They, the taxpayers, are on the hook for those costs, whichever municipality or agency ends up paying them.

But while I do not find Defendants' argument persuasive,[12] *Harris*, properly read, suggests that cost-shifting, wither intra- or inter-governmental, has no relevance when evaluating the third *Mathews* factor.

In *Harris*, the plaintiffs challenged the constitutionality of Harris County's cash bail system on the ground that it failed to protect the rights of poor persons accused of misdemeanors. *See* 251 F. Supp. 3d at 1133–34. The district court applied the *Mathews* balancing test to determine what process was due. It concluded that the first two *Mathews* factors favored the plaintiffs: misdemeanor defendants had a private interest in release from custody before trial, and the risk of erroneous deprivation of their liberty by imposing secured money bail was high. It then turned to the third *Mathews* factor – the Government interest. *See id.* at 1143–44.

The Harris County defendants argued that alternatives to detaining misdemeanor arrestees on secured financial conditions would be prohibitively expensive. The Harris County Director of Pretrial Services Kevin Banks testified that it would cost pretrial services $30 million annually to adopt the relief the plaintiffs sought – a number that vastly exceeded the county's pretrial services budget of $7.5 million. *See id.* at 1144. The district court concluded that this testimony was "far from credible" and involved numerous erroneous assumptions that "greatly overstated the costs," most particularly because Mr. Banks did not estimate the costs the county would save by detaining fewer people for shorter periods, which outweighed the added costs of supervising released arrestees. *See id.* at 1145. As a result, the district court concluded that the third *Mathews* factor also favored the plaintiffs, and entered a preliminary injunction barring the County from detaining indigent defendants who were otherwise eligible for release but who could not afford to post bond.

---

[12] For one thing, it is arguable that the localities are acting as agents of the State when temporarily incarcerating State prisoners pending parole revocation hearings, which would cause their costs – unfunded though the mandate be – to be attributable to the State.

The terms of the injunction required the County to verify an arrestee's ability to pay a secured financial condition of release by an affidavit and hold a bail hearing within 24 hours after a misdemeanor arrest. Based on the affidavit, an indigent defendant could only be held on an unsecured personal bond with nonfinancial conditions or a secured money bond for which the defendant could afford a commercial surety's premium. *See id.* at 1161–63.

After considerable procedural back and forth on appeal, the Fifth Circuit ultimately vacated the District Court's injunction as overbroad. *ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018). The panel agreed that the County's cash bail procedures violated the plaintiffs' due process rights. *Id.* at 159. But when it came to assessing the government's interest, the Circuit was not interested in comparing the financial burdens of the due process hearings sought by plaintiffs against cost-savings that would result from releasing larger numbers of misdemeanor arrestees as required by the district court's injunction. That issue played no part in the Court of Appeals assessment of the third *Mathews* factor. Instead, the Court of Appeals noted that the government's interest in efficiency was "particularly important," and said, "The sheer number of bail hearings in Harris County each year—according to the court, over 50,000 people were arrested on misdemeanor charges in 2015—is a significant factor militating against overcorrection." *Id.* In light of this government interest – its interest in efficiency in light of the large number of misdemeanor arrests – the Circuit concluded that the numerous procedural protections required by the district court required were too onerous. *See id.* at 160. While agreeing that some relief in favor of the plaintiffs was warranted, the Fifth Circuit remanded the case so that the district court could tailor its injunction more narrowly. *Id*. at 166–67.

So far from establishing that the proper way to assess the third *Mathews* factor is to compare the cost of incarceration with the cost of holding "bail" hearings, *Harris*, as ultimately

decided by the Court of Appeals, suggests that comparing the cost of hearings against the cost savings from non-incarceration is not the relevant consideration (or perhaps even a relevant consideration). I suggest that, if the *Harris* court were confronted with this case, it would likely conclude that the sheer volume of new work that would result if Plaintiffs' proposal was adopted – a volume that, as I have already concluded, cannot be gainsaid – cuts in favor of the State when evaluating the third *Mathews* factor. Since in this case, unlike in *Harris*, the second *Mathews* factors also cuts in favor of Defendants, not Plaintiffs, it seems to me that *Harris* actually favors Defendants' position, rather than Plaintiffs'.

In this Circuit, Plaintiffs have found only one case that even mentions the concept of cost savings (not cost shifting) in the context of *Mathews* balancing. And when read carefully that case, too, suggests that Defendants have the better of argument on the third *Mathews* factor.

In *Velasco Lopez v. Decker*, 978 F.3d 842, 845 (2d Cir. 2020), the petitioner, a non-citizen, was detained for fourteen months while removal proceedings were pending against him. After being twice denied bail, he filed a habeas petition challenging the procedures of U.S. Immigration and Customs Enforcement's ("ICE") bond hearings as violative of due process – specifically, that the detainee bears the burden of demonstrating that s/he is not dangerous or a flight risk. *See id.* at 846–48, 849. My colleague, the Hon. Andrew L. Carter Jr., granted his petition and ordered a new bond hearing – one that shifted from the detainee to ICE the burden of proving, by clear and convincing evidence, that the petitioner was not a flight risk or a danger to the community. *See id.* at 848.

The Government appealed from the decision, arguing that the former bond hearing procedures were constitutionally adequate and that the district court erred by shifting the burden of proof. The Second Circuit affirmed the district court's judgment. *See id.* at 846.

The Court of Appeals used *Mathews* balancing to determine whether the petitioner's ongoing incarceration violated due process. *See id.* at 851–56. It noted the detainee's private liberty interest, and said that procedures that placed the burden of proving the detainee was not a flight risk or a danger to the community on the detainee "markedly increased the risk of error" of wrongful detention, since the detainee did not have access to the relevant evidence while the Government did. *Id.* at 851–53. Because months, or even years, ordinarily pass between arrest and the conduct of initial removal determination proceedings, the Second Circuit concluded that individuals *who were subject to prolonged detention* had to be afforded process over and above that provided in an ordinary bond hearing. The Court agreed with Judge Carter that a bond hearing at which the government bore the burden of proof would mitigate the risk of an extended erroneous detention. *See id.* at 854.

Assessing the third *Mathews* factor, the Circuit acknowledged the government's regulatory interest in detaining noncitizens pending their removal proceedings, but found that the government failed to articulate an interest in the *prolonged* detentions of noncitizens like the petitioner, who are neither dangerous nor a flight risk. *See id.* "On the contrary," the Circuit found that "shifting the burden of proof to the Government to justify continued detention promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose." *Id.*

As in *Harris*, the Court of Appeals did not rely on the comparative cost of bail hearings versus incarceration in its discussion of *Mathews* balancing. In fact, nothing about the cost of incarceration appears in the text of the *Velasco Lopez* opinion at all. In a footnote, the court observed that the cost to taxpayers of the petitioner's lengthy detention had already mounted to about $60,000. *Id.* at 854 n.11. But saving that amount was not balanced against any countervailing

cost, as Plaintiffs ask the Court to do here. Rather, the Circuit concluded that shifting the burden of proof at the petitioner's bond hearing – an issue having nothing to do with the cost of either incarceration or a new bond hearing – would neither undermine any legitimate government interest nor entail an undue administrative burden. *See id.* at 854–55.

The reason why the *Velasco Lopez* court mentioned the cost of incarceration is important. It did so only to say that saving the cost of incarceration would promote the government's interest only "in cases where [incarceration] *serves no purpose.*" *Id.* at 854 (emphasis added). The Circuit did not suggest that eliminating the cost of incarceration counterbalanced or outweighed such incarceration "where it advances a legitimate governmental purpose." *See id.*

I have already concluded that the mandatory detention of an alleged parole violator when there is probable cause to believe that a violation of parole has occurred serves a legitimate governmental purpose; it protects society from an individual who has not yet completed his sentence for proven criminal activity, and whose behavior has given rise to reason to believe that he cannot comply with the one and only condition of temporary liberty – obey all of the rules of your parole. Plaintiffs no doubt disagree that this is a legitimate governmental purpose, or one that prevents any danger to society. But that is why we have courts of appeal.

Significantly, the *Velasco Lopez* court also stated that, the longer detention continued, the greater need for the government to justify its continuation: "*While the Government's interest may have initially outweighed short-term deprivation of Velasco Lopez's liberty interests*, that balance shifted once his imprisonment became unduly prolonged," such that his "prolonged incarceration, which had continued for fifteen months without an end in sight or a determination that he was a danger or flight risk, violated due process." *Id.* at 855 (emphasis added). In other words, the Second Circuit recognized, as did the Supreme Court in *Morrissey*, that the state's interest in temporary

incarceration would outweigh an individual's liberty interest in the short term if there were reason to believe that the individual (who in our case is an alleged parole violator) has committed an infraction that subjected him or her to detention. Only when detention becomes "prolonged" does the calculus shift in favor of the accused.

It bears noting that the "prolonged" detention in Velasco Lopez's case was well more than a year and with no end in sight. In this case, by contrast, the detention of alleged parole violators after a finding of probable cause is not, and cannot be, "unduly prolonged," because New York's Parole regulations mandate that a final revocation hearing be held no more than 90 days after a finding of probable cause or a waiver of the preliminary hearing – which itself can occur no more than 15 days after the alleged violator is arrested on a parole warrant. As noted above, most of the mandatory detentions for technical violations – those that do not involve charges of new criminal activity – last no more than 63 days, a period of time that the Supreme Court in *Morrissey* did not find to be overly burdensome to the alleged parole violator. Even those parolees who are detained because they were arrested for new criminal behavior are mandatorily detained for an average of just four months – not fifteen.

Finally, in parole violation cases, there is always an end in sight, in the form of a final revocation hearing that must be held within a fixed period of time. This is precisely why Plaintiffs here have only a conditional liberty interest of which they can be deprived for only a short period of time. *See* Part I, *supra* at pp. 10-12. The mandatory detention of alleged parole violators under New York's scheme ends well before the balance between the government's interest and the parolee's conditional liberty interest starts to shift in favor of the parolee.

There may be exceptional cases where certain parolees are subject to prolonged detention, perhaps as long as fifteen months like the petitioner in *Velasco Lopez*. But those rare cases have

no relevance here. Plaintiffs challenge Defendants' mandatory detention policy as it applies to *all* parolees awaiting a final hearing, and expressly declined this Court's invitation to challenge the lawfulness of detention beyond 90 days. Global changes to "procedural due process rules are shaped by . . . the generality of cases, not the rare exceptions." *See Mathews*, 424 U.S. at 344. Any such parolees whose period of mandatory detention approaches the length of the detention in *Velasco Lopez* would be well advised to seek habeas relief.

In sum, New York's mandatory detention of alleged parole violators for the relatively brief period between the determination of probable cause and a final revocation hearing serves an important government purpose; is always for a limited period and never "without end in sight"; and turns out to be "erroneous" in a *de minimis* number of cases. The third *Mathews* factor, like the second, tilts decidedly in favor of Defendants. These two factors plainly outweigh Plaintiffs' conditional liberty interest – particularly since there is probable cause to believe that the condition on which liberty hinges has been violated.

All this being so, the detention of alleged parole violators pending their final revocation hearing does not violate due process; nor does due process require the State to conduct bail-like release hearings for these parolees.

*       *       *       *       *       *       *       *       *       *       *

At bottom, Plaintiffs' concerns are rooted in policy, not constitutional entitlement. Those concerns should be voiced to the legislature, not the courts. Just last year, New York enacted a sweeping bail reform that effectively eliminated cash bail for most persons charged with misdemeanors and nonviolent felonies. N.Y. Crim. Proc. Law § 530.20. This change has resulted in considerably more persons being admitted to bail in New York State when charged with crimes that, if committed by a parolee, would also constitute parole violations. This Court is not

insensitive to the irony that a parolee who committed such a crime might not be subject to pretrial detention pending the adjudication of that crime, but would be subject to mandatory detention pending the adjudication of the same conduct if it were charged as a parole violation. But it is not the province of this Court to reconcile this conflict unless the Constitution requires it. The Constitution does not.

Nevertheless, New York may soon provide parolees with bail-like "suitability for release" hearings. As Defendants correctly note, a bill is currently pending before the New York Legislature that would provide Plaintiffs the relief they seek. Indeed, even as this Court was finalizing its opinion, Senate Bill S1144 was assigned a "same as" bill in the Assembly – A5576. In other words, an identical bill about parole revocation is currently pending in both the Senate and the Assembly. That is an early sign that the bill may well pass both houses.

This Court expresses no view on whether or not such a bill would be sound policy. I conclude only that, as a matter of federal constitutional law, New York's mandatory detention of alleged parole violators pending their final revocation hearings does not deprive parolees of their liberty interest as defined in *Morrissey* without due process.

## IV.    The Suit Against Governor Cuomo is Barred under Eleventh Amendment Immunity

There remains one administrative matter to be addressed. Plaintiffs bring this suit against Governor Cuomo in his official capacity and Tina M. Stanford in her official capacity as Chairperson of the New York State Board of Parole. Ordinarily, a suit against a state official in his or her official capacity is deemed an action against the state itself, and Eleventh Amendment immunity applies. *Williams v. Marinelli*, No. 18-1263, 2021 WL 377791, at *6 n.13(2d Cir. Feb. 4, 2021). However, under the *Ex parte Young* exception to state sovereign immunity, state officials may be subject to actions seeking only prospective injunctive relief to prevent a continuing violation of federal law. *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir.

2005) (discussing *Ex parte Young*, 209 U.S. 123, 160 (1908)). "[T]he state officer against whom a suit is brought 'must have some connection with the enforcement of the act' that is in continued violation of federal law." *In re Dairy Mart*, 411 F.3d at 372–73 (2d Cir. 2005) (quoting *Ex parte Young*, 209 U.S. at 154).

Here, Plaintiffs clearly seek prospective injunctive relief. But the parties dispute whether Governor Cuomo has a sufficient connection with the enforcement of the act at issue – the State's mandatory detention scheme under 9 N.Y.C.R.R. §§ 8004.3(d)(1), 8005.7(a)(5) – to qualify for the *Ex parte Young* exception.

Plaintiffs argue that Governor Cuomo has "assumed control over the enforcement of the Board's regulations during the coronavirus pandemic" by declaring a disaster emergency, suspending the enforcement of some parole revocation regulations, and directing DOCCS to review whether parolees detained on technical parole violations or absconding charges could be safely released. (*See* Pls. Br. at 24.) They are wrong.

Connection with the enforcement of an act that is a continuing violation of federal law includes "both a **particular duty to enforce the statute in question** and a demonstrated willingness to exercise that duty." *Citizens Union of City of New York v. Attorney Gen. of New York*, No. 16-cv-9592, 2017 WL 2984167, at *4 (S.D.N.Y. June 23, 2017) (emphasis original) (quoting *Kelly v. New York State Civil Serv. Comm'n*, No. 14-cv-716, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015), *aff'd sub nom. Kelly v. New York Civil Serv. Comm'n*, 632 F. App'x 17 (2d Cir. 2016)).

Governor Cuomo's general duty to execute the laws is not sufficient to make him a proper party. *See id.* To the extent he has played a role in the parole revocation process via executive orders and an emergency directive, it is the Parole Board or DOCCS – not Governor Cuomo – who

have promulgated and enforced all procedures related to the detention (or release) of alleged parole violators. *See Hund v. Cuomo*, No. 20-cv-1176, 2020 WL 6699524, at *5 (W.D.N.Y. Nov. 13, 2020). Moreover, far from *enforcing* the mandatory detention rule, Governor Cuomo's directive led to emergency *exceptions* to this rule. And in any event, as this Court made clear in its P.I. Opinion, Plaintiffs challenge regulations that have been in place for decades, not any pandemic-specific aspect of the parole revocation process like the discretionary release of parolees or delays in their hearings.

Here, New York's executive law expressly provides that the detention of alleged parole violators is regulated by the rules and regulations of the Parole Board. *See* N.Y. Exec. Law § 259-i(3)(a)(i). (*See also* Defs.' Facts ¶ 12.) And it is the Parole Board that has promulgated and enforced the mandatory detention regulations. Thus, while Chairperson Stanford is a proper defendant to this lawsuit, Governor Cuomo is not.

## CONCLUSION

For reasons stated above, Defendants' motion for summary judgment is GRANTED. Plaintiffs' cross motion for summary judgment is DENIED.

This constitutes a written opinion and order of the Court. The Clerk of Court is directed to market the motions at Docket #s 5, 57, 64, 65, and 80 off the Court's list of open motions, to enter judgment for Defendants, and to close this case.

Dated:  March 10, 2021
      New York, New York

                                                   Chief Judge

BY ECF TO ALL PARTIES